RECEIVED

AUG 0 2 2005

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT, LOUISIANA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

A.B. Coker Co., Inc.,　　　　　　　　)
S&M Brands, Inc., CLP, Inc.,　　　　)
Tobacco Discount House #1, Inc.,　　)
and Mark Heacock,　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiffs,　　　　　　)
　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
Charles C. Foti, Jr.,　　　　　　　　)
in his official capacity as　　　　　　)
Attorney General, State of Louisiana, )
　　　　　　　　　　　　　　　　　)
　　　　　　　Defendant.　　　　　　)
　　　　　　　　　　　　　　　　　)

CV05 - 1372 S

CIVIL ACTION FILE NO. _____

JUDGE HICKS

MAG JUDGE HORNSBY

### COMPLAINT

　　　A.B. Coker, Co., Inc., S&M Brands, Inc., CLP, Inc., Tobacco Discount House #1,

Inc., and Mark Heacock (collectively "Plaintiffs") file this Complaint, hereby stating and

alleging the following:

### INTRODUCTION

　　　1.　　This case challenges the Master Settlement Agreement of 1998 (MSA),

through which the four major tobacco companies (the Majors) and the States became

business partners in establishing one of the most effective and destructive cartels in the

history of the Nation.

2.      During the 1990s, state Attorneys General filed dozens of suits against the Majors alleging decades of fraud that cost the States billions of dollars in increased Medicaid expenses.  Faced with the risk of verdicts that could drive them into bankruptcy, the Majors agreed to a settlement that transformed the States from adversaries into business partners.  Thus, the MSA was born.

3.      The MSA is a collective agreement among the state Attorneys General and the Majors that settled virtually all of the state lawsuits against the Majors by giving the States an ongoing share in the tobacco business.  While the MSA disposed of all of the pending lawsuits with the strokes of several pens, States would receive their share of hundreds of billions of dollars in future tobacco revenues if, and only if, they each passed identical laws enforcing a tobacco cartel among the Majors and any other companies that joined the agreement.  With their Attorneys General having already forfeited their legal claims and faced with billions of dollars dangling before them, State legislatures quickly fell in line.  They passed statutes insulating the majors from price competition by imposing new "escrow" payment obligations on any non-participating manufacturer (NPM).  Such escrow payments effectively exceeded the per-cigarette cost to the Majors of the MSA and thus erected barriers to entry and expansion that ensured the Majors would maintain their market shares despite their dramatic price increases to pay off the States.  The settlement of the Majors' massive potential liability thus was converted into a joint cartel under which the States received vast payoffs while the Majors were able to raise their prices well beyond the amount required for those payments.

4.      The result of the MSA was to turn the world on its head.  The Majors, which had allegedly committed fraud and imposed huge costs on the States, were now

the privileged beneficiaries of a national cartel collectively enforced by the States. Current tobacco consumers – some of whom were the direct victims of the supposed fraud by the Majors – were the ones who now had to pay for that fraud through higher prices, while the Majors and their shareholders reaped even greater profits under protection of the States. The States, which had supposedly suffered at the hands of the Majors, were now the biggest stakeholders in their ongoing business, and used the power of government to protect their newfound allies. Non-participating manufacturers, which had never committed any wrongdoing and who had never even been sued, were effectively hamstrung from competing with the Majors and subjected to crippling escrow burdens that had no legitimate government purpose. The winners in this scheme are the Majors and their new business partners, the States. The losers are tobacco consumers, non-participating manufacturers, distributors and dealers who wish to sell the products of such manufacturers, and the federal government, whose lawful authority over national and interstate affairs has been circumvented.

5.     This entire scheme is not only unseemly, it is unconstitutional. The agreement among the States, and with the Majors, constitutes an unapproved interstate compact, which the Constitution expressly forbids. That compact is in express derogation of federal power in that it sets up a competing national entity to govern state conduct and lawmaking, regulates interstate commerce, violates federal statutes forbidding state regulation of tobacco advertising, and undermines the central policies of the antitrust laws. The MSA also restricts the constitutionally-protected speech and petitioning activities of its signatories and interferes with the freedom of association of non-participants.

3

## How the MSA Cartel Was Presented and Implemented Across America

6.      The MSA was entered into on November 23, 1998 between the Majors and the attorneys general of 46 States.  The MSA obligated manufacturers who join it ("Participating Manufacturers") to pay hundreds of billions of dollars to settle lawsuits in Louisiana and other states that accused the Majors of concealing and lying about the harmful effects of smoking, suppressing safer cigarettes, and unlawfully marketing to children.  These payments continue in perpetuity and are estimated at over $200 billion over the first 25 years.  None of the plaintiffs in this action were either parties to those lawsuits or accused of any misconduct.

7.      The MSA was presented as a state-by-state legal "settlement."  In fact, the MSA constituted an interstate compact.  In plain violation of the U.S. Constitution, that compact was never submitted to Congress for its approval.  *See* U.S. Const., Art. 1, § 10.  Moreover, the cartel created by the MSA is a per se violation of the Sherman Act, since it gives participating manufacturers the full, unsupervised discretion to reap monopoly profits throughout an entire interstate industry.

8.      Under the MSA, Participating Manufacturers make a payment based on every cigarette they sell anywhere in the United States.  The resulting sum of more than $200 billion is collected and then apportioned among the States and territories that have joined the MSA ("Settling States") by entities selected by the National Association of Attorneys General and the Majors.

9.      To enable the Participating Manufacturers to make these payments without fear of having their prices undercut by competitors who have not joined the MSA, the MSA requires each Settling State to adopt a Qualifying Statute, which

requires any Non-Participating Manufacturer (NPM) to make an escrow payment for each cigarette it sells.

