RECEIVED

OCT 3 1 2005

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT, LOUISIANA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

A. B. COKER CO., INC.,                    :   CIVIL ACTION NO.: CV05-1372 S
S&B BRANDS, INC., CLP, INC.,
TOBACCO DISCOUNT HOUSE
#1, INC. and MARK HEACOCK

                                          :   JUDGE HICKS

VERSUS

CHARLES C. FOTI, JR., in his
Official capacity as Attorney
General, STATE OF LOUISIANA               :   MAGISTRATEJUDGE HORNSBY


## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

In accordance with Rule 7 of the Local Rules of this Court, Defendant Charles C.

Foti, Jr., in his official capacity as Attorney General of the State of Louisiana, submits

this Memorandum in support of his Motion to Dismiss the Complaint pursuant to Rule

12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Plaintiffs A.B. Coker Co., Inc., S&M Brands, Inc., CLP, Inc., Tobacco Discount

House #1, Inc., and Mark Heacock ("Plaintiffs") seek to invalidate on constitutional

grounds the tobacco Master Settlement Agreement ("MSA"), which the United States

Supreme Court has described as a "landmark" public health agreement, Lorillard

Tobacco Corp. v. Reilly, 533 U.S. 525, 533 (2001), and which addresses "tobacco use,

particularly among children and adolescents, [which] poses perhaps the single most

significant threat to public health in the United States," Food & Drug. Admin. v. Brown

& Williamson Tobacco Corp., 529 U.S. 120, 161 (2000).

Plaintiffs allege that the MSA, as well as certain statutes[1] that Louisiana has enacted to assist in its implementation, are invalid under the United States Constitution's Compact Clause, Supremacy Clause, Commerce Clause, Due Process Clause, and Tenth Amendment. Because the Complaint is based on patently false characterizations of the MSA and on an incorrect interpretation of the constitutional provisions on which Plaintiffs rely, it should be dismissed for failure to state a claim.[2]

## STATEMENT OF FACTS

The Plaintiffs recite a litany of wild mischaracterizations of the MSA and operation of Louisiana's Escrow Statutes. A long line of cases listed in note 2 have provided factual backgrounds of the MSA and various states' Escrow Statutes, without any hint of the nefarious claims attributed to them by these Plaintiffs. Due to briefing

---

[1]    Louisiana's "Escrow Statutes" (LSA-R.S. 13:5061 et seq.) and "Complementary Legislation" (LSA-R.S. 13:5071 et seq.) require non-participating manufacturers ("NPMs") to create and fund reserve accounts to offset the harmful future effects of their tobacco products.

[2]    This is just the most recent in a string of constitutional challenges to the MSA and related statutes, none of which has resulted in a determination that the MSA or related statutes is unconstitutional. *See* Star Scientific, Inc. v. Beales, 278 F.3d 339 (4th Cir.), *cert. denied sub nom.* Star Scientific, Inc. v. Kilgore, 537 U.S. 818 (2002) (due process, equal protection, Commerce Clause, Compact Clause); Mariana v. Fisher, 226 F.Supp.2d 575 (M.D. Pa. 2002), *aff'd on other grounds*, 338 F.3d 189 (3d Cir. 2003), *cert. denied sub nom.* Mariana v. Pappert, 540 U.S. 1179 (2004) (Commerce Clause, Compact Clause); Grand River Enter. Six Nations Ltd. v. Pryor, 2003 WL 22232974 (S.D.N.Y. Sep 29, 2003) (Commerce Clause, due process, equal protection, preemption, First Amendment), *vacated in part on other grounds*, 2004 WL 1594869 (S.D.N.Y. Jul. 15, 2004), *aff'd in part, reversed in part, and remanded* (425 F.3d 158 (2d Cir. 2005), *reconsideration pending* (2d Cir. No. 03-9179cv); Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205 (2d Cir. 2004) (Commerce Clause); S&M Brands v. Summers, No. 3:05-0171 (M.D. Tenn. Oct. 6, 2005) (First Amendment, due process, equal protection, preemption); Forces Action Project, LLC v. State of California, No. C99-0607MJJ (N.D. Cal. Jan. 15, 2002), *aff'd*, 2003 WL 1900848 (9th Cir. Apr. 17, 2003) (No. 02-15336) (motion to amend complaint to add Commerce Clause claim denied on ground of futility); Xcaliber Int'l Ltd. v. Ieyoub, 377 F.Supp.2d 567 (E.D.La. 2005), *appeal pending* (5th Cir. No. 05-30323) (First Amendment, due process, equal protection, Commerce Clause); Xcaliber Int'l Ltd, LLC v. Edmondson, No. 04-CV-0922-CVE-PJC (N.D. Okla Apr. 5, 2005), *reconsideration denied* (Aug. 31, 2005) (First Amendment, due process, equal protection, Commerce Clause); North American Trading Co. v. National Ass'n of Attys Gen'l, Civ. Action No. 01-01600 (D.D.C. Sept. 18, 2001), *aff'd on other grounds*, No. 01-7173 (D.C. Cir. Nov. 25, 2002) (Commerce Clause); Star Scientific, Inc. v. Carter, 2001 WL 1112673 (S.D. Ind. Aug. 20, 2001) (Commerce Clause); PTI, Inc. v. Philip Morris Inc., 100 F. Supp. 2d 1179 (C.D. Cal. 2000) (Compact Clause, Commerce Clause, equal protection); Hise v. Philip Morris Inc., 46 F. Supp.2d 1201 (N.D. Okla. 1999), *aff'd mem.*, 208 F.3d 226 (10th Cir.), *cert. denied*, 531 U.S. 959 (2000) (Compact Clause).

length limitations, the Defendant respectfully directs the Court to the impartial factual backgrounds provided in the authorities listed in note 2, *supra*, and to the clear language of the MSA and the Escrow Statutes themselves.

**ARGUMENT**

A claim should be dismissed under Rule 12(b)(6) when a plaintiff fails to allege any set of facts in support of his claim that would entitle him to relief. U.S. ex rel. Willard v. Humana Health Plan of Texas, 336 F.3d 375, 379 (5th Cir. 2003). In the context of a Rule 12(b)(6) motion, "the court accepts as true the well-pled factual allegations in the complaint, and construes them in the light most favorable to the plaintiff." Taylor v. Books A Million, Inc., 296 F.3d 376, 378 (5th Cir.2002). However, "conclusory allegations . . . will not suffice to prevent a motion to dismiss," *id.,* and neither will "unwarranted deductions of fact." Guidry v. Bank of LaPlace, 954 F.2d 278, 281 (5th Cir.1992). "In deciding a motion to dismiss, the court may consider documents attached to or incorporated in the complaint and matters of which judicial notice may be taken." Humana Health Plan of Texas, 336 F.3d at 379.

Under these standards, the Complaint should be dismissed. It rests on conclusory allegations and unwarranted deductions of fact that are contradicted by matters that are before the Court or of which the Court may take judicial notice, including the provisions of the MSA and Escrow Statute, and it relies on unfounded legal theories. Except for Plaintiffs' Tenth Amendment claim, every constitutional claim asserted in the Complaint has been raised before and has been rejected by other courts. *See* note 2 *supra.* Plaintiffs provide no reason why this settled body of law should not be followed by this Court.