  10. To enforce the MSA, Settling States such as Louisiana have also enacted laws, called Complementary Statutes, that ban the sale of any cigarette whose manufacturer refuses to make payments under the MSA or Qualifying Statute.  In the process, the MSA and implementing state acts have imposed economic burdens on NPMs, tobacco sellers and consumers and violated their constitutional rights. Those violations are the basis of this action.

<h3 style="text-align:center">PARTIES, JURISDICTION, AND VENUE</h3>

  11. A.B. Coker Co., Inc., is a cigarette distributor that sells cigarettes in this district and division.  It purchases cigarettes from both Participating and Non-Participating Manufacturers.  A.B. Coker is a Kansas corporation.  Its headquarters is located in Lawrence, Kansas, and its principal distribution center is located in Sherman, Texas, closer to this division than to any other division in Louisiana.  Its cigarette sales in this state occur primarily in this district and division.

  12. S&M Brands, Inc., maker of the Bailey's cigarette brands, is a Virginia corporation with its principal place of business in Keysville, Virginia. Founded in 1993, it is in the business of manufacturing tobacco products, including cigarettes.  It is not a signatory to the MSA and thus is an NPM.  But for the obstacles to competition posed by the Qualifying Statute, it would seek to sell cigarettes in Louisiana, including in this district and division.  Louisiana is demographically similar to the southern states in which S&M Brands sells most of its cigarettes, and that is especially true of the Shreveport area.  Prior to the MSA and the Qualifying Statute, S&M Brands grew

5

rapidly, often more than 100 percent per year.   Reflected in its business plan was its intention to sell cigarettes on a national basis.

13.    CLP, Inc., a tobacco manufacturer, is a North Carolina corporation with its principal place of business in Ayden, N.C.   It is a Non-Participating Manufacturer. Because it sells tobacco in Louisiana, it is compelled to make escrow payments pursuant to the Qualifying Statute.  CLP has been approved to sell tobacco in Louisiana since 2003.  It produces Bridgeton cigarettes and several varieties of roll-your-own tobacco (such as Railroad and Southern Harvest).

14.    Tobacco Discount House #1, Inc., a Louisiana corporation, is a retail tobacco store located in Shreveport in this district and division.

15.    A.B. Coker Co. and Tobacco Discount House #1 are forced to pay higher prices for cigarettes as a result of the MSA and implementing legislation. Participating Manufacturers charge them more for cigarettes to finance their MSA payments, while Non-Participating Manufacturers charge them more for cigarettes to make escrow payments.  Moreover, the cartel created by the MSA has enabled the Participating Manufacturers to raise their prices even further without fear of competition

16.    A.B. Coker Co. and Tobacco Discount House #1 are also subject to Louisiana's Complementary Statute, which prohibits the sale of cigarettes whose makers do not make payments.  (La. R.S. §§ 47:843D(2)(f) & 47:843D(3); La. R.S. §§ 13:5071-5077).   If they sell any such cigarettes, they can be criminally prosecuted and jailed, La. R.S. § 13:5076(D)(2), fined $5,000 for each such violation, La. R.S. § 13:5076(A), have their cigarettes seized and destroyed, La. R.S. § 13:5076(B), be sued by the Attorney General, La. R.S. § 13:5076(C), and lose their license to sell cigarettes, La. R.S. § 13:5076(A).  Moreover, the Complementary Statute subjects them to

additional sanctions under other statutes, such as Louisiana's unfair-trade laws (see

La. R.S. 47:843D(3) & La. R.S. § 13:5076(E) (both citing R.S. § 51:1401, et seq.)),

which include lawsuits by competitors (La. R.S. § 51:1409A), actions by the district

attorney (La. R.S. § 51:1417) and Attorney General (La. R. S. § 51:1404B & 1407),

destruction of their cigarettes (La. R.S. § 47:865), injunctive relief, and civil fines of up to

$5,000 per violation.  La. R.S. § 51:1416.

17.    By prohibiting the sale of cigarettes whose manufacturers do not make

MSA or escrow payments, the Complementary Statute reduces the variety of cigarettes

A.B. Coker and Tobacco Discount House #1 can offer to their customers and reinforces

the cartel and high prices resulting from the MSA and Qualifying Statute.    For

example, Tobacco Discount House #1 has been forced to purchase more expensive

cigarettes from Participating Manufacturers because of the difficulties that Non-

Participating Manufacturers face in complying with the Qualifying Statute.

18.    Mark Heacock is a citizen of Louisiana and a resident of Shreveport

who smokes and purchases cigarettes primarily in this district and division, and who has

had to pay artificially high prices for his cigarettes as a result of the cartel created by the

MSA and implementing legislation, such as the Qualifying Statute and the

Complementary Statute.   The interstate reach of the MSA also increases the price of

cigarettes he purchases while traveling in non-MSA states, such as Texas.

19.    Charles Foti, Jr. is the Attorney General for the State of Louisiana and is

charged with enforcing Louisiana's Qualifying Statute and the Master Settlement

Agreement within Louisiana.  His predecessor, Richard Ieyoub, signed the MSA.  Mr.

Foti is sued in his official capacity.

20.    Plaintiffs seek declaratory and injunctive relief, pursuant to 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2, to prevent the defendant from enforcing the MSA as well as Louisiana's Qualifying Statute and Complementary Statute, which implement the MSA.

21.    Jurisdiction is proper in the United States District Court for the Western District of Louisiana pursuant to 28 U.S.C. §§ 1331, 1343(a), 1367, 2201, and 42 U.S.C. § 1983.

22.    Venue in this district is proper under 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

### The Lawsuits Behind the Tobacco Settlement

23.    In the mid-1990s, various States (including Louisiana) brought lawsuits against the Majors alleging wrongful conduct in the development and marketing of their cigarettes and seeking costs for medical services provided by the States to smokers. These cases sought to recover Medicaid funds spent to treat diseases alleged to result from use of tobacco products.