### A. Count I – Plaintiffs' Compact Clause Challenge to the MSA Is Invalid as a Matter of Law.

Count I of the Complaint alleges that the MSA is an "Agreement or Compact" among the States within the meaning of the Compact Clause of the Constitution, Article I, § 10, and that, "[c]ontrary to the plain requirement of the Compact Clause, the MSA has not been submitted to or approved by the Congress." ¶¶ 58-59. This claim fails for two reasons: (1) the MSA needed no congressional consent; and (2) even if such consent was necessary, Congress provided it.

#### 1. The MSA Did Not Require Congressional Consent.

Claims that the MSA needed Congress's consent under the Compact Clause have been rejected previously by four courts on motions to dismiss because the MSA does not meet the requirement for consent as construed by a long line of Supreme Court cases.[3] Indeed, Plaintiffs are unable to cite a single case in which any agreement among States was held invalid under the Compact Clause.

The Fourth Circuit, in Star Scientific, described the types of interstate compacts that require congressional consent under governing Supreme Court precedent:

> The Compact Clause does not require congressional approval of every agreement between or among States. Instead, the Supreme Court has held that "the proper balance between federal and state power with respect to compacts and agreements among states" is maintained by limiting application of the Compact Clause to agreements that are "directed to the formation of any combination tending to the increase of political power in the States, which may encroach upon or interfere with the just

---

[3] Star Scientific, Inc. v. Beales, 278 F.3d 339, 359-60 (4th Cir.), *cert. denied sub nom.* Star Scientific, Inc. v. Kilgore, 537 U.S. 818 (2002); Mariana v. Fisher, 226 F.Supp.2d 575, 586-87 (M.D. Pa. 2002), *aff'd on other grounds*, 338 F.3d 189 (3d Cir. 2003), *cert. denied sub nom.* Mariana v. Pappert, 540 U.S. 1179 (2004); PTI, Inc. v. Philip Morris Inc., 100 F. Supp. 2d 1179, 1197-98 (C.D. Cal. 2000); Hise v. Philip Morris Inc., 46 F. Supp.2d 1201, 1210 (N.D. Okla. 1999) (allegation of "unlawful confederation"), *aff'd mem.*, 208 F.3d 226 (10th Cir.), *cert. denied*, 531 U.S. 959 (2000).

> supremacy of the United States." <u>Virginia v. Tennessee</u>, 148 U.S. 503, 519, 13 S.Ct. 728, 37 L.Ed. 537 (1893); *see also* <u>Northeast Bancorp, Inc. v. Board of Governors of the Fed. Res. Sys.</u>, 472 U.S. 159, 175-76, 105 S.Ct. 2545, 86 L.Ed.2d 112 (1985); <u>United States Steel Corp. v. Multistate Tax Comm'n</u>, 434 U.S. 452, 471, 98 S.Ct. 799, 54 L.Ed.2d 682 (1978); <u>New Hampshire v. Maine</u>, 426 U.S. 363, 369, 96 S.Ct. 2113, 48 L.Ed.2d 701 (1976).

278 F.3d at 359-60.

Thus, "the test is whether the Compact enhances state power *quoad* the National Government." <u>Multistate Tax Commission</u>, 434 U.S. at 473 (1978). Interstate comity is to be encouraged and not discouraged by the Clause, as its purpose is not to "circumscribe modes of interstate cooperation." *Id.* at 460. In <u>Multistate Tax Commission</u>, the Supreme Court upheld a compact resulting in reciprocal legislation and establishing a quasi-independent administrative body to coordinate State taxation of certain entities, concluding that the agreement did not threaten federal supremacy because each of the tax commission's actions could have been taken separately by the individual States themselves, even though the coordinated action "well may [have provided] some incremental increase in the bargaining power of the member States *quoad* the [entities being taxed]." *Id.* at 472-73.

Similarly, each Settling State could have separately settled its claims against the Participating Manufacturers ("PMs") and included in a settlement agreement the MSA provisions that Plaintiffs claim intrude on federal supremacy. That the States may have increased their bargaining power vis-à-vis the manufacturers, and the MSA may be more effective than individual State settlements, is of no moment because the MSA does not "enhance[] state power *quoad* the National Government." As the <u>Star Scientific</u> court concluded, "the Master Settlement Agreement 'does not purport to authorize the member

States to exercise any powers they could not exercise in its absence.' " 278 F.3d at 360

(*quoting* Multistate Tax Commission, 434 U.S. at 473).

The Complaint purports to describe several ways in which the MSA "encroaches

upon areas of federal authority and policy." ¶ 61. This formulation already departs from

controlling Supreme Court authority because the test for congressional consent under the

Compact Clause is encroachment on federal power, federal authority, and federal

supremacy -- not "federal policy."     In any event, none of the examples of alleged

encroachment satisfies that test.  Moreover, each of these allegations is subject to the

general response provided by the Fourth Circuit in Star Scientific:

> [T]he Master Settlement Agreement does not derogate from
> the power of the federal government to regulate tobacco.
> Sections X and XVIII(a) of the agreement specifically
> anticipate that Congress may, in the future, pass laws
> regulating tobacco and provides [sic] for adjustments of the
> Master Settlement Agreement's terms if that occurs.

278 F.3d at 360.[4]

*First*, Plaintiffs allege that "[t]he MSA and its Qualifying Statute encroach upon

federal supremacy by patently violating the antitrust laws, including the Sherman Act."

Complaint, ¶ 62. In Northeast Bancorp, however, the Supreme Court rejected the notion

that a multi-state agreement implicated the Compact Clause merely because it allegedly

violated federal statutes. As the Court stated: "To the extent that the state statutes might

conflict in a particular situation with other federal statutes, . . . they would be pre-empted

---

[4]      Section X addresses the consequences of federal tobacco-related legislation enacted on or before
November 30, 2002, that provides for payments by any OPMs that are made available to any Settling State,
and allows the OPMs an offset against such payments. Section XVIII(a) provides that "[i]f any current or
future law includes obligations or prohibitions applying to Tobacco Product Manufacturers related to any
of the provisions of this Agreement, each Participating Manufacturer shall comply with this Agreement
unless compliance with this Agreement would violate such law."

by those statutes, and therefore any Compact Clause argument would be academic." 472 U.S. at 176. For the same reason, Plaintiffs' attempt to bootstrap an antitrust-based claim that they did not plead should be rejected.

The Court should disregard this supposed basis for invoking the Compact Clause's congressional consent requirement for the further reason that Plaintiffs have wholly failed to establish the prerequisites for preemption of State actions by the Sherman Act. *See* Rice v. Norman Williams Co., 458 U.S. 654, 661 (1982), (holding that "[a] state statute, when considered in the abstract, may be condemned under the antitrust laws only if it mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute") Plaintiffs point to no provision in the MSA that accords any type of ability to any Participating Manufacturer, or to Participating Manufacturers collectively, to fix industry prices, limit industry output, or otherwise take actions that would enable the PMs to "reap monopoly profits" (Complaint, ¶ 7) and indeed there is none. Indeed, Plaintiffs' failure to plead an antitrust preemption claim is understandable in light of the decisions rejecting such a claim.[5]