24.    Defendant Foti's predecessor as Attorney General, Richard Ieyoub, brought suit against the Majors on behalf of the State of Louisiana on March 13, 1996. *Ieyoub, Attorney General ex rel. State of Louisiana v. The American Tobacco Co., et al.,* 14th Judicial District Court, Calcasieu Parish, No. 96-1209 (La.). The suit sought recovery under an unjust enrichment theory, alleging conspiracy and fraud on the part of the Majors. The suit was later settled as part of the MSA. *See Ieyoub, Attorney General ex rel. State of Louisiana v. Philip Morris, Inc.,* 14th Judicial District Court, Calcasieu Parish, No. 98-6473 (Consent Decree and Judgment, Dec. 11, 1998).

8

## Congressional Rejection of the First Proposed Settlement

25.    In 1997, a precursor to the MSA (the "Resolution") was drafted by a group of attorneys general and the Majors.   The Resolution contained many features in common with the MSA.  Recognizing that the Resolution was, by its terms, an interstate compact, its drafters made it contingent upon congressional approval.  In accordance with the Compact Clause, it was presented to the Congress for ratification on November 5, 1997, as S. 1415.  The bill became the focus of much congressional attention and activity.  It encountered heated resistance on the Senate floor, where it died on June 17, 1998, without ever reaching the floor of the House.  See 144 Cong. Rec. S6481.  A principal objection to the Resolution was that it, like the MSA, would have allowed the Majors to raise their prices to monopoly levels, undermining the federal antitrust laws.  See Federal Trade Commission, Competition and the Financial Impact of the Proposed Tobacco Industry Settlement (Sept. 1997) at ii, v-vi.

## The Revival of the Settlement by the State Attorneys General

26.    After the defeat of the Resolution, several state attorneys general initiated negotiations with two of the major tobacco companies to reach a new national tobacco settlement, this time without involving Congress.  The resulting agreement was completed on November 16, 1998.  The MSA was then released to those attorneys general (such as Louisiana's) who had not participated in the settlement negotiations.  The non-participating attorneys general were given seven days to review its terms and decide whether to join it.

27.    On November 23, 1998, the attorneys general of 46 States (including Louisiana) and the Majors agreed to enter into the MSA to resolve the cases brought by the states.  Four States, Florida, Mississippi, Texas, and Minnesota, made separate,

individual settlements prior to the MSA.  The MSA was also signed by the lead
government attorneys of six territories, such as Puerto Rico and the District of
Columbia, which had also sued.

### The MSA's National Regulatory Scheme

28.    The MSA purports to govern the sale, marketing, and pricing of
cigarettes and other tobacco products across the entire United States.  It cannot be
found in any code or statute book, state or federal.  However, it is available at the
NAAG's website. A copy of the MSA is attached hereto as Exhibit 1.

29.    The MSA provides for annual payments by the Participating
Manufacturers to the Settling States that are based principally on a Participating
Manufacturer's national market share.  See, e.g., MSA, § IX(c), II(mm).  A Participating
Manufacturer's national MSA payment is divided among the Settling States based on a
fixed formula, referred to as the State's "allocable share."  Louisiana's allocable share
is permanently fixed at 2.2553531% of the national MSA payment. See MSA, Exhibit
A.  A Participating Manufacturer must make payments on all cigarettes it sells
throughout the nation, including those it sells within the four non-settling states.

30.    The MSA requires Participating Manufacturers to agree to restrictions
that could not have been imposed constitutionally on tobacco manufacturers by any
state legislature, including bans on advertising and political lobbying, restrictions on
trade association activities, and relinquishment of any legal challenges to state laws
and rules regulating tobacco.  See MSA § III.

### NAAG Supervision of the MSA

31.    The National Association of Attorneys General is charged with enforcing
the MSA.  For example, NAAG "provide[s] coordination and facilitation for the

implementation and enforcement of the Agreement on behalf of the Attorneys General of the Settling States . . . [and]  support[s] and coordinate[s] the efforts of the Settling States in carrying out their responsibilities under" the MSA.  MSA, § VIII(a).  NAAG itself receives $150,000 per year from the Majors to perform that supervisory role.   MSA § VIII(b).   Moreover, NAAG administers the States' Antitrust/Consumer Protection Tobacco Enforcement Fund, established with $50 million from the Majors.  See MSA section VIII(c) & Exh. J.   One purpose of the Fund is to directly enforce and implement the MSA.  MSA, Exh. J.  Another is to pay for the investigation and litigation of suspected MSA violations.  Id.  That includes enforcement of the MSA's Consent Decrees against Participating Manufacturers and its Qualifying Statute against Non-Participating Manufacturers.  Id.   States must notify NAAG in advance of any planned enforcement proceedings, MSA § VII(c)(2), and NAAG coordinates their discovery in such proceedings.  See, e.g., MSA §§ VII(g), VIII(a).  NAAG interprets the terms of the MSA relied upon in enforcement proceedings and provides guidance to state assistant attorneys general and legislators about what action by States is sufficient to comply with their duty to diligently enforce the MSA.

32.     Payments by Participating Manufacturers pursuant to the MSA are made not to individual states, but to a central depository (an escrow agent selected by NAAG and the Majors), from which payments are later made to the Settling States. See, e.g., MSA, Exhibit B.

### The MSA's Creation of a Protected Tobacco Cartel

33.     The Majors accepted the obligations contained in the MSA for two reasons.  First, the Agreement  immunizes them from further liability and damages to the States.  Second, the MSA contains provisions that protect the Majors' dominant

market share and enables them to shift the costs of the settlement to their customers rather than having it borne by their shareholders. The MSA achieved that goal by imposing costs on Non-Participating Manufacturers (NPMs) that are the same as, or greater than, those imposed on parties to the MSA.