---

[5]     Tritent Int'l Corp. v. Kentucky, No. 3-04-67 (E.D. Ken. Sept. 8, 2005) (granting motion to dismiss challenge to amended Escrow Statute because plaintiffs failed to allege facts "sufficient to show an irreconcilable conflict between the Sherman Act and the state statutes"), *reconsideration denied* (Oct. 24, 2005); Xcaliber Int'l Ltd. LLC v. Edmondson, No. 04-CV-0922-CVE-PJC (N.D. Okla. Apr. 5, 2005), *reconsideration denied* (Aug. 31, 2005) (granting summary judgment against antitrust challenge to amended Escrow Statute because MSA-related statutes are direct state action and hence not preempted); Sanders v. Lockyer, 365 F.Supp.2d 1093, 1101 (N.D. Cal. 2005), *appeal docketed*, No. 05-15676 (9th Cir. 2005) (dismissing antitrust challenge to MSA on grounds that MSA is state action not subject to Sherman Act and that MSA is not preempted by antitrust laws because "the Court cannot conclude that the MSA authorizes collusive or concerted action on the part of the manufacturers to raise prices to monopolistic levels"; Freedom Holdings, Inc. v. Spitzer, 2004 WL 2035334 (S.D.N.Y. Sept. 14, 2004), (NO. 02 CIV.2939 AKH), *reconsideration denied*, 2004 WL 2251668 (S.D.N.Y. Oct. 6, 2004), *aff'd on other grounds*, 408 F.3d 112 (2d Cir. 2005) (holding that Plaintiffs lacked reasonable likelihood of success on their claim that the MSA is preempted by the Sherman Act).

*Second*, Plaintiffs allege that the MSA "encroaches upon federal authority and policy by establishing a comprehensive regulatory scheme governing the advertising and promotion of cigarettes, a subject reserved for Congress alone by federal law." Complaint, ¶ 63. This allegation runs into the same difficulty as the antitrust allegation discussed above – *i.e.*, it adds nothing to a preemption claim based on the Federal Cigarette Labeling and Advertising Act and an alleged dormant Commerce Clause violation, which are addressed below in connection with Counts II and III of the Complaint.

*Third*, according to the Complaint, the MSA imposes a "nationwide excise tax on cigarettes" that "would be flatly unconstitutional if any individual State attempted to impose it "and that "does not become constitutional because attorneys general and the Majors managed to create a scheme that compelled virtually all States to impose the tax." ¶ 64.[6] Plaintiffs' "excise tax" characterization is incorrect, however. The PMs' payments are amounts the manufacturers, in settlement of a lawsuit, have contracted to pay for each cigarette they sell; they are not exactions levied by force of statute or regulation. More importantly, each Settling State could have separately settled with the PMs and obtained their promise to pay the State a certain amount each year, with adjustments for various contingencies such as inflation and changes in their sales volumes. Instead, because the settlement included almost all States (and took into account payments to the four States that had already settled), the Settling States and the OPMs agreed to a payment structure whereby the manufacturers make payments based on their total sales and the Settling

---

[6]    This allegation is also addressed below in connection with Plaintiffs' dormant Commerce Clause claim.

States allocate the payments among themselves according to a fixed percentage formula in Exhibit A to the MSA.

These circumstances do not threaten federal supremacy, and therefore do not require congressional consent under the test enunciated in <u>Multistate Tax Commission</u>. Furthermore, the Complaint, ¶ 42, alleges that States were "effectively compelled" to sign the MSA because otherwise their citizens would pay the higher prices resulting from the MSA payments but would receive none of the ensuing revenues. This circumstance, however, even if it were true (which it is not since States had numerous options available to avoid it), would not result in any "increase of political power in the States, which may encroach upon or interfere with the just supremacy of the United States." <u>Virginia v. Tennessee</u>, 148 U.S. at 519. As the Supreme Court said in connection with a similar argument in <u>Multistate Tax Commission</u>:

> [I]t is not explained how any economic pressure that does exist is an affront to the sovereignty of nonmember States. Any time a State adopts a fiscal or administrative policy that affects the programs of a sister State, pressure to modify those programs may result. Unless that pressure transgresses the bounds of the Commerce Clause or the Privileges and Immunities Clause of Art. IV, § 2, . . . it is not clear how our federal structure is implicated.

434 U.S. at 478 (citation omitted).

*Fourth*, Plaintiffs allege that "the MSA further encroaches upon federal authority by heavily regulating tobacco makers' petitioning activity at the federal level." ¶ 65. Thus, the MSA required the dissolution of certain tobacco industry trade associations, § III(o), places requirements and restrictions on activities of new trade associations, § III(p), and prohibits PMs from engaging in lobbying on certain matters, § III(m), activity for which Plaintiffs claim First Amendment protection. These restrictions, like

the others in Section III relating to advertising and promotion, were freely entered into by the PMs as part of a litigation settlement that produced rights and obligations on both sides. *See* MSA § XV. Plaintiffs do not explain how an agreement between private parties and States whereby the private parties agree to limit their exercise of certain constitutional rights can encroach upon federal authority. In any event, as already mentioned, the federal government retains the power to regulate any of the matters addressed in Section III of the MSA.

*Fifth*, Plaintiffs allege that the MSA conflicts with federal bankruptcy law "by giving the Settling States an unfair advantage over tobacco companies' other creditors." It allegedly does this by banning PMs from seeking relief from MSA payments in bankruptcy courts, and by barring bankrupt PMs from seeking discretionary stays of regulatory or police actions by Settling States. Complaint, ¶ 67. As the Fourth Circuit pointed out in <u>Star Scientific</u>, however, "Section XVIII(w)(1)(C) of the Master Settlement Agreement, dealing with bankruptcy, specifically states that the provision is enforceable only if consistent with the Bankruptcy Code." 278 F.3d at 360.

*Sixth*, and finally, Plaintiffs allege that the MSA requires each Settling State "to delegate a substantial element of its sovereignty to NAAG, a national entity that is not subject to the control of the federal government or individual state governments," Complaint, ¶ 69, and that the MSA establishes entities, such as "the Firm," "to make discretionary decisions that are conclusive and binding upon the Settling States," *id.*, ¶ 70. Those allegations are clearly contradicted by the MSA's provisions.

NAAG is described in Section II(bb) of the MSA as "the National Association of Attorneys General, or its successor organization that is directed by the Attorneys General

to perform certain functions under this Agreement." NAAG's continuing MSA functions include only the coordinating and supporting functions described in Sections VII and VIII.[7] In particular, Section VIII(a) provides that "NAAG will provide coordination and facilitation for the implementation and enforcement of this Agreement on behalf of the Attorneys General of the Settling States." This includes convening meetings, informing other organizations of the results of meetings, supporting and coordinating the efforts of Attorneys General in carrying out their responsibilities under the MSA, and establishing and maintaining a fund to support the enforcement and implementation of the MSA. *See* MSA §§ VIII(a),(c). Section VII, "Enforcement," directs the Attorneys General of the Settling States, through NAAG, to "monitor potential conflicting interpretation by courts"[8] of the MSA, and directs NAAG to coordinate the Settling States' inspection and discovery rights so as to avoid repetitive and excessive inspection and discovery. §§ VII(f),(g). Pursuant to Sections VII and VIII, NAAG disseminates information, helps the Settling States arrive at common positions, assists in preparing proposed legislation and in explaining it to legislators, and performs other coordinating and facilitating functions as directed by the Settling States.

Contrary to the Complaint's allegations, nothing in these MSA provisions or the functions carried out under them grants NAAG the power to interpret or enforce the

---

[7]     The MSA also assigned NAAG responsibilities with respect to the formation of a "National Foundation" (§ VI) and establishment of websites for public access to tobacco company documents (§ IV). These responsibilities were discharged soon after the MSA went into effect.