34.     Many tobacco manufacturers other than the Majors were coerced into joining the MSA as Subsequent Participating Manufacturers (SPMs) even though they were not named in the lawsuits brought by the Settling States. Those who joined the MSA within a 90-day window from the execution of the MSA were granted an exemption on MSA payments as long as their yearly market shares do not exceed the larger of their 1998 market shares or 125% of their 1997 market shares. See MSA § IX(i). Such SPMs thus share in the monopoly profits generated by the MSA without paying a penny to the Settling States, as long as they limit their sales.

35.     On the other hand, if SPMs increase their sales by selling additional packs of cigarettes, they are required to make a higher MSA payment on each additional pack than the Majors pay on each additional pack they sell. This happens for two reasons. First, an SPM's MSA payment on each additional pack is not fixed but rather rises disproportionately with each additional pack it sells. This is because its MSA payments are a function not only of the number of packs it sells, increasing with each additional pack, but also of the extent to which the SPM takes market share from the Majors, increasing if it gains market share by underpricing them. See MSA IX(i)(1),(4). Thus, the SPM's proportion of the annual payment increases by more than its gain in the proportion of overall market share.

36.     Second, SPMs, unlike the Majors, do not receive the so-called Previously Settled States Reduction, a 12 percent reduction in MSA payments per

12

pack. See MSA §§ IX(c)(1), IX(j), II(kk).  The Majors receive this reduction to offset their payments to the four non-MSA states, which settled with them prior to the MSA (Texas, Mississippi, Florida, and Minnesota).  Unlike the Majors, SPMs do not have their MSA payments reduced even when they, too, are forced to make payments to previously-settled States.  See Minn. Stat. § 297F.24 (Supp. 2003) (singling out SPMs and NPMs for a 46 cent per pack assessment on their cigarette packs).  These MSA provisions were designed to freeze SPMs' market share at no more than their 1997 or 1998 levels, thereby preserving the Majors' dominant position. At the same time, the MSA subjects manufacturers who refuse to join the MSA (NPMs) to a fee for every cigarette sold in the Settling States.  See, e.g., MSA § IX(d) & Exhibit T.

<u>The MSA's Compulsion of State Collaboration</u>

37.    A State can receive MSA payments only by joining the MSA and taking specific actions to bind itself to and enforce the MSA, such as having the MSA entered as a consent decree by a state court. See MSA, §§ VII (enforcement), IX(d)(2) (enactment, diligent enforcement, and full legal defense of qualifying statute), XIII (consent decree), XVIII(I) (best efforts to cause Agreement to become effective).

38.    The MSA establishes a clever scheme to protect the Majors' market power and to compel the states' collaboration in achieving that objective. Section IX(d) of the MSA, the Non-Participating Manufacturer Adjustment (or "NPM Adjustment"), provides that, if one of the Majors loses market share in a particular year, a nationally recognized firm of economic consultants—designated by the MSA as "The Firm"—is to determine whether the restraints imposed on the Majors by the MSA were a significant factor contributing to the market share loss.  If The Firm determines that a Major has

13

lost national market share as the result of the MSA, its payments under the MSA may be reduced by as much as three times its market share loss.  See MSA, § IX(d).  This provides incentives to the Settling States to protect the market share of the Majors.  As Vermont Attorney General Sorrell, Chairman of the NAAG Tobacco Project, admonished officials of the Settling States in a September 12, 2003 memo, "All States have an interest in reducing NPM sales in every State."

39.    Although the NPM Adjustment is based on nationwide loss of market share by the Majors, the reduction in payments it mandates is not borne equally by all States.  Instead, the entire NPM Adjustment is imposed only on those States that fail to comply with its requirement that they pass and diligently enforce a Qualifying Statute protecting Participating Manufacturers from competition from Non-Participating Manufacturers.  If all but one Settling State complies with this Qualifying Statute requirement, then the entire NPM Adjustment would be applied to that one State's MSA payments, and it would lose all of its MSA payments.  See, e.g., MSA § IX(d)(2)(B).  Thus, the MSA effectively commandeers state legislatures to adopt a Qualifying Statute.

40.    The NPM Adjustment is essentially a tax on States that refuse to adopt the Qualifying Statute.  As Richard Ieyoub, defendant Foti's predecessor as Attorney General, observed in his April 8, 1999 testimony before the Louisiana House Judiciary Committee urging the state legislature to pass the Qualifying Statute (HB 1007, 1999 Acts 927), "if we don't pass this [Qualifying Statute] legislation we're going to be taxed by the Non-Participating Manufacturer Adjustment."

41.    To satisfy the Qualifying Statute requirement, a State must pass a statute that "effectively and fully neutralizes the cost disadvantages that the [Majors]

experience *vis-à-vis* [NPM's] within each [MSA State] as a result of the provisions of [the MSA]." MSA § IX(d)(2)(E); see Dec. 11, 1998 Consent Decree in leyoub v. Philip Morris, supra (stipulating that the Qualifying Statute does so in Louisiana). Exhibit T to the MSA provides a "Model Statute" for the Settling States to follow "without any modification or addition" when enacting their Qualifying Statute. In 1999, Louisiana enacted a Qualifying Statute in accordance with the Model Statute. See 1999 La. Acts 721 (H.B. 1007); La. Rev. Stat. §§ 13:5061, 13:5062 & 13:5063. Pursuant to its terms, every tobacco manufacturer selling cigarettes to consumers within Louisiana must either (a) join the MSA and become a Participating Manufacturer, or (b) "place into a qualified escrow fund by April fifteenth of [each] year" a specified amount of money per cigarette sold in the State during the prior calendar year. (The amount is $.0167539 per cigarette in 2003-2006, plus an adjustment for all inflation since December 1998, resulting in a charge of more than $4.10 for every carton sold in 2005. See La. Rev. Stat. §§ 13:5063(c)(1)(d) (payment per cigarette), 13:5063(c)(1) & 13:5062(1) (inflation adjustment), MSA, Exh. C, ¶ 3). The Qualifying Statute provides that the escrowed funds are to remain in escrow unless used to pay a settlement or judgment against the Non-Participating Manufacturer. If not so used, the escrow funds are to be released and revert back to the manufacturer twenty-five years after they were first placed into escrow.