[8]     Plaintiffs try to cast this function in a sinister light by alleging that "States must work to harmonize their interpretation of the MSA with NAAG, *see, e.g.,* MSA § VII(f) . . . ." This allegation appears to suggest that States must seek NAAG's prior approval before adopting a particular interpretation. In fact, however, Section VII(f) merely requires the monitoring of potential conflicting interpretations of MSA provisions by courts of different States, and directs the Settling States to use their best efforts, in cooperation with the PMs, to resolve the effects of such conflicting interpretations as to matters that are not exclusively local in nature.

MSA, let alone "govern state conduct and lawmaking." Nor could the MSA be said to "require[] each State to delegate a substantial element of its sovereignty to NAAG." ¶¶ 5, 69. Indeed, the MSA explicitly states that only the Settling States have authority to enforce the MSA.[9] NAAG, therefore, is not an independent force that operates separately from the Settling States and controls their actions; rather, it simply fills the need for coordination that any arrangement involving a large number of parties inevitably creates. Moreover, whatever NAAG does, it does at the direction of the State officials of which its membership consists. It is, therefore – and directly contrary to the allegation in Paragraph 69 of the Complaint – "subject to the control of . . . individual state governments."

In other words, NAAG is the membership organization[10] of the Attorneys General of all States, including the MSA Settling States, much like other governmental officers and agencies have national organizations that provide expertise in certain areas.[11] It functions through voluntary, participatory committees and a staff and exists for the purpose that many "national organizations" exist for elected officials – to provide a

---

[9]     MSA § VII(c) ("any Settling State or Participating Manufacturer may bring an action in the Court to enforce the terms of this Agreement"); *see also* MSA § XVIII(p) ("No portion of this Agreement shall provide any rights to, or be enforceable by, any person or entity that is not a Settling State . . . .").

[10]     As explained on NAAG's website: "The National Association of Attorneys General (NAAG) was founded in 1907 to help Attorneys General fulfill the responsibilities of their office and to assist in the delivery of high quality legal services to the states and territorial jurisdictions. . . . The Association fosters interstate cooperation on legal and law enforcement issues, conducts policy research and analysis of issues, and facilitates communication between the states' chief legal officers and all levels of government. The Association's members are the Attorneys General of the 50 states and the District of Columbia, the Commonwealths of Puerto Rico (Secretary of Justice) and the Northern Mariana Islands, and the territories of American Samoa, Guam, and the Virgin Islands. The U.S. Attorney General is an honorary member." (*See* http://www.naag.org/naag/about_naag.php (visited September 23, 2005)).

[11]     E.g., the "National Governors Association" (www.nga.org), the "National Association of Insurance Commissioners" (www.naic.org), the "National Association of Counties" (www.naco.org), and the National Association of State Treasurers (www.nast.net), to name just a few.

continuity of expertise on issues pertinent to the respective elected office.  One such

NAAG committee is the Tobacco Committee, which is supported by a staff of attorneys

(the NAAG Tobacco Project) who have developed expertise in MSA-related issues.

> In any event, as in <u>Multistate Tax Commission</u>:

>> the multilateral nature of the agreement and its
>> establishment of an ongoing administrative body do not,
>> standing alone, present significant potential for conflict
>> with the principles underlying the Compact Clause. . . .  As
>> to the powers delegated to the administrative body, we
>> think these also must be judged in terms of enhancement of
>> state power in relation to the Federal Government.

434 U.S. at 472.  The Complaint contains no allegation that the powers or responsibilities

delegated to entities under the MSA enhance state power "in relation to the Federal

Government." *Id.*

In sum, the MSA embodies the settlement of State claims for the recoupment of

funds that the Settling States have been and will be required to spend for the treatment of

tobacco-related illnesses, and it includes other provisions designed to protect the health

and safety of the Settling States' citizens from the demonstrated harm caused by tobacco

products.  The Agreement's terms concern a matter of vital local interest – the health and

welfare of the State's citizens – over which the States have traditionally exercised broad

authority.    In simply pursuing and settling their legal claims against cigarette

manufacturers and furthering their efforts to discourage smoking, Louisiana and other

Settling States have in no way increased their political power at the expense of the federal

government or interfered with the "just supremacy" of the United States.  Accordingly,

congressional consent to the MSA is unnecessary.

## 2. Even if the MSA Needed Consent, Congress Has Provided It.

Even if congressional consent to the MSA were required, Congress has plainly

provided it. The Supreme Court has long held that Congress possesses great discretion

with respect to the timing and form of its consent to an interstate compact: "Congress

may consent to an interstate compact by authorizing joint state action in advance or by

giving *expressed or implied* approval to an agreement the States have already joined."

Cuyler v. Adams, 449 U.S. 433, 441 (1981) (emphasis added). Accordingly, the Court

has found implied congressional consent to interstate agreements broadly and in widely-

varying circumstances.[12]

Congress clearly indicated its approval of the MSA in 1999, when it amended the

Medicaid statute and expressly recognized the MSA's existence and disclaimed any

federal interest in the moneys received by Louisiana and other Settling States under the

agreement. At that same time, Congress also authorized Louisiana and other Settling

States to use MSA funds "for any expenditures determined appropriate."[13] Were there

---

[12]   *See, e.g.,* Cuyler, 449 U.S. at 441 (Congress impliedly consented in a 1934 statute giving consent to compacts "for cooperative effort and mutual assistance in the prevention of crime" to 1956 Uniform Agreement on Detainers and its 1980 Pennsylvania uniform implementation statute); Virginia v. Tennessee, 148 U.S. at 521-22 (Congress impliedly consented to agreement between Virginia and Tennessee fixing their respective borders when it treated the territory granted to Tennessee as part of Tennessee by, *inter alia,* administering elections in it, and setting it apart for judicial and revenue purposes as in Tennessee); Green v. Biddle, 21 U.S. (8 Wheat.) 1, 86-87 (1823) (Congress impliedly consented to 1789 compact between Virginia and Kentucky on the separation of Kentucky from Virginia by its Act admitting Kentucky to the Union).

[13]   Specifically, the amendment provided that federal rules governing health overpayments

shall not apply to any amount recovered or paid to a state as part of *the comprehensive settlement of November 1998* between manufacturers of tobacco products . . . and State Attorneys General, or as part of any individual State settlement or judgment reached in litigation initiated or pursued by a State against one or more such manufacturers. . . . A State may use amounts recovered or paid to the State as part of a comprehensive or individual settlement, or a judgment, . . . for any expenditures determined appropriate by the State.

42 U.S.C. § 1396b(d)(3)(B)(i-ii) (Supp. V 1999) (emphasis added).

any doubt that Congress by this enactment approved the Settling States' decisions to enter the MSA, the Conference Report accompanying the Medicaid amendment expressly states that Congress' purpose in disclaiming its interest was to avoid needless litigation by providing certainty and finality to the States in their use of MSA funds.[14]  Congress' express reference to the MSA and its provision for disposition of the settlement proceeds clearly demonstrate Congress' consent to the agreement.

For all of these reasons, Plaintiffs have not stated a claim under the Compact Clause upon which relief may be granted.