42.    MSA payments are based on the number of cigarettes a manufacturer sells throughout the country – not just in MSA States. Thus, the costs of the MSA are borne by a State's citizens whether or not it joins. Put differently, once the MSA's terms had been negotiated between the Majors and certain attorneys general, *States*

*could opt out of the benefits but not the costs of the Agreement.*    To avoid that
consequence, even states that had never filed suit against the Majors joined the MSA.
Alabama's former Attorney General, who had previously criticized the draft MSA as
unconstitutional and the lawsuits leading to the MSA as a violation of the rule of law,
nevertheless signed the MSA, noting that its provisions effectively compelled him to
sign it.  William H. Pryor, A Comparison of Abuses and Reforms of Class Actions and
Multigovernment Lawsuits, 74 Tulane L. Rev. 1885, 1911 (2000); id. at 1909, 1916-17
(criticizing MSA provisions); Bill Pryor, Litigators' Smoke Screen, Wall St. J., April 7,
1997, at A14.

        43.      Moreover, while the MSA holds any payments to a State hostage to its
legislature's subsequent enactment of the Qualifying Statute, its execution
automatically extinguished a State's legal claims.  That cost Louisiana its lawsuit
seeking recovery of billions of dollars in health care costs from the Majors.  By the time
the Louisiana legislature voted on whether to adopt the Qualifying Statute in April 1999,
it  was too late to do anything about that loss, or the higher prices to be paid by the
State's consumers in perpetuity under the MSA for the benefit of other Settling States
and the Majors.  The legislature was trapped: If it wished to recoup its losses to out-of-
state entities under the MSA, it had no choice but to pass the Qualifying Statute.

        44.      The legislature was compelled to adopt the Qualifying Statute in
precisely the form dictated by the MSA without any change. As the legislative sponsor
of the Qualifying Statute, Rep. Copelin, noted on the House floor on April 15, 1999,
"This bill is a uniform bill. All of the States in the settlement have to have the same bill,
same comma, same dot, same cross on the T.  Please don't try to amend it.  We can't
do that."  "We have to do this" or lose the State's MSA payments.  Similarly, Rep.

LeBlanc observed that "if we do not pass this piece of legislation, then we have $2.9 billion on the line. That is our potential loss -- $2.9 billion." "Each and every state that is a part of this Master Settlement Agreement will have to pass the exact same type of bill."

45.    To forestall a reduction of Louisiana's Allocable Share and for other purposes, defendant Foti and his predecessor in office, with the active involvement and supervision of the NAAG, have enforced the provisions of the MSA and the Qualifying Statute.

46.    The "diligent enforcement" provision of the MSA, see MSA § IX(d), effectively subjects each of the Settling States' sovereign law enforcement powers to the ongoing supervision and "coordination" of an external agency (that is, the NAAG and its tobacco enforcement bodies).   For example, States must work to harmonize their interpretation of the MSA with NAAG, see, e.g., MSA § VII(f), and whether they receive MSA funding to enforce the Agreement and related provisions (such as the Consent Decree and Qualifying Statute) is subject to the total discretion of NAAG. See, e.g., MSA, § VIII(c) & Exhibit J.

47.    Using its ability to construe what constitutes "diligent enforcement," NAAG pressures legislatures to adopt laws extending the reach of the MSA, such as Complementary Statutes. As Rep. Diane Winston observed to NAAG's lobbyist at the Louisiana House Appropriations Committee's June 2, 2003 hearing, "Now we've got our hands tied behind our back.  Because in order to get the payments, we're going to basically be your hostage.  Because whatever you all say, we've got to do or you're going to threaten that we're not going to get the [MSA] payment."

48.     For example, in lobbying for the adoption of NAAG's Model
Complementary Statute, Michael Herring, attorney for NAAG, explained that "[t]he
purpose of this bill [HB 732, which later became law as HB 1112 (2004 Acts No. 544)] is
to assist in Louisiana's diligent enforcement of its escrow statute. . .[I]f a State is found
not to have diligently enforced, that could put the entire State's MSA payment at risk.
That is, Louisiana could potentially lose its entire payment."  His testimony before the
June 2, 2003 hearing of the House Appropriations Committee was echoed by Assistant
Attorney General Arlene Knighten, who similarly testified that the Complementary
Statute was needed for the State to "diligently enforce our Model [Qualifying] Statute
which is a condition of us being able to continue to get our MSA Money."  The enacted
law dutifully recites that it was passed to "aid the enforcement of the Qualifying
Statute." La. Rev. Stat. § 13:5071.

49.     Under the MSA, trial lawyers hired by the state Attorneys General to
assist in suing the Majors received billions of dollars, including more than $500 million
in Louisiana alone. The Louisiana Board of Ethics found that these payments violated
Section 111A(1) of the Code of Government Ethics and fined the trial lawyers
$650,000.  But it declined to require repayment of the fees, citing the fact that the MSA
itself required the unlawful payments, and the fact that the State had no choice but to
sign the MSA if it was to avoid losing billions of dollars.  Opinion # 2000-381 (May 17,
2001).