**B.      Count II – Plaintiffs' FCLAA Preemption Claim Should Be Dismissed.**

The Federal Cigarette Labeling and Advertising Act ("FCLAA"), 15 U.S.C. § 1331 *et seq.*, contains a preemption provision stating that "[n]o requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter." 15 U.S.C. § 1334(b).  In their Count II, Plaintiffs allege that the MSA and Escrow Statute are a "national regulatory scheme on the advertising and marketing of cigarettes that violates and is preempted by the FCLAA" because "[t]he MSA bans many forms of cigarette advertising" and the Escrow Statute

---

[14]     *See* House Conf. Rep. 106-143, 106th Cong. 1st Sess., Pub. L. No. 106-31, Emergency Supplemental Appropriations, May 14, 1999, 1999 U.S.C.C.A.N. 27, 1999 WL 303282:

> The conference agreement includes language . . . to prohibit any Medicaid-related funds recovered or paid to a State as part of a settlement or judgment reached in litigation the State initiated or pursued against one or more tobacco companies being treated as an overpayment for purposes of the Medicaid statute. . . .  The conferees recognize that, *absent Congressional action, the issue of the federal share of funds recovered under such settlements or judgments would be subject to litigation over the next several years, delaying the availability of these funds and putting planned State uses on hold.  The conferees . . . [intend] to permit States which are delaying their plans for the use of these funds the certainty they need to plan their initiatives. Id.* (emphasis added).

"compels cigarette makers to either join the MSA and thus restrict their advertising, or make substantial annual payments into escrow." Complaint, ¶ 75.

The PMs voluntarily agreed to the MSA's restrictions on their advertising, promotional, and marketing activities. *See* MSA § 15. Those restrictions therefore do not fall within the scope of FCLAA's preemption provision, which applies only to any "requirement or prohibition ... imposed under State law." Plaintiffs, however, apparently contend that there is a requirement or prohibition imposed under State law because the Escrow Statute compels manufacturers either to accept the restrictions or to make escrow payments.

This argument has already been raised and rejected in the <u>PTI</u> and <u>Grand River</u> cases. As the <u>Grand River</u> court held:

> Plaintiffs believe the plain language of the FCLAA preempts the Escrow and Certification Statutes because those Statutes have the effect of forcing manufacturers to join the MSA. The MSA, in turn, contains advertising restrictions.
>
> The Escrow and Certification Statutes do not, however, force manufacturers to join the MSA. In fact, the Statutes apply only to those manufactures that chose not to join the MSA. The very argument that plaintiffs raise in this action was raised and rejected in <u>PTI, Inc. v. Philip Morris Inc.</u>, 100 F.Supp.2d 1179 (C.D.Cal.2000). The court in <u>PTI</u> held that the Escrow Statute "does not have any connection whatsoever with cigarette packaging, advertising, or promotion. To the extent plaintiffs object to the voluntary advertising restrictions to which signatories to the M.S.A. have agreed, they lack standing to challenge these provisions. Moreover, the restrictions are not legislatively required." *Id.* at 1205. As there is nothing in the FCLAA to indicate Congress's intention to preempt the entire field of cigarette regulation and nothing in the Statutes having to do with advertising, the FCLAA does not preempt the Statutes.

Grand River Enter. Six Nations Ltd. v. Pryor, 2003 WL 22232974 at *16-*17 (S.D.N.Y. Sep 29, 2003), *vacated in part on other grounds*, 2004 WL 1594869 (S.D.N.Y. Jul. 15, 2004), *aff'd in part, reversed in part, and remanded* (425 F.3d 158 (2d Cir. 2005), *reconsideration pending* (2d Cir. No. 03-9179cv).[15]  Plaintiffs' FCLAA preemption claim should be rejected here for the same reasons.

## C.    COUNT III – THE  MSA VIOLATES NEITHER THE COMMERCE CLAUSE NOR THE DUE PROCESS CLAUSE

Count III of the Complaint invokes the Commerce and Due Process Clauses, and alleges that the MSA and Escrow Statute violate those constitutional provisions by acting extraterritorially in various ways.  As with Plaintiffs' other claims, these have been repeatedly rejected by other courts in cases challenging the MSA and Escrow Statute.

### 1.    Commerce Clause.

State regulation generally violates the negative or "dormant" aspect of the Commerce Clause if it either (1) facially discriminates in favor of intrastate interests or (2) although facially neutral, "directly controls commerce occurring wholly outside the boundaries of a State." *See* Healy v. The Beer Institute, 491 U.S. 324, 335-36 (1989); City of Philadelphia v. New Jersey, 437 U.S. 617, 624 (1978).  State regulation that is evenhanded passes constitutional muster, even if it imposes an incidental burden on interstate commerce, unless a plaintiff can show that the burden is "clearly excessive" when compared to the local benefits of the enactment.  Oregon Waste Sys., Inc. v. Department of Envtl. Quality, 511 U.S. 93, 99 (1994); Pike v. Bruce Church, Inc., 397 U.S. 137, 142, (1970).

---

[15]    The dismissal of the FCLAA claim in Grand River has been affirmed throughout and is not the subject of the current "Motion for Reconsideration" filed in 2d Cir. No. 03-9179cv.

### a.    The MSA.

Plaintiffs do not allege that the MSA discriminates in favor of intrastate commerce; instead, they rely on the allegation that the MSA regulates "interstate commerce in an extraterritorial fashion." Complaint, ¶ 79. According to Plaintiffs, this is because PMs' payments under the MSA are based on the PMs' sales in the entire United States, including the four "non-settling states".[16]  *Id.*   This claim fails for two fundamental reasons.

First, the MSA is not a "state regulation" subject to the dormant Commerce Clause. As the court in Mariana v. Fisher noted, after reviewing relevant Supreme Court authority, including Healy and Brown-Forman Distillers v. New York Liquor Auth., 476 U.S. 573 (1986):

> unlike the price affirmation laws before the Supreme Court [in Healy and Brown-Forman], the M.S.A. is not a statute promulgated by the state legislature.  Rather, it is a settlement agreement that disposed of pending litigation. Thus, while Plaintiffs attempt to draw analogies to Brown-Forman and Healy, the M.S.A. does not contain "pricing decisions [that] are imported by statutes into the [local] market regardless of local competitive conditions." Healy, 491 U.S. at 339, 109 S.Ct. 2491.

Mariana v. Fisher, 226 F.Supp.2d 575, 585-86 (M.D. Pa. 2002), *aff'd on other grounds*, 338 F.3d 189 (3d Cir. 2003), *cert. denied sub nom.* Mariana v. Pappert, 540 U.S. 1179 (2004).  The Commerce Clause is traditionally applied to State legislative or regulatory actions and not agreements involving a State.[17]  In particular, an agreement that settles

---

[16]    In fact, the four States did enter into settlements, albeit separate from the MSA.

[17]    *See, e.g.,* C&A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 390 (1994) (observing that the "central rationale" for the negative Commerce Clause "is to prohibit *state or municipal laws* whose object is local economic protectionism") (emphasis added); City of Philadelphia v. New Jersey, 437 U.S. 617, 626 (1978) (discussing protectionism as flowing from "*legislative* means as well as *legislative* ends") (emphasis added).

claims in litigation between a State and a private party is a voluntary act that does not constitute State regulation in any ordinary sense. Research has produced only a single decision even to consider a Commerce Clause challenge to a settlement agreement, which the court described as "the antithesis of 'direct' regulation of the kind that is per se invalid" under the Commerce Clause.[18] A multi-state agreement settling legal claims is, if anything, more antithetical to Commerce Clause analysis.