The Qualifying Statute's Impact on Companies That Refuse To Join the Cartel

50.     The MSA's qualifying statute regulates even cigarette manufacturers
that are neither located in nor sell cigarettes in the Settling States.  As construed by

18

NAAG, the qualifying statute requires even an NPM that conducts no business in a State to make escrow payments measured by the volume of cigarettes bearing its brand that are sold in that State by independent distributors over whom the NPM exercises no control. Under the literal terms of the Qualifying Statute, if an NPM "intends" its cigarettes to be sold in the United States, the NPM is subject to the escrow payment requirement in each state in which its products are sold -- irrespective of how its products find their way into the State, by whom they are sold, or that the NPM did not direct or take part in any sale in that State, and, further, notwithstanding that the NPM might have no property, personnel, or business in such states. La. R.S. § 13:5062(9), (10). While the courts generally construe statutes narrowly to avoid such extraterritorial applications, the Louisiana Attorney General's office, under NAAG's influence, has interpreted the Qualifying Statute broadly as having an extraterritorial reach.

51.    Although the Qualifying Statute purports to equalize the costs of Participating and Non-Participating Manufacturers, escrow payments are in reality more burdensome than MSA payments. In contrast to MSA payments, escrow payments are not tax-deductible. Moreover, NPMs cannot take advantage of various MSA payment limits, such as a grandfather clause shielding Subsequent Participating Manufacturers that limit their market share from making any MSA payments. See, e.g., MSA § IX(i). Nor can they seek refunds of their escrow payments to the extent that those payments exceed what they would have paid the State under the MSA; a provision sponsored by NAAG forbids that. See 2003 Acts 925 (HB 731). Finally, state Attorneys General construe the statute to require NPMs to enter into a model escrow agreement, drafted by NAAG, which prevents them from reaping any meaningful interest on their escrow

payments. Escrow account fees have exceeded interest for many of S&M's escrow accounts. The red tape involved in complying with the Qualifying Statute and Complementary Statute makes it very costly and risky for NPMs to sell cigarettes in multiple States, much less expand into new markets, and discourages distributors and dealers from even carrying NPM cigarettes.

52.    Unlike Participating Manufacturers, the plaintiff manufacturers have not been subject to a complaint by Louisiana or been found liable to Louisiana; nor have they entered into any settlement with Louisiana. Prior to the Master Settlement Agreement, the plaintiff manufacturers did not even sell tobacco products in Louisiana. They have not been accused of the wrongful conduct committed by Participating Manufacturers which resulted in the MSA and the consent settlement with Louisiana. Thus there is no basis for assuming that the plaintiff manufacturers are likely to be found liable for greater damages than the Participating Manufacturers during the next 25 years and the Qualifying Statute includes no such finding.

53.    The Qualifying Statute's purpose, design and effect is to coerce the plaintiff manufacturers and other Non-Participating Manufacturers into joining the MSA. If Non-Participating Manufacturers do not join the MSA, the Qualifying Statute punishes them for their non-agreement by imposing greater financial burdens on them than they would have shouldered under the MSA.

54.    The purpose, design and effect of the Qualifying Statute is to prevent Non-Participating Manufacturers from competing against Participating Manufacturers, thereby preserving the market shares of Participating Manufacturers and the payments received by the Settling States under the MSA.  This anticompetitive purpose is further demonstrated by a new law in which Louisiana singled out Participating Manufacturers

for an appeals bond cap for which no other litigant is eligible, "in order to secure and protect the monies to be received as a result of the Master Settlement Agreement." See 2001 Acts No. 669 (HB 1807), La. Rev. Stat. § 38:98.6.

55.    The Complementary Statute also is designed to discourage competition from NPMs. NAAG's tobacco chairman, Sorrell, exhorted state officials in September 2003 to enact such "complementary legislation" to stem "the proliferation of NPM sales" and thus avoid "reductions in tobacco settlement payments."

**COUNT I:**
**THE MSA AND THE QUALIFYING STATUTE**
**VIOLATE THE COMPACT CLAUSE OF**
**THE UNITED STATES CONSTITUTION**

56.    Each and every allegation contained in the preceding paragraphs is incorporated herein by reference.

57.    The Constitution provides that "[n]o State shall, without the Consent of Congress . . . enter into any Agreement or Compact with another State."

58.    The MSA is an "Agreement or Compact" among the States for purposes of the Compact Clause of the Constitution of the United States. Article I, § 10.

59.    Contrary to the plain requirement of the Compact Clause, the MSA has not been submitted to or approved by the Congress.

60.    The MSA establishes a complex national tax and regulatory scheme that directly regulates interstate commerce, even beyond the borders of the Settling States. In so doing, it encroaches on the prerogatives and supremacy of the federal government, enlarges the political power and influence of the Settling States collectively

21

at the expense of the federal government and the non-settling States, and reduces the autonomy and sovereignty of individual States.

61.    The MSA is especially troubling for purposes of the Compact Clause because it encroaches upon areas of federal authority and policy in the following ways. At a minimum, it raises serious concerns about potential violations of the antitrust laws, the First Amendment, the Commerce Clause, the federal cigarette labeling and tobacco control laws, and the Bankruptcy Code.

62.    The MSA and its Qualifying Statute encroach upon federal supremacy by patently violating the federal antitrust laws, including the Sherman Act. The MSA has the intended effect of maintaining the national market shares of the Majors as of the execution date of the MSA. By establishing a cigarette cartel, the MSA undermines the national policy of free competition in the cigarette market that is reflected in the antitrust laws. Had the Majors' executives attempted to establish it without the assistance of the "attorneys general, they would long ago have had depressing conversations with their attorneys about the United States Sentencing Guidelines." Freedom Holdings v. Spitzer, 357 F.3d 205, 226 (2d Cir. 2004). Moreover, the MSA is not immunized by the Sherman Act's state-action exemption. That exemption, rooted in federalism, shields only local or intrastate regulations, not national cartels like the MSA.