Second, as the Supreme Court has explained, the dormant Commerce Clause is principally implicated by State legislation that interferes "with the maintenance of a national economic union," either by discriminating against interstate commerce or by directly controlling "commerce occurring wholly outside the boundaries of a State." Healy, 491 U.S. at 335-36. No facts alleged in the Complaint suggest that the MSA enables one or more States to do either of those things. The Complaint contains no allegations relating to discrimination against interstate commerce or in favor of intrastate interests. Furthermore, unlike the price affirmation schemes at issue in Healy and Brown-Forman, which had the effect of controlling prices in other States:

> There is no allegation that the M.S.A. adopts a scale of prices that is applicable in other states, and the M.S.A. does not contain mandates on pricing akin to those in Healy or Brown-Forman. Furthermore, there is no set of facts that Plaintiffs could prove that would show that Defendants are controlling conduct beyond the state, especially not in a way that has the effect of favoring in-state economic interests over out of state economic interests.

---

[18] Automated Salvage Transport, Inc. v. Wheelabrator Entl. Sys., Inc., 155 F.3d 59, 78 (2d Cir. 1998) (affirming dismissal of a third party's challenge to a settlement agreement by which another party had agreed with the State of Connecticut "to place certain restrictions on its activities" beyond the borders of the State).

Mariana, 226 F.Supp.2d at 586. Any effect the MSA may have on interstate commerce is wholly incidental to the Settling States' exercise of authority in an area of vital State public health interests that are fundamental to the MSA and that occupy a traditional area of State jurisdiction.

That the Participating Manufacturers' MSA payments are based on national sales rather than sales in only the Settling States, as alleged in Paragraph 79 of the Complaint, and are allocated among the States according to a formula, does not mean the Settling States are regulating commerce or conduct in the other four States, either directly or indirectly.[19] At most, the result may be higher prices paid by consumers in those four States. But that is no different from other situations in which manufacturers incur higher costs as a result of regulations imposed by one or more States and then, through their own pricing decisions, decide to pass them on to all of their customers, including those in other States. Such situations are well beyond the reach of the dormant Commerce Clause. Moreover, the parties to a voluntary agreement may choose to calibrate their obligations by reference to a wide variety of indices, and the mechanism adopted in the MSA no more runs afoul of the Commerce Clause than would one that created a settlement fund by reference to a national CPI index or a national average interest rate.

### b.    The Escrow Statute.

Plaintiffs' Commerce Clause claim against the Escrow Statute is equally deficient. Plaintiffs allege that the Statute has an "extraterritorial reach" because any

---

[19]    The Complaint, ¶ 79, incorrectly alleges that MSA payments are "apportioned among the Settling States by entities selected by NAAG and the Majors." In fact, the payments are allocated among the Settling States in accordance with a schedule of percentages specified in Exhibit A to the MSA. In any event, it is difficult to perceive what constitutional significance inheres in the manner in which MSA payments are allocated.

NPM whose cigarettes are sold in Louisiana is subject to an escrow requirement, provided it intended that its cigarettes be sold anywhere in the United States, even though it may be located and conduct business entirely outside Louisiana. Complaint, ¶ 81. Plaintiffs also purport to find an impermissible extraterritorial reach in the fact that the Statute applies to an NPM's cigarettes even though they may be sold through a distributor, retailer, or other intermediary. For example, Plaintiff CLP alleges that it sells its cigarettes in the four Previously Settled States and, because those cigarettes are resold in Louisiana, the Louisiana Escrow Statute requires that escrow deposits be made with respect to those cigarettes even though CLP may not have known or given permission that they be sold in Louisiana. Complaint, ¶ 83. Plaintiffs further allege that these requirements excessively burden interstate commerce. *Id.*

Louisiana's Escrow Statute applies only to cigarettes sold "within the State," (LSA-R.S. 13:5063(A)) and defines "units sold," the operative term for calculating escrow payments, as "the number of individual cigarettes sold in the state . . . bearing the excise tax stamp of the state." (LSA-R.S. 13:5062(10)). Consequently, the Statute regulates only commerce occurring within Louisiana; more specifically, only that commerce that results in Louisiana excise tax stamps being affixed to the cigarettes – making them legal for sale in Louisiana only. This would necessarily exclude those cigarettes that are merely "trans-shipped" through Louisiana to some other final destination. As the Fourth Circuit held in <u>Star Scientific</u>: "[R]ather than regulate 'upstream transactions' outside of the State, the Virginia qualifying statute imposes a fee only for cigarettes actually sold within the State. It has no effect on transactions undertaken by out-of-state distributors in other States." 278 F.3d at 356. *See also*

Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 221 (2d Cir. 2004) ("In short, none of
the indicia of an impermissible extraterritorial regulation are present.").

The most recent decision, Grand River, 425 F.3d 158, declined to foreclose a
different extraterritoriality challenge on a motion to dismiss, on the basis that the
[Plaintiffs] therein had alleged that "interstate regulatory gridlock would occur if 'many
or every' state adopted similar legislation." Id., at page 10-11 of the printed copy.[20]
However, the instant Complaint contains no such allegation. The Commerce Clause
allegation made in the instant Complaint merits the same response made anew by the
Grand River court that "[t]he extraterritorial effect described by appellants amounts to no
more than the upstream pricing impact of a state regulation." Id.

Moreover, none of the facts recited in the Complaint support the conclusory
allegation in Paragraph 83 that the Escrow Statute imposes a burden on interstate
commerce that is excessive in relation to putative local benefits. The judicially-
developed restrictions of the dormant Commerce Clause were "never intended to cut the
States off from legislating on all subjects relating to the health, life, and safety of their
citizens." Huron Portland Cement Co. v. City of Detroit, 362 U.S. 440, 443-44 (1960);
see also CTS Corp. v. Dynamic Corp. of America, 481 US 69, 92 (1987) (dormant
Commerce Clause analysis should not "second-guess the empirical judgments of
lawmakers concerning the utility of legislation"). The burden alleged here – that an NPM
must determine how many of its cigarettes were sold in Louisiana in order to comply
with the Escrow Statute – can hardly be regarded as "excessive" in comparison to the

---

[20]     (Westlaw annotation: "Publication page references are not available for this document").

important health and safety goals achieved by the Escrow Statute.[21] Distributors of NPM cigarettes are already required to maintain records of the number of cigarettes they stamp and to report this information to the State. (LAC 61:I.5101). "Because distributors already have to keep track of this information, any additional burden caused by requiring manufacturers to obtain this information from the distributors is minimal." <u>Star Scientific</u>, 278 F.3d at 357.

Nor does <u>Quill Corp. v. North Dakota</u>, 504 U.S. 298 (1992), support Plaintiffs' Commerce Clause claim. In <u>Quill</u>, the Supreme Court considered a challenge to North Dakota's "use tax," which served as "a corollary to its sales tax." *Id.* at 302. Among other things, the State required most out-of-State sellers of products to persons located in North Dakota to collect this tax from their customers and to remit it to the State. *Id.* The Court found the collection requirement unconstitutional as applied to Quill, a mail-order seller that had neither outlets nor sales representatives in North Dakota. Although the Court recognized the changes in both Commerce Clause jurisprudence and the nature of mail-order business and technology that had led the North Dakota Supreme Court to uphold the statute against a Commerce Clause challenge, it nevertheless reaffirmed the "bright-line rule" of <u>National Bellas Hess, Inc. v. Dep't of Revenue</u>, 386 U.S. 753 (1967), which had held that a State could not require a vendor that lacked a physical presence in the taxing state to collect a use tax. *Id.*

The <u>Quill</u> Court, however, repeatedly emphasized that the <u>Bellas Hess</u> "bright-line rule" applied only to State sales and use tax statutes and *not even to other types of*

---

[21]     See LSA-R.S. 13:5061 (Findings and Purpose).