63.    The MSA also encroaches upon federal authority and policy by establishing a comprehensive regulatory scheme governing the advertising and promotion of cigarettes, a subject reserved for Congress alone by federal law. For example, it bans cartoons in cigarette advertising (MSA § III(b)), prohibits tobacco makers' sponsorship of national sports teams or leagues (MSA § III(c)(6)), forbids them

22

to sponsor displays or references to any tobacco product on television or in motion pictures, theatrical productions, video games, and both live and recorded musical performances (MSA § III(e)), bans them from using as a brand name any nationally-recognized sports team, entertainment group, or celebrity, or non-tobacco product or service brand name (MSA § III(j)); and requires that all cigarette packs contain a minimum of twenty cigarettes (MSA § III(k)). These provisions violate the preemption provisions of the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. § 1334(b), the First Amendment, and the Dormant Commerce Clause, Art. I, § 8, cl. 3.

64.     The MSA encroaches upon federal supremacy by establishing a nationwide excise tax on cigarettes in the form of annual, perpetual payments by participating manufacturers and NPMs (in the form of escrow payments). Such a tax would be flatly unconstitutional if any individual State attempted to impose it. The tax does not become constitutional because attorneys general and the Majors managed to create a scheme that compelled virtually all States to impose the tax.  Its imposition under the MSA violates the Interstate Commerce Clause and usurps Congress's exclusive authority to levy national taxes and assessments.

65.     The MSA further encroaches upon federal authority by heavily regulating tobacco makers' petitioning activity at the federal level.  The MSA abolished several existing industry trade associations, including the industry's principal national lobby, the Tobacco Institute (MSA § III(o)).  As is explained further below, the MSA requires new industry trade associations containing Participating Manufacturers to support the MSA and regulates their internal workings (MSA § III(p)). And it prohibits Participating Manufacturers from lobbying Congress to preempt the MSA.  MSA, §

III(m).  The lobbying activity the MSA forbids is protected by the speech and petition clauses of the First Amendment.

66.    By pressuring all cigarette makers to join the MSA, and then requiring them to make payments on cigarettes sold anywhere in the 50 states, even in non-MSA states, the MSA enables the Settling States to do collectively what they would be powerless to achieve individually: raise the prices charged in every state in the country, including the non-settling States; and on an industry-wide basis (including even those manufacturers that do no business in the Settling States).

67.    The MSA conflicts with the federal Bankruptcy Code by giving the Settling States an unfair advantage over tobacco companies' other creditors.  It bans Participating Manufacturers from seeking relief from MSA payments "in any proceeding before any court of law (including the federal bankruptcy courts)."  MSA, Section XVIII(w)(1)(D).  It also prevents bankrupt PMs unable to meet their financial obligations under the MSA from seeking a "discretionary stay" of any "police and regulatory action" by a Settling State.  MSA, § XVIII(w)(1)(D).  These provisions give the Settling States an unfair edge over tobacco makers' other creditors, such as injured smokers and non-MSA States.  That violates the fundamental federal policy in favor of equitable distribution of a debtor's assets among creditors and against one class of creditor enriching itself at others' expense.  It also violates federal prohibitions against debtors contractually waiving the prepetition protection of the Bankruptcy Code.

68.    By confronting state legislatures with a Hobson's choice of either enacting a Qualifying Statute or else suffering the imposition of substantial economic costs on their citizens without any offsetting benefit, the MSA compelled them to enact it.  More importantly, States can never leave the MSA.  The MSA is a "binding

24

contractual obligation, enforceable" on "present and future agents" of the Settling States.  MSA § XVIII(g).  If a State repeals its Qualifying Statute implementing the MSA, all of its MSA payments may be withheld to pay for the NPM Adjustment.  MSA § IX(d)(2)(H).  The MSA can only be modified by "unanimous agreement" of all Settling States and (except as to certain reallocations of payments among the States) "all Participating Manufacturers affected by the amendment."  MSA §§ XI(f)(6), XVIII(j).

69.    The MSA requires each State to delegate a substantial element of its sovereignty to NAAG, a national entity that is not subject to the control of the federal government or individual state governments, by ceding to NAAG the power to enforce certain provisions of the MSA independently and without direction from, or control by, any individual State.  The MSA gives NAAG millions of dollars both to enforce and implement the MSA on its own, and to bankroll others' lawsuits and investigations enforcing the MSA and Qualifying Statutes.  See, e.g., MSA, § VIII(c), Exhibit J; see also ¶¶ 31, 46 above.

70.    The MSA establishes and endows, under the umbrella of the NAAG, standing entities with the authority to make discretionary decisions that are conclusive and binding upon the Settling States.  For example, "The Firm" (see ¶ 25 above)  has the authority to determine whether any State has complied with the provisions of the MSA, make "conclusive and binding" "final and non-appealable" legal and financial determinations concerning payment allocations, and fix penalties to be imposed on non-complying States (MSA, §IX(d)).  In this fashion, the MSA effects an uncontrollable delegation of inherent state powers to an extra-constitutional supra-state agency in violation of the Tenth Amendment.

71.    The unconstitutional provisions of the MSA are not severable from the MSA as a whole.

72.    Plaintiffs' injuries are fairly and directly traceable to the MSA and are redressable through the relief sought.   The Plaintiffs have been injured by the implementation of the MSA principally because of its coercive effect on the Louisiana legislature, which adopted almost word-for-word a model statute set forth in the MSA as Exhibit "T", as the State's Qualifying Statute in order to receive billions of dollars in future payments under the MSA.

## COUNT II:
## THE MSA AND THE QUALIFYING STATUTE VIOLATE
## THE CIGARETTE LABELING AND ADVERTISING ACT

73.    Each and every allegation contained in the preceding paragraphs is incorporated herein by reference.

74.    States' power to regulate the advertising, marketing and promotion of cigarettes is limited by the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. § 1331, et seq. ("FCLAA"), which provides that "[n]o requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising, or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter."   15 U.S.C. § 1334(b).

75.    Through the Qualifying Statute and the MSA, Defendant has imposed a national regulatory scheme on the advertising and marketing of cigarettes that violates and is preempted by the FCLAA.   The MSA bans many forms of cigarette advertising. (See ¶ 63, above, and MSA, § III).  The Qualifying Statute compels cigarette makers to either join the MSA and thus restrict their advertising, or make substantial annual payments into escrow.