23

taxes.[22]  As the Court also made clear, Quill was largely based on *stare decisis*

considerations and had little to do with the merits of the formalistic Bellas Hess rule,

which was (and is) at odds with the Court's other Commerce Clause cases.[23]

Quill is inapplicable to the Louisiana Escrow Statute.  The statute does not impose

a tax, let alone a sales or use tax, on the sale of Plaintiffs' cigarettes, nor does it require

Plaintiffs to collect such a tax from Louisiana residents and then remit it to the State.  Nor

is this escrow obligation triggered by a transaction that occurs in an interstate transaction

between a foreign mail-order company and an in-State customer, as was the case in Quill;

the escrow requirement here is triggered by a transaction that occurs *within Louisiana*—

the sale of an NPM's cigarettes by a Louisiana retailer in Louisiana.  Also, unlike the use

tax collection mandate invalidated in Quill, in which the tax payments went directly into

the State treasury as part of the public revenue, the funds placed into escrow by Plaintiffs

can enter the State treasury only at some future time in order to satisfy a tort judgment or

settlement.   In effect, the escrow requirement is similar to a bonding requirement,

providing a source of funds that can be used to compensate Louisiana for harm caused by

Plaintiffs' products in Louisiana.

Two courts have already rejected a Commerce Clause challenge to an Escrow

Statute premised on Quill.  Most recently, in Xcaliber Int'l Ltd. v. Ieyoub, 377 F.Supp.2d

567, 578 (E.D.La. 2005), *appeal pending* (5th Cir. No. 05-30323), the Eastern District of

Louisiana held that "[b]ecause the amended escrow statute is not a tax or other 'revenue-

---

[22]     *See* Quill, 504 U.S. at 317 (noting that "a similar bright-line, physical presence requirement" has not been adopted in cases "subsequent to Bellas Hess and concerning other types of taxes").

[23]     *See* Quill, 504 U.S. at 311 (noting that "contemporary Commerce Clause jurisprudence might not dictate the same result were the issue to arise today"); *id.* at 317 ("the continuing value of a bright-line rule in this area and the doctrine and principles of *stare decisis* indicate that Bellas Hess remains good law").

24

raising measure designed to line the State's coffers,' the test utilized by the <u>Quill</u> /<u>Complete Auto Transit</u> line of cases does not apply." Similarly, in <u>Star Scientific, Inc. v. Carter</u>, 2001 WL 1112673 (S.D. Ind. Aug. 20, 2001), the court rejected the argument that Indiana could not impose an escrow obligation on an NPM that claimed to have no substantial nexus with that State. The court found <u>Quill</u> to be inapposite because "the escrow requirement is not a tax placed on interstate commerce, but is rather an exercise of the state's police powers." <em>Id.</em> at *9. Other courts have distinguished <u>Quill</u> on other grounds.[24]

### 2.    Due Process Clause.

Plaintiffs' due process claims, which are based on essentially the same factual allegations as their Commerce Clause claims, are also legally deficient.

#### a.    The MSA.

Plaintiffs contend that the MSA violates the Due Process Clause by "by regulating conduct occurring wholly outside the Settling States' jurisdiction." Complaint, ¶ 79. Plaintiffs also allege that the MSA injures individual smokers by increasing cigarette prices nationally and by preventing smokers from being able to obtain cheaper cigarettes by traveling into non-MSA States, <em>id.</em>, although it is unclear whether this is part of the Due Process claim or merely an allegation of injury intended to establish Plaintiff Heacock's standing.

---

[24]    <em>See also</em> <u>Ferndale Labs., Inc. v. Cavendish</u>, 79 F.3d 488, 494 (6th Cir. 1996) (holding that <u>Quill</u> does not apply to a statute requiring out-of-State pharmaceuticals distributors to register and pay a fee, even where that fee went directly into the State treasury, because the fee requirement was "not designed as a revenue-raising measure."); <u>American Target Advertising, Inc. v. Giani</u>, 199 F.3d 1241, 1255 (10th Cir.) <u>cert. denied</u>, 531 U.S. 811 (2000), (holding <u>Quill</u> inapplicable to licensing or registration requirements passed by a State under its police powers because <u>Quill</u> concerns only "tax burdens.").

As discussed above in connection with the Commerce Clause claim, the fact that MSA payments are based on national sales does not mean that the Settling States are "regulating conduct" outside their jurisdiction in any constitutionally meaningful sense. First, there is no "regulation" because the MSA is a contract, not a requirement imposed by statute or regulation. Second, the impact of MSA payments outside of the MSA States is indirect and – even if the MSA were considered a State regulation – is not compelled by the MSA. The MSA imposes payment obligations on PMs that are measured by national sales. Neither the MSA nor the Escrow Statute imposes any obligation on NPMs in non-MSA States. Both PMs and NPMs simply decide how to price their products using their own best judgments based on whether and to what extent they are subject to either settlement payment or escrow obligations. This situation is far removed from the concerns of the Due Process Clause.

With respect to the allegation of higher prices, it suffices to say, as the Ninth Circuit did in a similar due process challenge to the MSA, "no constitutional injury occurs when a manufacturer passes on higher costs in the form of price increases." Table Bluff Reservation (Wiyot Tribe) v. Philip Morris, Inc., 256 F.3d 879, 881 (9th Cir. 2001).

### b.    The Escrow Statute.

Plaintiffs' due process challenge to the Escrow Statute is on no stronger ground than its Commerce Clause claim. In Quill, which involved a State's power to tax a transaction, the Supreme Court stated:

> we have held that if a foreign corporation purposefully avails itself of the benefits of an economic market in the forum State, it may subject itself to the State's *in personam* jurisdiction even if it has no physical presence in the State. . . . Comparable reasoning justifies the imposition of the collection duty on a mail-order house that is engaged in

> continuous and widespread solicitation of business within a
> State. . . .   The requirements of due process are met
> irrespective of a corporation's presence in a taxing State.

504 U.S. at 307-08.  As discussed in the preceding section, the Escrow Statute does not

impose a tax, so the "requirements of due process" for imposition of the escrow deposit

obligation on NPMs with no physical presence in a State are, if anything, less than the

requirements described in Quill for imposition of a tax collection requirement on out-of-

State sellers.

The Fifth Circuit applies the due process "minimum contacts" test for jurisdiction

described in Ruston Gas Turbines, Inc. v. Donaldson Co., Inc., 9 F.3d 415, 419 (1993):

> The Supreme Court has stated that a defendant's placing of
> its product into the stream of commerce with the
> knowledge that the product will be used in the forum state
> is enough to constitute minimum contacts.  World-Wide
> Volkswagen Corp. v. Woodson, 444 U.S. 286, 298, 100
> S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).  The Fifth Circuit is
> among the circuits that have interpreted World-Wide
> Volkswagen to hold that "mere foreseeability or awareness
> [is] a constitutionally sufficient basis for personal
> jurisdiction if the defendant's product made its way into the
> forum state while still in the stream of commerce."