26

76.     These violations of the FCLAA are actionable under 28 U.S.C. §§ 1331 and 2201-02.

77.     In order to compete with the Majors, which have greater brand recognition, S&M Brands advertises in ways that would be prohibited or sharply curtailed if it joined the MSA, such as placing its brand names on T-shirts and hats and promoting racing and sporting events.  See MSA, § III(f) (prohibiting use of tobacco brand names on non-tobacco products); MSA, § III(d) (prohibiting "Outdoor Advertising" except for certain exceptions set forth in Section III of the MSA, such as "Brand Name Sponsorships"); MSA, §§ III(c)(2)(A)&(c)(3)(E)(ii) (restricting duration of "Brand Name Sponsorship" advertising and generally banning multiple sponsorships).

### COUNT III:
### THE MSA AND THE QUALIFYING STATUTE VIOLATE
### THE COMMERCE CLAUSE AND DUE PROCESS CLAUSE

78.     Each and every allegation contained in the preceding paragraphs is incorporated herein by reference.

79.     As described above, Participating Manufacturers' payments under the MSA are collected nationally and then apportioned among the Settling States by entities selected by NAAG and the Majors.  Those assessments are based on the national market share of each Participating Manufacturer, including all cigarette sales in the four non-settling states.   By regulating interstate commerce in an extraterritorial fashion, the MSA violates the Commerce Clause.  By regulating conduct occurring wholly outside the Settling States' jurisdiction, the MSA also violates the Due Process Clause.  It also injures individual smokers like Mr. Heacock by increasing cigarette prices nationally, even outside the Settling States, and preventing them from obtaining

cheaper cigarettes when they travel across state lines into non-MSA States such as Texas and Mississippi.

80.     The MSA scheme also extends beyond the jurisdiction of the Settling States in its Qualifying Statute requirement.  See MSA § IX, Exhibit T.

81.     The Qualifying Statute violates the Commerce Clause and Due Process Clause through its extraterritorial reach.  As construed by NAAG and the Louisiana Attorney General's office, it regulates transactions occurring far outside the boundaries of Louisiana.  Under it, any NPM, wherever located, and irrespective of whether it conducts business, is located, or operates in Louisiana (or any MSA State), is nonetheless subject to the escrow payment requirements if any of its cigarettes are sold to consumers in Louisiana, provided that the NPM "intended" that its cigarettes be sold anywhere in the United States.   Thus, it mandates the collection of escrow payments from NPMs, regardless of whether they are located in, or sell cigarettes in, Louisiana, if their cigarettes ultimately end up in Louisiana.

82.     For example, the Statute requires plaintiff CLP to make escrow payments with respect to cigarettes it sells in non-MSA States such as Mississippi, Texas, or Florida, that are then resold without its knowledge or permission in Louisiana and other MSA States by independent distributors and other persons over whom it exercises no control.

83.     To be able to make such escrow payments to MSA States, CLP is forced to raise its prices in non-MSA States to cover the costs, resulting in reduced sales. To reduce the risk of being hit with unexpected escrow liabilities if its cigarettes are resold without its knowledge in MSA States, CLP must take elaborate and costly precautions, such as sending its officers to distant States to monitor distributors and

ensure that they attach to its products the tax stamp of the State in which CLP intends that they be sold. The Qualifying Statute is invalid per se because it directly regulates and controls interstate commerce occurring outside Louisiana. It further violates the Commerce Clause by imposing a burden on interstate commerce that is clearly excessive in relation to any putative local benefits, and not substantially related to any valid state interest.

**COUNT IV:**
**TENTH AMENDMENT**

84.     Plaintiffs allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

85.     The MSA violates the Tenth Amendment by commandeering state legislatures to adopt the Qualifying Statute and delegating their powers to bodies outside the control of either the state or federal governments.

86.     The MSA commandeers the Louisiana legislature and other state legislatures by compelling them to enact, and preventing from repealing, the Qualifying Statute.   States are not permitted to withdraw from the MSA, which is binding on "present and future" state officials. See ¶ 68, above. They cannot "directly or indirectly" challenge it or call it into question and must defend it in the courts and other fora where they might otherwise have petitioned for relief. See, e.g., MSA, § XVII(l).

87.     Under the MSA, fundamental state powers are delegated to NAAG and related entities, which administer tax, appropriations, and law enforcement functions that are properly reserved for state governments.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request this Court to grant the following relief:

(1)     A judgment declaring the MSA, the Qualifying Statute, and the Complementary Statute to be unconstitutional on their face and as applied to Plaintiffs;

(2)     An injunction preliminarily and permanently enjoining Defendant from implementing and enforcing the MSA, the Qualifying Statute, and the Complementary Statute;

(3)     An injunction preliminarily and permanently enjoining Defendant from requiring escrow deposits from the Plaintiffs or preventing them from selling tobacco products produced by manufacturers that have not paid escrow deposits;

(4)     Award Plaintiffs their attorneys' fees and costs incurred in bringing this action; and,

(5)     Award such other relief as the Court shall deem just and proper.

Dated: August 1, 2005.

By: _____
Billy J. Guin
Rountree, Cox & Guin
1200 Beck Building
400 Travis St., P.O. Box 1807
Shreveport, LA 71166-1807
(318) 226-0993
ID # 06587

_____
Sam Kazman
Hans Bader, T.A.
Competitive Enterprise Institute
1001 Connecticut Ave., NW, #1250
Washington, DC 20036
(202) 331-1010
(*Pro Hac Vice* applications pending)

Erik S. Jaffe
Erik S. Jaffe, P.C.
5101 34th Street, NW
Washington, D.C. 20008
(202) 237-8165

30