(Citation omitted.)  Thus, a manufacturer "purposefully avails itself" of the benefits of a

market in a State when it knows *or should know* that its products are being sold there and

takes no steps to prevent such sales.  *See also* Oswalt v. Scripto, Inc., 616 F.2d 191, 201

(5th Cir. 1980) (holding that in applying due process "fairness" test for jurisdiction, "it is

a matter of common sense that there should be no distinction between 'know' and 'should

have known' ").

None of the Plaintiffs can credibly claim that it has not purposefully availed itself

of the benefits of the Louisiana market.  A.B. Coker is a distributor that sells cigarettes in

Louisiana.  Complaint, ¶ 11.  S&M Brands, an NPM, would seek to sell cigarettes in

Louisiana but for the Escrow Statute. *Id.* ¶ 12. CLP, also an NPM, avers that it sells tobacco and cigarettes in Louisiana and makes escrow payments. Complaint, ¶ 13. The remaining plaintiffs are a retailer located in Louisiana and a smoker who resides in the State. Id., ¶ 14, 18.

Thus, S&M Brands is the only Plaintiff that has not itself alleged facts establishing that it is already purposefully availing of the opportunity to do business in Louisiana. It alleges that it would like to do so, however, if not for the "obstacles to competition" posed by the Escrow Statute, Complaint, ¶ 12, which leaves no room for doubt that its sales would be purposeful. Indeed, under Louisiana's Complementary Legislation, S&M's cigarettes could be sold in Louisiana only if S&M purposefully availed itself of the Louisiana market by asking that its brand or brands be certified for sale there. (LSA-R.S. 13:5073). In any event, if any of S&M's cigarettes were sold in Louisiana, it would be able to determine that fact from its distributors, such as its co-Plaintiff here, A.B. Coker. *See* Part C.1.b. of this Memorandum. Consequently, S&M would be chargeable with such knowledge for purposes of the "purposeful availment" test. *See, e.g.*, <u>Barone v. Rich Bros. Interstate Display Fireworks Co.</u>, 25 F.3d 610, 613 (8th Cir. 1994) (rejecting a manufacturer's claim that it did not know if its products were being sold in the forum State, noting that in light of the manufacturer's use of distributors, "such ignorance defies reason and could aptly be labeled 'willful' ").

For the same reasons, Plaintiffs' due process challenge to the Escrow Statute should be dismissed.

## D.   COUNT IV – THE TENTH AMENDMENT HAS NO APPLICABILITY TO THE MSA OR ESCROW STATUTE

The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." Count IV of the Complaint is premised on allegations that the MSA commandeers State legislatures to adopt the Escrow Statute and delegates the legislatures' powers to bodies outside the control of either the State or federal government. ¶ 85.

As a threshold matter, plaintiffs lack standing to assert the constitutional rights of the States under the Tenth Amendment. In *Tennessee Elec. Power Co. v. TVA*, 306 U.S. 118 (1939), a group of State-chartered utilities argued that the federal statute authorizing the TVA to sell electricity violated the Tenth Amendment by regulating matters reserved to the States. The Court held: "As we have seen there is no objection to the Authority's operations by the states and, if this were not so, the [utilities], absent the states or their officers, have no standing in this suit to raise any question under the [Tenth] [A]mendment." *Id.* at 144. *See also* Gaubert v. Denton, 1999 WL 350103, *5 (E.D. La. May 28, 1999) (denying standing to private litigant to challenge federal statute under Tenth Amendment, and holding that "Tennessee Electric remains binding authority").

Even if Plaintiffs had standing, and even if their allegations were true, it would mean only that the Settling States have willingly entered into an arrangement – the MSA – that has the described effects on those States. It is difficult to see in what respect such an arrangement would violate the Tenth Amendment, which operates as a check on federal authority: "In examining congressional enactments for infirmity under the Tenth Amendment, this Court has focused its attention on laws that commandeer the States and

29

state officials in carrying out federal regulatory schemes." McConnell v. Federal Election Comm'n, 540 U.S. 93, 186 (2003). For this reason alone, Plaintiffs' Tenth Amendment claim should be dismissed. In any case, Plaintiffs' allegations are not true, as is evident from the face of the MSA.

First, the MSA did not compel any Settling State's legislature to enact an Escrow Statute. Rather, it created a financial incentive for enactment and enforcement of such Statutes to protect against possible reductions in payments. Congress transgresses no Tenth Amendment limits when it places conditions on the receipt by States of federal benefits;[25] *a fortiori* the States do not do so when they act collectively to create incentives for each one of them to enact legislation. Moreover, the legislatures had other, independent, reasons for enacting the Statutes, including the need to create a fund to satisfy future judgments and the concern that the NPMs' price advantage would increase demand for their deadly products.

Second, the allegation in Paragraph 87 of the Complaint that "fundamental state powers are delegated to NAAG and related entities, which administer tax, appropriations, and law enforcement functions," is patently without any basis in the MSA or in any fact cited in the Complaint. As discussed previously, NAAG performs limited functions specifically assigned to it in the MSA. The only other entities involved in the MSA are "the Firm," whose function is to make certain determinations in limited circumstances carefully defined in the MSA; the Independent Auditor, which performs calculations and whose functions are essentially ministerial; the MSA Escrow Agent, which simply

---

[25] *See* South Dakota v. Dole, 483 U.S. 203, 210 (1987) (noting, in case involving statute conditioning receipt of federal highway funds on state's raising drinking age to 21, that Supreme Court has held "that a perceived Tenth Amendment limitation on congressional regulation of state affairs did not concomitantly limit the range of conditions legitimately placed on federal grants.").

receives and distributes MSA settlement payments in accordance with the parties' instructions (*see* MSA §§ IX(a), XI(f), and Exhibit B); and any arbitral tribunals appointed under Section XI(c), which is a traditional dispute-resolution procedure applicable to disputes concerning calculations or determinations of the Independent Auditor. None of these functions or responsibilities in any way affects the Settling States' sovereign powers to tax, appropriate funds, and enforce the MSA and Escrow Statutes.

Plaintiffs' Tenth Amendment claim therefore fails on both legal and factual grounds and, accordingly, should be dismissed.

## CONCLUSION

For the reasons set forth above, the Court should dismiss the Complaint.

Respectfully submitted,

CHARLES C. FOTI, JR.
Attorney General

BY:

Thomas L. Enright, Jr.
Assistant Attorney General
(Attorney ID #25040)

LOUISIANA DEPARTMENT OF JUSTICE
Tobacco Settlement Enforcement Section
1885 North Third Street
P. O. Box 94005
Baton Rouge, Louisiana 70804-9005
Telephone: (225) 326-6423
Facsimile: (225) 326-6072

and

_Jerald L. Perlman_
Jerald L. Perlman
Assistant Attorney General
(Attorney ID #8602)

LOUISIANA DEPARTMENT OF JUSTICE
Litigation Division
330 Marshall Street, Suite 777
Shreveport, Louisiana  71101
Telephone (318) 676-5711
Facsimile (318) 676-5703

ATTORNEYS FOR DEFENDANT


## C E R T I F I C A T E

I HEREBY CERTIFY that a copy of the above and foregoing has this day been served upon plaintiffs through their counsel of record by placing the same in the U. S. Mail, postage prepaid and properly addressed.

Shreveport, Louisiana, this _71__ day of October, 2005.

_Jerald L. Perlman_
OF COUNSEL