RECEIVED

DEC 1 6 2005

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT, LOUISIANA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

A.B. COKER CO., INC.,      )
      et al.,              )
                           )
      Plaintiffs,          )
                           )      Civil Action No. 05-1372
v.                         )
                           )      Judge Hicks
CHARLES C. FOTI, in        )
his official capacity as   )      Magistrate Judge Hornsby
Attorney General,          )
State of Louisiana,        )
                           )
      Defendant.           )

PLAINTIFFS' MEMORANDUM IN OPPOSITION
TO MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION..............................................................................................1

ARGUMENT ....................................................................................................3

I.   THE MSA CONSTITUTES "STATE ACTION" SUBJECT TO
     CONSTITUTIONAL SCRUTINY. ......................................................3

II.  THE MSA VIOLATES THE COMPACT CLAUSE. ..........................5

  A.  The Compact Clause Must be Construed to Have Independent Meaning...... 5

  B.  The MSA Plainly Required Congressional Approval Under the Compact
      Clause but Never Received It................................................................ 9

III. THE MSA'S CREATION OF A NATIONAL CARTEL EXCEEDS
     ANTITRUST EXEMPTIONS AND UNDERMINES FEDERAL
     ANTITRUST POLICY...........................................................................16

IV.  THE MSA CONFLICTS WITH FEDERAL POLICY BY VIOLATING
     THE FEDERAL CIGARETTE LABELING AND ADVERTISING ACT
     AND THE BANKRUPTCY CODE.......................................................21

V.   THE MSA VIOLATES THE FIRST AMENDMENT AND INTERFERES
     WITH THE NATIONAL POLITICAL PROCESS. ...........................24

VI.  THE MSA FLOUTS FEDERAL AUTHORITY AND PRINCIPLES OF
     FEDERALISM BY REGULATING SALES AND ACTIVITIES OUTSIDE
     ITS MEMBER STATES. ......................................................................26

  A.  The MSA and Escrow Statute Violate the Commerce Clause........................ 27

  B.  The MSA and Escrow Statute Violate Due Process.......................................... 31

VII. THE MSA VIOLATES THE TENTH AMENDMENT .....................32

CONCLUSION ...............................................................................................35

# TABLE OF CASES AND AUTHORITIES

Cases

*A.D. Bedell Wholesale Co. v. Philip Morris*, 263 F.3d 239 (3d Cir. 2001) ................................................ 22

*ACORN v. Edwards*, 81 F.3d 1387 (5th Cir. 1996) ................................................................................. 34

*Aetna Health Ins. v. Davila, 124 S.Ct. 2488 (2004)* .......................................................................... 8, 19

*American Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003)....................................................................... 7

*Automated Salvage Transport, Inc. v. Wheelabrator Ent'l Sys. Inc.*, 155 F.3d 59 (2d Cir. 1998)............ 4, 27

*Baldwin v. G.A. Seelig, Inc.*, 294 U.S. 511 (1935) ................................................................................ 26

*Blackburn v. Sweeney*, 53 F.3d 825 (7th Cir. 1995) ............................................................................. 17

*BMW v. Gore*, 517 U.S. 559 (1996).................................................................................................... 32

*Board of County Commr's v. Umbehr*, 518 U.S. 668 (1996........................................................................ 4

*Boulter v. Boulter*, 930 P.2d 112 (Nev. 1997) ...................................................................................... 3

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)........................................................................... 29

*Burks v. Lasker*, 441 U.S. 471 (1979)................................................................................................. 8

*Cain v. Darby Borough*, 7 F.3d 377 (3d Cir. 1993) (en banc)............................................................ 23, 24

*Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643 (1980)...................................................................... 17

*Commissioner v. Heininger*, 320 U.S. 467 (1943).................................................................................. 14

*Community Communications v. City of Boulder*, 455 U.S. 40 (1982)......................................................... 16

*Conley v. Gibson*, 355 U.S. 41 (1957)............................................................................................ 3, 29

*Davies v. Grossmont Union High School*, 930 F.2d 1390 (9th Cir. 1991) .................................................. 26

*Dollan v. City of Tigard*, 512 U.S. 374 (1994) ...................................................................................... 4

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961)..................... 24

*Edgar v. M.I.T.E. Corp.*, 457 U.S. 624 (1982) ...................................................................................... 30

*Elrod v. Burns*, 427 U.S. 347 (1976) ................................................................................................... 25

*F.T.C. v. Ticor Title Ins. Co.*, 504 U.S. 621 (1992) ............................................................................... 19

*Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278 (5th Cir. 1993) ..................................................... 3

*Florida v. Georgia*, 58 U.S. 478 (1855) ................................................................................................ 8

*Freedom Holdings v. Spitzer*, 357 F.3d 205 (2d Cir. 2004)................................................... 2, 11, 16, 29

*Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000)........................................................................ 4

*Gillespie v. Indianapolis*, 185 F.3d 693 (7th Cir. 1999) .......................................................................... 32

*Great Atlantic & Pac. Tea Co. v. Cottrell*, 424 U.S. 366 (1976)................................................................ 26

*Hague v. C.I.O.*, 307 U.S. 496 (1939).................................................................................................. 24

*Hallie v. Eau Claire*, 471 U.S. 34 (1985) ............................................................................................. 19

*Healy v. Beer Institute*, 491 U.S. 324 (1989)................................................................................... 27, 30

*Helvering v. Davis*, 301 U.S. 619 (1937).............................................................................................. 32

*In re Cole*, 226 B.R. 647 (9th Cir. B.A.P. 1998) .................................................................................... 23

*Jerry Rossman Corp. v. Commissioner*, 175 F.2d 711 (2d Cir. 1949)........................................................... 14

*Jones v. Vilsack*, 272 F.3d 1030 (8th Cir. 2001)....................................................................................... 22, 23

*Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389 (1978)........................................................... 16, 19

*LeClerc v. Webb*, 419 F.3d 405 (5th Cir. 2005)................................................................................................ 8

*Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001) .............................................................................. 4

*Lilly v. Commissioner*, 343 U.S. 90 (1952).................................................................................................... 14

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001)................................................................... 11, 21, 24

*Louisiana Dairy Stabilization Bd. v. Dairy Fresh Corp.*, 476 F. Supp. 416 (M.D. La. 1979), *aff'd*, 631 F.2d 67 (5th Cir. 1980) ......................................................................................................................... 31

*Louisiana Dairy Stabilization Board v. Dairy Fresh Corp.*, 631 F.2d 67 (5th Cir. 1980), *aff'd*, 454 U.S. 884 (1981)........................................................................................................................... 30, 31

*Lowrey v. Texas A & M Univ. Sys.*, 117 F.3d 242 (5th Cir. 1997)................................................................... 3

*McConnell v. Federal Election Commission*, 540 U.S. 93 (2003)................................................................. 33

*Miller Bros. v. Maryland*, 347 U.S. 340 (1954)............................................................................................ 31

*New York v. United States*, 505 U.S. 144 (1992)........................................................................................... 34

*Northern Securities Co. v. United States*, 193 U.S. 197 (1904).................................................................... 18

*Pacific Frontier v. Pleasant Grove City*, 414 F.3d 1221 (10th Cir. 2005)..................................................... 25

*Pfizer, Inc. v. Giles*, 46 F.3d 1284 (3d Cir. 1994)......................................................................................... 24

*Port Authority Trans-Hudson Corp. v. Feeney*, 495 U.S. 299 (1990) ............................................................ 8

*Quill v. North Dakota*, 504 U.S. 298 (1992) ................................................................................................. 30

*Rhode Island v. Massachusetts*, 37 U.S. 657 (1838)....................................................................................... 9

*Ridgway v. Ridgway*, 454 U.S. 46 (1981)........................................................................................................ 3

*Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002) ........................................................................................ 6

*Simon & Schuster v. Members of New York State Crime Victims Bd.*, 502 U.S. 115 (1991)....................... 25

*South-Central Timber Dev. v. Wunnicke*, 467 U.S. 82 (1984)................................................................. 15, 27

*Star Scientific v. Beales*, 278 F.3d 339 (4th Cir. 2002)........................................................................ passim

*Star Scientific v. Carter*, 2001 WL 1112673 (S.D. Ind. Aug. 20, 2001)....................................................... 31

*State Farm Auto. Ins. Co. v. Campbell*, 123 S.Ct. 1513 (2003)................................................................... 32

*Steward Machine Co. v. Davis*, 301 U.S. 548, 573 (1937)........................................................................... 32

*Tennessee Elec. Power Co. v. TVA*, 306 U.S. 118 (1939) ........................................................................... 32

*Thompson v. Western Medical Center*, 535 U.S. 357 (2002) .................................................................. 4, 25

*Town of Newton v. Rumery*, 480 U.S. 386 (1987)......................................................................................... 23

*U.S. Steel Corp. v. Multistate Tax Commission*, 434 U.S. 452 (1978) .................................................. passim

*U.S. Term Limits v. Thornton*, 514 U.S. 779 (1995)..................................................................................... 24

*United States v. Cruikshank*, 92 U.S. 542 (1876) ....................................................................................... 24

*United States v. Gasoline Retailers Ass'n*, 285 F.2d 688 (7th Cir. 1961)..................................................... 17

*United States v. Menache*, 348 U.S. 528 (1955) ............................................................................................ 6

*United States v. Richardson*, 418 U.S. 166 (1974) ...................................................................................... 32

*Virginia v. Patriot Tobacco Co.*, No. CH03-44-1 (Va. Cir. Oct. 17, 2003)..................................................... 32

*Virginia v. Tennessee*, 148 U.S. 503 (1883) ................................................................................................ 6

*White v. Ford Motor Co.*, 312 F.3d 998 (9th Cir. 2002)............................................................................. 32

*Whitman v. American Trucking Association*, 531 U.S. 457 (2001)............................................................. 15

*Wisconsin Dept. of Industry v. Gould*, 475 U.S. 282 (1986) ................................................................... 4, 7

*World-Wide Volkswagen v. Woodson*, 444 U.S. 286 (1980) ...................................................................... 26

## Statutes

Alaska Stat. § 43.50.200.............................................................................................................................. 5

La. R. S. § 13:5062 .................................................................................................................................... 30

Michigan Compiled Laws § 205.426d.......................................................................................................... 5

## Constitutional Provisions

Commerce Clause (art. I, § 8, cl. 3)............................................................................................. 1, 27, 28, 31

Compact Clause (art. I, § 10, cl. 3)................................................................................................ 1, 5, 35

Tenth Amendment .......................................................................................................... 1, 32, 33, 34

## Other Authorities

Ayres, *Symposium: Using Tort Settlements to Cartelize*, 34 Val. U. L. Rev. 595 (2000) ..................... 10, 32

Correia & Davidson, *The State Attorney Generals' Tobacco Suits: Equitable Remedies*, 7
    Cornell. J. L. & Pub. Pol'y 843 (1998)..........................................................................................4

Dagan & White, *Governments, Citizens, and Injurious Industries*, 75 N.Y.U. L. Rev. 354 (2000)............. 23

Greve, *Compacts, Cartels, and Congressional Consent*, 68 Mo. L. Rev. 285 (2003)............... 10, 11, 13, 16

Hoffstadt, *Retaking the Field: The Constitutional Constraints on Federal Legislation That
    Displaces Consent Decrees*, 77 Wash. Univ. L. Quarterly 53 (1999)........................................................4

### INTRODUCTION

The Complaint in this case challenges the constitutionality of the Master Settlement Agreement (MSA), entered into between 46 States and Big Tobacco, and the Louisiana laws that enforce it.  Plaintiffs allege encroachments on federal and state power without congressional consent, in violation of the Compact Clause; violations of federal antitrust laws, the Federal Cigarette Labeling and Advertising Act ("FCLAA"), and the Bankruptcy Code; extraterritorial regulation of interstate commerce in violation of the Commerce Clause and the Due Process Clause; and violation of federalism principles embodied in the Tenth Amendment.

During the 1990s, Attorneys General in many States, including Louisiana, sued the four largest tobacco companies (the "Majors") alleging decades of fraud that cost the States billions of dollars in increased Medicaid expenses. Cplt. ¶ 1.  The MSA is a collective agreement among 46 state Attorneys General and the Majors that settled virtually all of those lawsuits by giving the States an ongoing share in the tobacco business.  Cplt. ¶ 2.  The MSA obligated manufacturers who join the MSA ("Participating Manufacturers") to pay more than $200 billion over a 25-year period plus other payments in perpetuity.  That money comes from payments made by most Participating Manufacturers on every cigarette they sell anywhere in the United States, and is apportioned among the Settling States.  Cplt. ¶ 8.  The MSA also restricts Participating Manufacturers' advertising and lobbying.  Cplt. ¶ 63.

The MSA requires each Settling State to enact a Qualifying Statute.  In purpose and effect, the Qualifying Statutes insulate the Majors from price competition by imposing "escrow" payment obligations on non-participating manufacturers ("NPMs"),

effectively forcing them to pay more per cigarette than if they joined the MSA. Cplt. ¶ 9; MSA, Exhibit T. That requirement ensures the Majors' market shares despite dramatic price increases to pay off the States; protects the Majors' profits by enabling them to pass on to consumers the cost of the settlement; and allows the States to share in those profits. The burden of escrow payments has forced many of the Majors' innocent competitors, who were never sued nor committed any of the alleged wrongs that prompted the States' lawsuits, to join the MSA.

If a State does not join the MSA and enact a Qualifying Statute that is word-for-word identical to Exhibit T of the MSA, its citizens would remain subject to the MSA's national costs, but it would risk losing its share of hundreds of billions of dollars. States cannot withdraw from the MSA, which is binding on "present and future" state officials, who may not "directly or indirectly" challenge it. Cplt., ¶ 68; MSA, § XVIII(1).

Contrary to Defendant's suggestion, Mem. at 2, Plaintiffs neither "mischaracterize" the MSA nor invent its "nefarious" purposes and effects. States were forced to comply with the MSA through "coercive" pressure. *Star Scientific Inc. v. Beales,* 278 F.3d 339, 359 (4ᵗʰ Cir. 2002). If the MSA were a purely private contract, the parties involved "would long ago have" been jailed. *Freedom Holdings v. Spitzer*, 357 F.3d 205, 226 (2d Cir. 2004). To prevail on their Compact Clause claim, Plaintiffs must show only a *potential* violation of statutory or constitutional rules. *U.S. Steel Corp. v. Multistate Tax Commission*, 434 U.S. 452, 472 (1978) (*MTC*). As shown below, federal court decisions have affirmatively established the existence of such potential violations.

## STANDARD OF REVIEW

On a motion to dismiss, the Court must view the allegations in the light most favorable to the plaintiffs, accept plaintiffs' factual allegations as true, and resolve any ambiguities or doubts regarding the sufficiency of the claim in their favor. *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993); *Lowrey v. Texas A & M Univ. Sys.*, 117 F.3d 242 (5th Cir. 1997) (dismissal is disfavored and "rarely granted"). Dismissal is warranted only if "it appears beyond doubt that the plaintiff can prove no set of facts … which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45 (1957). Defendant has not come remotely close to meeting this demanding burden.

## ARGUMENT

### I. THE MSA CONSTITUTES "STATE ACTION" SUBJECT TO CONSTITUTIONAL SCRUTINY

Defendant's primary defense is the fiction that the MSA is merely a voluntary "contract," does not involve any requirements "imposed by statute or regulation," and hence is not subject to constitutional scrutiny. *E.g.*, Mem. at 26; *id.* at 8, 20. Defendant is wrong on both the facts and the law. The Qualifying Statute, challenged here in conjunction with the MSA, is plainly state action and thus is not remotely subject to a voluntariness defense. And the MSA itself is embodied in a consent decree, which has the force of law no different from any other form of state action. State judicial actions are routinely subject to preemption by federal laws. *See Ridgway v. Ridgway*, 454 U.S. 46, 47, 53 (1981) (federal law preempted settlement "imposed both by [party's] voluntary agreement and by the express provision of a valid state court decree")[1]; *Cipollone v.*

---

[1] *See also Boulter v. Boulter*, 930 P.2d 112, 113-14 (Nev. 1997) (private settlement agreement made part of court order was state action preempted by federal law); Brian M. Hoffstadt, *Retaking the Field: The Constitutional Constraints on Federal Legislation That Displaces Consent Decrees*, 77 WASH. UNIV. L.

*Liggett Group*, 505 U.S. 504, 521 (1992) (FCLAA preempts state common-law claims); *Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000) (products liability claims).

Even "agreements" with a State or States can constitute state action subject to constitutional scrutiny. *Automated Salvage Transport, Inc. v. Wheelabrator Ent'l Sys. Inc.*, 155 F.3d 59, 78 (2d Cir. 1998) ("Of course, the fact that [a state agency and a business] have entered into an agreement does not necessarily insulate it from scrutiny under the Commerce Clause"); *Wisconsin Dept. of Industry v. Gould*, 475 U.S. 282, 289-90 (1986) (Supremacy Clause preempted State from including conditions in voluntary agreements that penalized businesses for repeated violation of federal labor laws); *South-Central Timber Dev. Co. v. Wunnicke*, 467 U.S. 87, 97 n.10 (1984) (State's "contractual condition" is subject to Commerce Clause scrutiny).

An agreement extracted as an unconstitutional condition likewise constitutes state action subject to constitutional review. "Under the well-settled doctrine of 'unconstitutional conditions,'" the government generally may not require a person to give up a constitutional right "in exchange for a discretionary benefit conferred by the government." *Dollan v. City of Tigard*, 512 U.S. 374, 385 (1994).[2] Even if the MSA were a voluntary agreement as to the Majors who settled the lawsuits, it is hardly "voluntary" as to other manufacturers. Participation in the MSA is coerced by the Qualifying Statutes, which impose substantial penalties for refusal to join the MSA. For

---

QUARTERLY 53, 110 (1999) (citing *Ridgway*); Edward Correia & Patricia Davidson, *The State Attorney Generals' Tobacco Suits: Equitable Remedies*, 7 CORNELL. J. L. & PUB. POL'Y 843, 849 n.33, 851 (1998) ("Actions by the state embodied in a consent decree are state action subject to the Fourteenth Amendment"; FCLAA could preempt "court-ordered remedial decrees").

[2] *See also Board of County Commr's v. Umbehr*, 518 U.S. 668, 674 (1996) (applying unconstitutional conditions doctrine to government contracts); *Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001) (unconstitutional condition to require agreement not to challenge federal laws); *Thompson v. Western States Med. Ctr.*, 535 U.S. 257 (2002) (unconstitutional condition to refrain from advertising).

SPMs joining the MSA, the alternative was compelled escrow payments equal to or greater than the costs of the MSA, with no corresponding benefits.[3]  To remain an NPM means to pay more money; to remain subject to potential past and future liability to the States; and, in Louisiana, to face excessive and potentially ruinous appeal bond requirements in any future suits.  Participating Manufacturers are exempt from such requirements. *See, e.g.,* Cplt. ¶ 3, MSA § XII (waiver of liability), Cplt. ¶ 54 (appeal bond exemption).  Thus, the claim that the MSA is merely a voluntary agreement not subject to scrutiny as state action is spurious.  And in truth, Defendant does not believe it: his antitrust defense is premised on the presence of state action. *See* Mem. at 7 n.5.

## II.  THE MSA VIOLATES THE COMPACT CLAUSE

Rarely-adjudicated clauses of the United States Constitution may at first glance look like relics, of little relevance to the needs of a modern society.  Even so, courts must give *all* constitutional provisions a fair reading and independent force.  Even seemingly arcane provisions of the Constitution are of one piece with, and integral to, the Founders' vision of the constitutional order.  The Compact Clause is a pristine case in point.

### A.  The Compact Clause Must be Construed to Have Independent Meaning

The Compact Clause provides that "[n]o state shall, without the Consent of Congress, . . . enter into any Agreement or Compact with another State, or with a foreign power." U.S. Const. art. I, § 10, cl. 3.  On its face, the Clause prohibits *any* agreement or compact among States that has not been approved by Congress.  The Supreme Court has

---

[3] SPMs who joined the MSA promptly and who limit their market share actually have *no* payment obligations under the MSA.  And even SPMs joining later pay less than the escrow payments if they had not joined at all because: (1) MSA payments are tax-deductible whereas escrow payments are not, Complaint, ¶ 51; and (2) SPMs avoid "equity assessments" imposed by certain States on NPMs, Michigan Compiled Laws § 205.426d; Utah Code § 59-14-214; Alaska Stat. § 43.50.200.

created a non-textual limitation on the scope of the Compact Clause, finding that it applies only to agreements or compacts that may encroach upon the power of the federal government or on the power of the States themselves. *MTC*, 434 U.S. at 472 ("*MTC*"). Under that reading, the Compact Clause "is directed to the formation of any combination tending to the increase of political power in the States, which may encroach upon or interfere with the just supremacy of the United States." *Virginia v. Tennessee*, 148 U.S. 503, 519 (1883). Even that narrowed understanding, however, provides no warrant for depriving the Compact Clause of any independent force and meaning.[4] Yet that is what Defendant would have this court do.

Defendant suggests that the Compact Clause requires an affirmative violation of a federal statute or constitutional provision (and then some) to trigger the congressional consent requirement.[5] But that cannot be right. A congressional consent requirement for state agreements that are *already unlawful* would lack any independent force. "It cannot be presumed," however, "that any clause in the constitution is intended to be without effect; and, therefore, such a construction is inadmissible unless the words require it." *Marbury* v. *Madison*, 5 U.S. 137, 174 (1803). Here, of course, the words require the opposite ("no State shall, without the consent of Congress . . . enter into any agreement. . .").

---

[4] Plaintiffs believe such a construction of the Compacts Clause is directly contrary to its plain language and historical purpose and should be overruled. *See* Greve, *Compacts, Cartels & Congressional Consent*, 68 Mo. L. Rev. 285, 290, 298 (2003). Plaintiffs, of course, realize this Court is in no position to overrule Supreme Court precedent and merely raise the point to preserve it for the proper venue should the need arise. The remainder of this brief assumes, without conceding, that MTC's narrower construction is valid.

[5] While conceding, at 13, that the MSA is invalid if it "'enhance[s] state power 'in relation to the Federal Government,'" Defendant nonetheless argues first, at 7, that a compact is not subject to the Compact Clause if it a State acting "separately" had the legal authority to do what it was attempting in concert with other States and second, at 8-9, that if an interstate compact *does* contain illegal provisions the *only* remedy for such illegality would be under the separately "violated statutes," not the Compact Clause. Under that reading, the universe of state actions prohibited by the Compact Clause is a null set. Neither the language of the Compact Clause nor the Supreme Court's jurisprudence allows that absurdity.

Precisely because a requirement of free-standing violations of federal law would render the Compact Clause a nullity, the Supreme Court has read the Clause as a prophylactic against *potential* problems. ***"The pertinent inquiry is one of potential, rather than actual, impact upon federal supremacy."*** *MTC*, 434 U.S. at 472. In other words, the Compact Clause places a higher burden on state action taken in concert with other States than the Constitution creates for action taken by a single State alone. While a single State may be able to regulate, *absent affirmative federal preemption*, matters that affect interstate commerce, the same actions taken in concert with other States would not be permissible *absent affirmative federal consent*. When States act alone within their sphere of authority, the Supremacy Clause generally imposes the burden of disapproving their actions on the Federal Government. In contrast, where States act in concert, they have the burden of obtaining approval. The correctness of this interpretation can be gleaned both from its inherent logic and from its coherence with elementary canons of statutory construction and constitutional interpretation.

With respect to statutes, the Supreme Court applies a presumption against federal preemption in areas of "historic" state authority, *see Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). But that presumption yields in areas of overriding federal concern. The Supreme Court has consistently barred state action that might interfere with federal purposes where Congress has "occupied the field" through federal legislation. *See, e.g., Gade v. Nat'l Solid Waste Assn*, 505 U.S. 88 (1992). Moreover, state laws can encroach on federal supremacy simply by conflicting with a federal policy,[6] even when they fall

---

[6] *E.g., American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420 (2003) (implicit federal policy behind letters from President on compensation for Holocaust victims override state tort law under Supremacy Clause); *Gould*, 475 U.S. at 289-90 (state could not use contractual conditions to punish businesses for repeated violation of federal labor laws, since that undermined "Congressional purpose" not to disturb balance of

within an exemption in federal law.[7]  Collective state action by means of compact is

anything but a "traditional" exercise of state authority.  On the contrary, the overriding

federal concern with such collective action is directly expressed in the Compact Clause.

Thus, even where federal statutes do not expressly bar individual state action, they

"occupy the field" with respect to collective state action.  Under the plain text and

structure of the Constitution, the States have the burden of gaining federal acceptance,

rather than Congress having the burden of affirmatively disapproving.

 The same analysis applies to the protection of state sovereignty against

infringements by other States.  That protection is embodied in the Due Process Clause

and in the dormant Commerce Clause injunction against extraterritorial state regulation.

*See infra* at 26-32.  And here again, the well-established judicial inference against

extraterritoriality dovetails with the Compact Clause.  *See Port Authority Trans-Hudson*

*Corp. v. Feeney*, 495 U.S. 299, 315 (1990) (purpose of Compact Clause is to "ensure that

whatever sovereignty a State possesses within its own sphere of authority ends at its

political border").  Since state compacts pose a distinct risk of collusion among some

States against others, the Compact Clause again provides a prophylactic, rather than

relying on defensive lawsuits or other uncertain means of resistance after the fact.

*Florida v. Georgia*, 58 U.S. 478, 494 (1855) (Compact Clause serves "to guard the rights

and interests of the other States, and to prevent any compact or agreement between any

two States, which *might* affect injuriously the interest of the others"); *Rhode Island v.*

---

power between business and labor); *Burks v. Lasker*, 441 U.S. 471, 479 (1979) ("federal courts must be ever vigilant to ensure that application of state law poses 'no significant threat to any identifiable federal policy"); *LeClerc v. Webb*, 419 F.3d 405, 423 (5th Cir. 2005).

[7]*Aetna Health Ins. v. Davila*, 124 S.Ct. 2488, 2500 (2004) ("overpowering federal policy" reflected in statute may preempt state law that would otherwise fall within one of its exceptions).

*Massachusetts*, 37 U.S. 657, 726 (1838) (submission to Congress of a boundary agreement between two States was "to guard against the derangement of their federal relations with other States … and the federal government; which *might* be injuriously affected") (emphases added).

Plaintiffs allege, and are prepared to demonstrate, that the MSA and implementing statutes independently violate federal statutes. Plaintiffs likewise allege, and are likewise prepared to demonstrate, that the MSA and implementing statutes independently violate the extraterritoriality prohibitions of the Commerce Clause and the Due Process Clause. For purposes of prevailing on their Compact Clause claim, though, Plaintiffs need not show any such affirmative and independent violations. Potentially serious encroachments on federal authority suffice, under binding law, to establish a violation of the Compact Clause without congressional consent. That proximity is no mere allegation: as already noted, and as shown below, numerous federal appellate courts have already found that the MSA cuts perilously close to abrogating federal prerogatives.

### B. The MSA Plainly Required Congressional Approval Under the Compact Clause but Never Received It

If any interstate compact falls within the Compact Clause, it must be the MSA. The MSA creates a national regulatory regime to oversee the tobacco industry; to collect what is effectively a national tax on cigarettes; to restrict federally-protected cigarette advertising; and to regulate lobbying and the national political process as it relates to tobacco. The MSA does all this even beyond the borders of the States that joined it, raising concerns regarding the federal interest in interstate commerce and the interests of the non-MSA States in not having their markets controlled by a consortium of sister States. *See* Ian Ayres, *Symposium: Using Tort Settlements to Cartelize*, 34 VAL. U. L.

REV. 595, 603 (2000) (MSA is "extraterritorial due process" violation); Michael Greve, *Compacts, Cartels, and Congressional Consent,* 68 MO. L. REV. 285, 356-58 (2003) (discussing how the MSA systematically imposes externalities on non-member states). Those concerns are compounded by the fact that the MSA will transfer more than $200 billion in its first 25 years, was the product of compulsion for many of the joining States, including Louisiana, Cplt., ¶¶ 44, 47-48 (statements of Louisiana legislators), and will bind its 46 member States forever, Cplt., ¶ 60.

Defendant relies, at 4, on the Fourth Circuit's conclusion in *Star Scientific* that the MSA does not encroach upon federal power and hence does not fall within the strictures of the Compact Clause. That reliance is misplaced, for several reasons. For starters, to the extent that *Star Scientific* read *MTC* as requiring an affirmative derogation or infringement of federal power (e.g., *id.* at 360), the decision was and is mistaken. As already explained, the appropriate test is a *potential* infringement. *MTC*, 434 U.S. at 472. Moreover, and in any event, Plaintiffs here allege encroachments on federal powers and prerogatives, including the antitrust laws and the federal regulation of tobacco under the FCLAA, that were neither presented nor adjudicated in *Star Scientific*. That case should not be read to have decided encroachment questions that it did not even address.

In numerous salient respects, the MSA bears no comparison to the modest, voluntary multistate commission that was sustained in *MTC*.

- The taxation agreement in MTC dealt with the mere coordination of state taxation of activities occurring within each State and sought to *prevent* extraterritorial taxation of more than each State's fair share, *MTC*, 434 U.S. at 456.[8] The MSA

---

[8] The MTC sought to harmonize state taxes by making sure that no corporation was taxed on more than 100 percent of its income by giving corporations credits for taxes paid elsewhere than in the particular taxing

does quite the opposite, requiring payments for activities occurring in other States, including in States not party to the MSA. Cplt., ¶¶ 64-66, 79-83.

- The agreement in *MTC* dealt with state taxation, which has rarely been the subject of federal action. Greve, 68 Mo. L. REV. at 337-38. The MSA, in contrast, encroaches on matters that have been subject to long-standing and pervasive federal control and legislation. That includes Congress's exclusive authority over cigarette labeling and advertising under the FCLAA. *See, e.g., Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001); *Cipollone*, 505 U.S. at 521; *infra* at 21-22. It includes the Bankruptcy Code, *infra* at 22-23, the antitrust laws, *infra* at 16-21, and the regulation of interstate commerce even outside the boundaries of any MSA State, where it is Congress' exclusive prerogative to regulate, *infra* at 26-32. It is simply not true, as the *Star Scientific* court claimed, that the MSA "'does not purport to authorize the member States to exercise any powers they could not exercise in its absence.'" 278 F.3d at 360 (*quoting MTC*, 434 U.S. at 473).

- The MTC did not create a cartel, or even give member States much added leverage in imposing their income tax rules on interstate businesses. By contrast, the MSA effectively taxes cigarette sales in all 50 States, even in non-MSA States, and distributes the proceeds just among the MSA States – the governmental members of its cartel – regardless of where the cigarettes were sold. The appeals courts, while disagreeing about whether the MSA falls within particular antitrust exemptions, have generally agreed that it constitutes a cartel. *Freedom Holdings*, 357 F.3d at 226; *A.D. Bedell Wholesale Co. v. Philip Morris*,

---

State, and making sure that each State didn't collect taxes beyond what activity within its jurisdiction supported. *See, e.g, MTC*, 434 U.S. at 456 ("avoiding duplicative taxation").

263 F.3d 239, 248-49 (3d Cir. 2001). Even if an individual State could create a similar cartel *within* its own borders under the *Parker* state-action doctrine, the MSA's interstate reach would make it a serious encroachment on federal supremacy and antitrust policy. *See infra*, at 17-21.

- Under the MTC, each State remained free to withdraw from the compact at any time, and States in fact joined and left the MTC without having to forfeit their ability to collect taxes. *MTC*, 434 U.S. at 457 (any party permitted to withdraw unilaterally); *id.* at 454 n.1 (parties joined and withdrew while case was pending). Each State likewise "retain[ed] complete freedom to adopt the rules and regulations" set forth in the MTC and could adopt whatever audit procedures it desired, "just as it could if the compact did not exist." *Id.* at 473, 477-78.[9] The MTC's actions could be challenged in any member State's courts. The MSA, in contrast, compels States to enforce it and adopt implementing legislation. Cplt., ¶¶ 39-44. The MSA lives on in perpetuity and a State may not withdraw without forfeiting billions of dollars of tobacco revenues. Not surprisingly, no State has ever withdrawn from the MSA and none has any practical choice but to accede to the will of the collective Settling States. *See, e.g.*, Cplt., ¶¶ 40, 44 (Louisiana legislators stating that they had no choice but to adopt the Qualifying Statute); *id.* ¶ 42 Alabama Attorney General conceding that he signed the MSA, despite believing it to be unconstitutional, because he had no choice). And rather than merely coordinate existing state procedures, the MSA empowers "the Firm," an

---

[9] *See also U.S. Steel Corp. v. MTC*, 417 F. Supp. 795, 803 (S.D.N.Y. 1976) (MTC auditors bound by "tax laws and regulations of the respective states," and taxpayer challenging MTC audit may use "all those remedies the taxing state provides" under "the same tax appeal procedures"), *aff'd*, 434 U.S. 452 (1978); *id.* at 804 (MTC subpoena power no greater than "powers of the state courts whose jurisdiction it invokes").

unaccountable and non-public entity, to make "conclusive and binding," "final and non-appealable" determinations on various issues, including penalties against States failing to enforce the MSA. Cplt., ¶ 70; MSA, § IX(d).

If a massive and intrusive multistate scheme on the scale of the MSA does not require congressional approval, nothing ever will. And yet, there is no serious dispute that the Settling States have failed to receive formal Congressional approval for the MSA. At no point was the MSA actually presented to Congress for its approval, and at no point has Congress ever adopted a law or resolution approving it as an interstate compact.[10] The only direct congressional action to date is Congress's unequivocal *failure* to approve a precursor to the MSA, called the "Resolution," that was drafted in 1997 by a group of attorneys general and the Majors. *See Proposed Resolution* (available at http://stic.neu.edu/settlement/6-20-settle.htm). Recognizing that the Resolution was an interstate compact, its drafters made it contingent upon congressional approval. *Id.* at 23 (Resolution's provisions to "become effective shortly after the Act is signed by the President"); *cf. id.* at 4 ("Only national legislation offers the prospects of," *inter alia*, "restricting nationwide the sale, distribution, marketing and advertising of tobacco products"). In accordance with the Compact Clause, the Resolution was presented to the Congress for ratification on November 5, 1997, as S. 1415. *See* 143 Cong. Rec. S12003 (Nov. 7, 1997). But it encountered heated resistance on the Senate floor, where it died

---

[10] The failure to seek Congressional consent is not surprising, for two reasons. First, Congress, in a provision of the Tobacco Control Act ("TCA"), expressly disavowed consent to "any compact for regulating or controlling the production of, or commerce in, tobacco for the purpose of fixing the price thereof, or to create or perpetuate monopoly, or to promote regimentation." 7 U.S.C. § 515. (In 2004, long after the MSA's execution, Congress repealed the TCA as a whole as part of its repeal of tobacco price supports. Nothing in the legislative history of the so-called tobacco-buyout bill suggests the repeal was enacted with the MSA in mind). Second, the MSA restricts cigarette advertising, which Congress, through the FCLAA, expressly bars the States from regulating. *See infra*, at 21-22. The FCLAA and TCA contradict any claim that Congress has implicitly consented to the MSA.

without ever reaching the floor of the House.  144 Cong. Rec. S6479-S6481 (June 17,

1998).  One objection to the Resolution was that it, like the MSA, would have allowed

the Majors to raise their prices to monopoly levels, undermining the federal antitrust

laws.  *See* FTC, *Competition and the Financial Impact of the Proposed Tobacco Industry*

*Settlement* (Sept. 1997) at ii, v-vi..

 Contrary to Defendant's claim, at 14-15, Congress did not implicitly approve the

MSA by disclaiming a right to MSA proceeds in a 1999 Medicaid amendment.  That

amendment did not constitute approval of the MSA (just as a tax deduction for expenses

associated with illegal activity does not constitute congressional approval of that

activity.)[11]  Indeed, the Medicaid amendment ran counter to an essential portion of the

MSA – its handling of legal fees.  The MSA provided for billions of dollars in attorneys

fees, including more than $500 million in Louisiana alone, in violation of Louisiana law.

*Complaint,* ¶ 49.  The Medicaid Amendment disapproved those legal fees in two ways:

it barred Medicaid from paying for them, and it denied the States permission to use

tobacco settlements to pay for them.  42 U.S.C. §§ 1396b(i)&(i)(19)& 1396b(d)(3)(B)(ii).

 The Medicaid amendment itself was buried in an obscure appropriations rider.  It

originated before the MSA was even drafted, to prevent the federal government from

seizing Florida's unilateral tobacco settlement.  *See* H.R. 2938, 105th Cong., 1st Sess.,

Nov. 8, 1997 (Medicaid recoupment bill introduced by 6 Florida representatives).  It

applies to a variety of other state settlements not implicating the Compact Clause at all,

and offers no basis for supposing that Congress intended to ratify the MSA.  In short,

---

[11] *See Lilly v. Commissioner*, 343 U.S. 90 (1952) (unethical rebates were deductible); *Commissioner v.*
*Heininger*, 320 U.S. 467, 474 (1943) (rejecting the view that "the mere fact that an expenditure bears a
remote relation to an illegal act makes it non-deductible"); *Jerry Rossman Corp. v. Commissioner*, 175 F.2d
711, 715 (2d Cir. 1949) (civil penalty was tax-deductible).

Congress does not "hide elephants in mouse holes," *Whitman v. American Trucking Association*, 531 U.S. 457, 468 (2001), and this obscure amendment is a mighty small mouse-hole in which to hide approval for such an elephantine compact as the MSA.[12] Approval of a Compact subject to constitutional restriction must be considerably clearer than the attenuated inference that Defendant would have this Court draw. *Cf. South-Central Timber Dev. v. Wunnicke*, 467 U.S. 82, 91-92 (1984) ("congressional intent must be unmistakably clear" to ratify a state regulation that requires congressional consent, such as a rule that burdens interstate commerce; clear consent to such a State action is necessary "to avoid economic Balkanization" and reduce the "danger that one State will be in a position to exploit others").

The cases cited by Defendant do not support its "mouse hole" theory of ratification. *Cuyler v. Adams*, 449 U.S. 433, 441 (1981) did not involve after-the-fact ratification at all, since it upheld a 1956 anti-crime compact based on Congress's *prior* express consent in 1934 to anti-crime compacts. *Virginia v. Tennessee* involved a boundary compact that did not potentially encroach on federal sovereignty and, thus, did not require consent, and in any event, had been used by Congress itself for more than a century for the very purpose of drawing district boundaries. 148 U.S. at 521-22. *Green v. Biddle*, 21 U.S. 1 (1823) involved the carving of Kentucky out of Virginia, which

---

[12] The amendment simply prevented the Medicaid statute from triggering yet another round of tobacco lawsuits, this time by smokers and the federal government, that would have generated even more legal fees. *See Harris v. Owens*, 264 F.3d 1282, 1295 (10th Cir. 2001) (provision sought to prevent "'very bitter, protracted, and expensive litigation,'"); *id.* at 1296 (smokers are barred from suing for a share of the settlements); 145 Cong. Rec. at S2890 (March 18, 1999) (Sen. Craig) (co-sponsor feared "more [Medicaid] litigation" that would eat up state funds "used to benefit [public] health and welfare"). The fact that Congress disclaimed any "federal share" in the tobacco settlements, Mem. at 15 n.14, means little because Congress likely had no federal share in the money to begin with. *See Watson v. Texas*, 261 F.3d 436, 443-45 (5th Cir. 2001) (tobacco settlement not governed by Medicaid, so smokers could not recover proceeds); *Broselow v. Fisher*, 319 F.3d 605, 608 (3d Cir. 2002). Congress may simply have wanted to protect States that had already been coerced into joining the MSA from being further injured by a new wave of lawsuits from smokers or the federal government.

Congress necessarily ratified (and superseded) by admitting Kentucky to the Union.

Moreover, state boundary compacts reflect the vital need for "clear and settled

boundaries . . . under the law of nations," a compelling "reason for recognizing

congressional consent ex post and by implication" that is absent for other kinds of

compacts, like the MSA. *Greve*, 68 MO. L. REV. at 380 n.361.

### III.   THE MSA'S CREATION OF A NATIONAL CARTEL EXCEEDS ANTITRUST EXEMPTIONS AND UNDERMINES FEDERAL ANTITRUST POLICY

As alleged in the Complaint, ¶ ¶ 3, 7, 33, the MSA created a national tobacco

cartel, enabling the Majors to raise prices and pass on its cost to tobacco consumers.

*Freedom Holdings*, 357 F.3d at 225-26. This conflicts with the "fundamental national

policy" against cartels. *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389,

406-07 (1978). Had the Majors' executives attempted to establish such a cartel without

state assistance, "they would long ago have" been sent to jail for violating the antitrust

laws. *Freedom Holdings*, 357 F.3d at 226; Cplt. ¶ 62. The fundamental conflict with

federal policy embodied in the Sherman Act amply demonstrates that the MSA

encroaches on an essential area of federal authority and thus triggers the Compact

Clause's affirmative requirement of Federal approval, whether or not it is independently

preempted by existing federal law.

That the MSA creates a forward-looking cartel, rather than a backward looking

remedial scheme, is evident from its structure. For example, despite purportedly settling

claims for past damages imposed by the Majors, the MSA does not assess payments

based on some estimate of the harm each manufacturer allegedly caused in the past, but

rather on producers' *current* share of the tobacco market. The MSA protects that current

market share in perpetuity, and insulates the Majors from the competitive consequences

of their increased cost structure (and resulting higher prices) due to their payment obligations, by imposing costs on NPMs that are the same as, or greater than, those imposed on parties to the MSA. The after-tax escrow payments imposed on NPMs by the Qualifying Statutes are considerably more burdensome than the Majors' tax-deductible payments, and wildly greater than the zero payments required of SPMs who joined promptly and agreed to limit their market shares according to the MSA's market-allocation scheme. MSA § IX(i).

Those added costs imposed on all would-be competitors to the Majors or their cartel-mates, and the market division scheme among the participants of the MSA itself, have the purpose and effect of stabilizing national prices in the tobacco industry at an increased level. Cplt., ¶¶ 3, 34-36. Such a price stabilization scheme is a *per se* violation of the antitrust laws. "Under the Sherman Act, a combination formed for the purpose of raising . . . or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se." *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647-49 (1980). The MSA's creation of a collective agreement to eliminate many kinds of advertising likewise is contrary to federal antitrust laws. *See Blackburn v. Sweeney*, 53 F.3d 825, 828 (7th Cir. 1995); *U.S. v. Gasoline Retailers Ass'n*, 285 F.2d 688, 691 (7th Cir. 1961).

Defendant claims, at 7, that the MSA is immunized by the implied state-action exemption established in *Parker v. Brown*, 317 U.S. 341 (1943). To begin with, this defense is notably at odds with Defendant's repeated claim that no state action is involved for purposes of the other claims against it. Either the State is merely a participant in a voluntary agreement not involving the exertion of state power, or it is acting in its supposedly "sovereign" capacity. But Defendant cannot have it both ways –

denying that it is acting as the State to avoid constitutional restrictions, but then donning the cloak of state action to obtain immunity from antitrust laws based upon the constitutionally grounded rules of construction that led to the *Parker* decision.

Assuming the State was indeed acting in its governmental capacity (as Plaintiffs argue as to *all* claims in this case), the *Parker* state-action doctrine still only shields local or intrastate regulations, not national cartels like the MSA. *See Northern Securities Co. v. United States*, 193 U.S. 197, 346 (1904) (State may not "give a corporation . . .authority to restrain interstate or international commerce"). Rooted in notions of federalism, the *Parker* doctrine only extends to State conduct within their limited spheres of sovereignty, which exist only "within their territory," not outside their borders. *Parker*, 317 U.S. at 359, 367-68 (upholding California raisin-marketing program only because it was limited to in-state producers, and only rejecting challenge based on its indirect effect on other states because "whatever effect the operation of the California program may have . . . [was] one which it has been the policy of Congress to aid and encourage through" laws like the Agricultural Adjustment Act). The *Parker* doctrine thus has no purchase here, where the MSA divides market share and protects price increases nationwide, even in the four non-MSA States,[13] and where its illegal agreement to restrict advertising extends to non-MSA States as well. *See MSA*, § III(c) (ban on brand-name sponsorships in "any State"); MSA, § II(rr) (defining "State" to include "any

---

[13] *Ieyoub v. Philip Morris*, No. 98-6473 (La. 14th Jud. Dist., Calcasieu, April 1, 2003) (Savoie, J.) (attached as Exhibit 3), Slip Op. at 1, ¶ (B) (tobacco company must release payments "to the Settling States," not just Louisiana); *id.* at ¶ (C) (company must establish an "escrow account" "for any cigarettes" it "ships or sells in the fifty United States," including non-MSA States); *id.* at ¶ (A) (company must provide data to the" Independent Auditor [in New York] all . . . cigarettes shipped or sold . . . in or to the fifty United States").

State of the United States," not just MSA States); MSA, § III(b) (cartoon advertising ban without any geographic limitations).[14]

Because "state action immunity is disfavored, much as are repeals by implication," *F.T.C. v. Ticor Title Ins. Co.*, 504 U.S. 621, 636 (1992), it should not be radically extended to cover extraterritorial regulation of national scope, like the MSA. *See Lafayette*, 435 U.S. at 406-07 (conduct's extraterritorial reach, involving buyers outside the defendant city, militated against granting immunity); *cf. Aetna Health Ins. v. Davila*, 124 S.Ct. 2488, 2500 (2004) ("overpowering federal policy" reflected in statute may preempt state law that would otherwise fall within one of its exceptions).

Furthermore, *Parker* immunity presumes that state-sponsored restraints on competition can be checked by the "electoral process" and "public scrutiny." *Hallie v. Eau Claire*, 471 U.S. 34, 45 n.9 (1985). Where such checks and accountability are lacking, and particularly where the effects of the conduct are felt by consumers outside the jurisdiction of the government body, *Parker* immunity will not apply. *Lafayette*, 435 U.S. at 406 (denying immunity to municipal cartel where "consumers living outside the municipality . . . have no recourse at the municipal level"). Such checks and accountability are strikingly absent for the MSA. As noted, many States felt they had no choice but to join what was presented to them as a *fait accompli* and to adopt the required statutes. States have no realistic option of withdrawing from the MSA, and neither States

---

[14] *See also, e.g.,* John Sturbin, *Cup Gets Sponsor Dollars; NASCAR Lands Funding by RJR*, Fort Worth Star-Telegram, July 18, 2001 (2001 WLNR 1202828), at pg. 1 (discussing loss of sponsorship in non-MSA State" because of limits on brand-name sponsorships in the "Master Settlement Agreement"); MSA, Exh. L (Model Consent Decree), § VI.I (MSA consent decrees in each State govern "actions taken (or omitted to be taken) within the [United] States," unless "otherwise limited" to a court's own state by the terms of the decree); *id.*, § V.F (nationally restricting use of non-tobacco brand names); *id.*, § VI.E (consent decree remedies are "in addition to" those in the MSA itself); *Ieyoub v. Philip Morris*, Consent Decree and Final Judgment (La. 14th Jud. Dist., Calcasieu, Dec. 11, 1998) (No. 98-6473) (parroting Model Consent Decree).

nor their citizens have any recourse regarding the decisions of the Firm.  The MSA itself

precludes lobbying, litigation, or advocacy against it by the Settling States or

Participating Manufacturers, and affected consumers in the four non-MSA States have no

say whatsoever over the behavior of the Settling States.  *See Star Scientific*, 278 F.3d at

359 ("the Master Settlement is coercive in requiring the State to pass [the Qualifying]

Statute"); *infra*, 24-26, 32-35; Cplt. ¶ 68; MSA, § XVIII(l).[15]

Finally, *Parker* immunity does not apply where the anti-competitive conduct

facilitated by the State is not "actively supervised by the State itself."  *California Retail

Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980); *see also 324

Liquor Corp. v. Duffy*, 479 U.S. 335, 337-39 (1987) (enjoining a state statute for lack of

supervision despite state formula for fixing prices).  Under the MSA, the Majors remain

free to raise prices under their cartel's umbrella, above and beyond any amount needed to

make their MSA payments.  *See Freedom Holdings*, 357 F.3d at 231-32.  The greater

expenses imposed on outside competitors by the Qualifying Statutes, and the market

division scheme (and penalties for deviation therefrom) agreed to by Participating

Manufacturers provide ample leeway for price increases beyond those necessary to fund

the MSA, and the States exert no control whatsoever over such behavior.

In short, the MSA affirmatively violates federal antitrust law and is not eligible

for *Parker* immunity.  For the purposes of this case, however, it is more than sufficient

that the MSA *encroaches* on this important area of federal law and policy and presents at

least a *potential* intrusion on federal authority.  That intrusion and potential is all that is

needed to trigger the requirement of congressional consent under the Compact Clause.

---

[15] The fact that citizens could lobby the national Congress to prohibit the MSA does not provide a substitute
for local electoral accountability.  *See Lafayette*, 435 U.S. at 406-07 (rejecting argument that municipal
cartel reaching beyond city limits could be excused by fact that citizens could get state legislators to ban it).

*MTC*, 434 U.S. at 472 ("[T]he pertinent inquiry is one of potential, rather than actual,

impact upon federal supremacy"). Defendant's own authorities recognize such potential

impact, noting that "'the MSA creates an incentive for the manufacturer defendants to

raise prices in parallel fashion'" and concededly "'presents a 'hypothetical' or 'potential'

conflict with the Sherman Act,'" even if "'not the 'irreconcilable' conflict required for

preemption'" under the antitrust laws.  *S&M Brands v. Summers*, No. 05-0171, 2005 WL

2469658, \*20 (M.D. Tenn. Oct. 6, 2005) (citation omitted).

## IV.   THE MSA CONFLICTS WITH FEDERAL POLICY BY VIOLATING THE FEDERAL CIGARETTE LABELING AND ADVERTISING ACT AND THE BANKRUPTCY CODE

The MSA encroaches on federal authority – and actually conflicts with federal

law – through its extensive regulation of cigarette advertising.  The Federal Cigarette

Labeling and Advertising Act ("FCLAA"), provides that States may impose "[n]o

requirement or prohibition based on smoking and health … with respect to the

advertising, or promotion of any cigarettes the packages of which are labeled in

conformity with" its provisions.  15 U.S.C. § 1334(b).  The FCLAA broadly "preempts

[all] state regulations targeting cigarette advertising." *Lorillard*, 533 U.S. at 550; *Jones v.

Vilsack*, 272 F.3d 1030, 1035 (8th Cir. 2001).  Notwithstanding such express federal

preemption, the MSA bans, *inter alia*, outdoor or transit advertising, cartoons in cigarette

ads, sponsorship of teams or leagues, and sponsorship of product placement or references

in television, motion pictures, theater, video games, or musical performances.  Cplt. ¶ 63;

MSA § III.

Defendant's only response is to claim, at 16, 18, that no state action is involved

because the MSA is a voluntary agreement and because the Qualifying Statute has

nothing to do with advertising. As to the Qualifying Statute, which is plainly state action,

Defendant's assertion is both false and disingenuous. Louisiana itself has recognized that

the burdens imposed by the Qualifying Statute were designed to make tobacco companies

comply with the MSA's marketing and advertising requirements.[16] As to the MSA itself,

Plaintiffs have already demonstrated how the MSA constitutes "state action" in multiple

respects, *supra* at 3-5, and the MSA's advertising and marketing restrictions are

permeated with state action. "The States actively and continually monitor the

implementation of portions of the" MSA restricting the Majors' conduct, state courts

have "continuing jurisdiction" to enforce it, and States receive $50 million to enforce it.

*A.D. Bedell*, 263 F.3d at 261. In any event, the FCLAA does not distinguish between

requirements imposed as part of a contract and those imposed unilaterally by statute.

     The MSA conflicts with the federal Bankruptcy Code by giving the Settling States

an unfair advantage over tobacco companies' other creditors. It bans Participating

Manufacturers from seeking relief from MSA payments "in any proceeding before any

court of law (including the federal bankruptcy courts)," or seeking a "discretionary stay"

of any "police and regulatory action" by a Settling State. MSA, § XVIII(w)(1)(D). The

MSA's waiver favors the Settling States over tobacco companies' other creditors, such as

injured smokers and non-MSA States, whose claims are not protected by any waiver. The

---

[16] *Amici* Brief of 41 States (including Louisiana) in support of reconsideration, *Freedom Holdings v. Spitzer* (S.D.N.Y. Sept. 29, 2004) (No. 02-2939), at 12 (MSA "'intended . . . to restrict the scope of cigarette manufacturers' advertising and marketing programs,'" and escrow and contraband statutes share "same purposes") (citation omitted)(attached as Exhibit 2); States' *Amici* brief in *Star Scientific v. Beales*, 2001 WL 34386556 (4th Cir. Aug. 10, 2002)(No. 01-1502), at 12, 3 (NPMs should pay more than grandfathered SPMs, because MSA "severely limits outdoor advertising"); *see Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994) ("statements in briefs" are "binding judicial admissions"). As Attorneys General observed in announcing the MSA, it had "incentives built into it" to bring in as many NPMs as possible, so "that every tobacco manufacturer [will] follow the rules of the [MSA], particularly as to marketing" and advertising. *Media Briefing with Attorneys General*, Federal News Service, Nov. 16, 1998, at 10-11 (found on LEXIS). One state calls escrow payments a "surety bond . . . imposed upon [NPMs for] choos[ing] to avoid the conduct [advertising] restrictions that apply if they sign the MSA." 11 Cal. Code Regs. § 999.10(a).

Bankruptcy Code forbids debtors to waive the right to seek bankruptcy protection in the future, *In re Huang*, 275 F.3d 1173, 1177 (9th Cir. 2002), especially when the protections waived benefit not just the debtor, but also competing creditors, since there is a fundamental federal policy against one creditor enriching itself at other creditors' expense. *See, e.g., In re Cole*, 226 B.R. 647, 651-54 (9th Cir. B.A.P. 1998).

Defendant claims the waivers are irrelevant because the MSA makes them "enforceable only if consistent with the Bankruptcy Code." Mem. at 10, *quoting Star Scientific*, 278 F.3d at 360, *citing* MSA, § XVIII(w)(1)(c). This misreads the MSA; it only makes the waivers unenforceable at the behest of their beneficiary, the States, and not tobacco makers. It protects the ability of a *State* – and not competing creditors -- to seek remedies against the debtor pursuant to its "rights provided under the federal Bankruptcy Code." MSA, Section XVIII(w)(1)(c). Thus, it shields a favored class of creditor – States – at the expense of competing creditors. Absent these waivers, a bankrupt tobacco maker would have to share its assets with other creditors, not just States. *See* Harris, *Note: State Tobacco Settlement: A Windfall of Problems*, 17 J.L. Pol. 167, 199-200 (2001); Dagan & White, *Governments, Citizens, and Injurious Industries*, 75 N.Y.U. L. Rev. 354, 379-380 (2000), *citing* 11 U.S.C. 362, 507(a)(8), 523.[17] With respect to the Bankruptcy Code as well the FCLAA, the encroachment on federal authority is not only potential; it is palpable.

---

[17] Even if such waivers were permissible in an individual settlement between a single firm and a State, they would still conflict with the Bankruptcy Code when incorporated into a national, industry-wide settlement like the MSA *See Cain v. Darby Borough*, 7 F.3d 377, 381 (3d Cir. 1993) (voiding waiver of right to sue under § 1983 by class of litigants; waivers should be sought on case-by-case basis, not across the board).

## V.   THE MSA VIOLATES THE FIRST AMENDMENT AND INTERFERES WITH THE NATIONAL POLITICAL PROCESS

The MSA encroaches on federal interests, as well as on federally protected rights, by restricting protected speech and petitioning.  For example, it forbids Participating Manufacturers from joining a trade association unless that association agrees not to oppose the MSA, it restricts who may serve as officers of tobacco trade associations, and it restricts lobbying, litigation, or other advocacy against the MSA or for anything that might "diminish[]" State receipts under the MSA or for any non-health uses of MSA funds.  *See, e.g.*, MSA, §§ III(m),(n),(o),(p),  § XV.  Such lobbying, litigation, and advocacy are plainly protected under the First Amendment.  *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) (lobbying protected by First Amendment); *Pfizer, Inc. v. Giles*, 46 F.3d 1284, 1286-88, 1290 (3d Cir. 1994) (trade association membership and lobbying protected).[18]  More importantly, restrictions on such activities encroach upon matters of federal authority and sovereignty by interfering with the political process at the federal level.  *See United States v. Cruikshank*, 92 U.S. 542, 552-53 (1876) (Even prior to Fourteenth Amendment, right of "petitioning Congress . . .[wa]s an attribute of national citizenship," a right "within the scope of the sovereignty of the United States"); *Hague v. C.I.O.*, 307 U.S. 496, 513 (1939) ("right to discuss national legislation" is principle inherent in federal government's republican form); *cf. U.S. Term Limits v. Thornton*, 514 U.S. 779, 838 (1995) (Kennedy, J.,

---

[18] The MSA's national advertising restrictions, MSA, §§ III(d), (f), likewise intrude upon constitutionally-protected commercial speech. *Lorillard*, 533 U.S. at 564.  And the MSA's blanket requirement of a waiver of First Amendment rights – applicable equally to the Majors, who were sued and may well have been guilty of deceptive advertising in the past, and to all other manufacturers joining or (like plaintiffs) being pressured to join, despite not even a bare allegation that they have engaged in wrongdoing – violates the requirement of individualized justifications for waivers of constitutional rights contained in settlement agreements. *See Cain*, 7 F.3d at 381.

concurring) ("States may not invade the sphere of federal sovereignty" by regulating national political process).

Defendant does not even attempt to argue the *substance* of these restrictions on constitutional or Compact Clause grounds, but once again pretends, at 20, that no state action is involved because the restrictions supposedly are pursuant to a "voluntary" agreement. And once again that claim is deficient for the reasons discussed *supra*, at 3-5. The States may no more condition the benefits of the MSA on a waiver of First Amendment Rights than the federal government can condition drug approval exemptions on such a condition. *Thompson v. Western Medical Center*, 535 U.S. 357 (2002) (agreement to restrict advertising an unconstitutional condition). And requiring escrow payments as the price for free speech is just the flip-side of the same unconstitutional coin. *Simon & Schuster v. Members of New York State Crime Victims Bd.*, 502 U.S. 115, 116-17 (1991) (conditioning speech on escrow deposit unconstitutional); *Pacific Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1232-33 (10th Cir. 2005) (bond requirement for commercial speech unconstitutional). The greater burdens of the Qualifying Statutes amount to a penalty imposed on the exercise of First Amendment rights, whether manufacturers suffer the penalty to preserve their rights or avoid it by waiving their rights and joining the MSA. The effect remains an unconstitutional burden on speech, whether intended (as here) or not. *Elrod v. Burns*, 427 U.S. 347, 362 (1976) (exacting scrutiny required even where deterrence of "exercise of First Amendment rights arises … indirectly as an unintended but inevitable result of the government's conduct").[19]

---

[19] *See also Minneapolis Star & Tribune v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 592 (1983) (illicit intent irrelevant given that "even regulations aimed at proper governmental concerns can restrict unduly the exercise of" First Amendment rights); *NAACP v. Alabama*, 357 U.S. 449, 461 (1958) (even "unintended" burdens may be unconstitutional if "the practical effect" is to discourage free speech).

Aside from the separate claim of a First Amendment *violation*, even a voluntary "agreement" among the States themselves and with others would still amount to an "Agreement or Compact" subject to Compact Clause analysis. Defendant offers no rationale as to why such interference with advocacy before Congress or in the Federal courts would not encroach upon federal sovereignty and interests, regardless of whether the agreement supposedly was "voluntary." *Cf. Davies v. Grossmont Union High School*, 930 F.2d 1390, 1394 (9th Cir. 1991) (settlement agreement contrary to public policy favoring uninhibited political participation, which was interest "of the highest order").

## VI.   THE MSA FLOUTS FEDERAL AUTHORITY AND PRINCIPLES OF FEDERALISM BY REGULATING SALES AND ACTIVITIES OUTSIDE ITS MEMBER STATES

A fundamental precept of federalism is that no State may encroach on a Sister State's sovereignty by regulating beyond its own borders. This precept is embodied in the Commerce and Due Process Clauses as well as the Compact Clause, *Great Atlantic & Pac. Tea Co. v. Cottrell*, 424 U.S. 366, 380-81 (1976) (Commerce Clause), *quoting Baldwin v. G.A. Seelig, Inc.*, 294 U.S. 511, 523 (1935); *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 293 (1980) (due process), reflecting a federal policy of preventing interstate rivalries and reprisals. *Cottrell, supra, citing Baldwin, supra.* The MSA's multi-State character and extra-territorial impact on the national cigarette market implicate constitutional constraints imposed by the Commerce Clause and the Due Process Clause. Plaintiffs have amply alleged, for purposes of a motion to dismiss, that each of those constraints is in fact violated by the MSA. But even were the ultimate determination of such violations uncertain, the potential for such violations is more than enough to encroach on federal terrain for Compact Clause purposes.

### A. The MSA and Escrow Statute Violate the Commerce Clause

By regulating interstate commerce in an extraterritorial fashion, the MSA violates the Commerce Clause, which vests Congress, not Sister States, with the authority to regulate commerce within a State's boundaries. *Grand River Enterprises Six Nations Ltd. v. Pryor*, 425 F.3d 158, 171-73 (2d Cir. 2005) (reviving commerce-clause challenge to the MSA and escrow statute); *see Healy v. Beer Institute*, 491 U.S. 324, 332 (1989) ("A state-imposed restraint which 'has the practical effect' of regulating commerce occurring wholly outside that State's border is invalid under the Commerce Clause").

Tobacco makers' acceptance of such conditions does not  render extraterritorial regulation permissible.  For the reasons discussed in Part I, such agreements still involve state action subject to constitutional scrutiny, and that analysis has been specifically recognized in the context of Commerce-Clause challenges. *See Wunnicke*, 467 U.S. at 97 n.10 (consent does not "validate under the Commerce Clause any contractual condition that the State had the economic power to impose").  Defendant's reliance, at 19, on *Automated Salvage* for an allegedly contrary proposition is misplaced. *Automated Salvage* explicitly recognized the rule that extracting a regulated party's agreement does not eliminate state action or Commerce Clause scrutiny. 155 F.3d at 78 ("Of course, the fact that [a state agency and a business] have entered into an agreement does not necessarily insulate it from scrutiny under the Commerce Clause").  In that case, however, the State had not been acting as a regulator or sovereign, but had instead entered the settlement at issue as a "market participant," in which capacity it was not "subject to the limitations of the dormant commerce clause." 155 F.3d at 78.[20]

---

[20] Of course, if the States were acting in such a quasi-private, *non-sovereign* capacity, one wonders precisely how the rationale for *Parker* antitrust immunity would apply. *See supra*, at 18.

27

Furthermore, and unlike the MSA, the settlement in *Automated Salvage* was not

incorporated into a judicially-enforced consent decree. *Id.* at 66 (mere "stipulation").

Here, of course, the States sued as sovereigns, not as market participants. And the terms

of the MSA, incorporated into a consent decree, plainly are aimed at the States'

regulatory interests, not at any market participant interest.

The MSA scheme also extends beyond the jurisdiction of the Settling States in its

escrow statute, also known as the Qualifying Statute. See MSA § IX, Exhibit T; La. R. S.

§§ 5061-5063. It directly regulates interstate commerce by linking escrow payments to

MSA payments. Escrow payments to an individual State are limited to what an NPM

would have had to pay to all States under "section IX(i)" of the MSA (see La. R. S. §

13:5063(b)), which takes into account its national "market share." See MSA, § IX(i).

By linking escrow payments to national market share, the escrow statute "effectively

regulates the pricing mechanism for goods in interstate commerce," and thus violates the

Commerce Clause. *Grand River*, 425 F.3d at 171-73 (overturning the dismissal of a claim

alleging that the MSA and the escrow statute violate the dormant commerce clause's ban

on extraterritorial legislation); *see, e.g., Brown-Forman Distillers v. New York State

Liquor Auth.*, 476 U.S. 573 (1986) (commerce clause forbids extraterritorial regulation).

Defendant's claim that the escrow statute merely has an indirect "upstream

pricing impact" insufficient to trigger Commerce-Clause scrutiny ignores the direct link

between escrow payments and national market share, and misstates the case it cites for

that proposition, *Grand River*. Defendant claims that *Grand River* revived a Commerce-

Clause challenge only because plaintiffs alleged that "interstate gridlock would occur" if

every state adopted the escrow statute. Mem. at 22. But "interstate gridlock" was just

one of three extraterritorial effects, each of which *Grand River* held would be sufficient "avenues of attack" against the MSA. 425 F.3d at 171, *quoting Freedom Holdings*, 357 F.3d at 221. Among other things, the Second Circuit found an actionable claim based on the Plaintiffs' allegation here: "that the practical effect of the challenged [escrow] statutes and the MSA is to control prices outside of the enacting states by tying both the SPM settlement and NPM escrow payments to national market share." 425 F.3d at 173.[21]

Defendant misconceives Plaintiffs' position and the rules on motions to dismiss by trying to limit our allegation that the escrow statute has an "extraterritorial reach" to the fact that an "NPM whose cigarettes are sold [by distributors] in Louisiana is subject to an escrow requirement . . . even though it may be located and conduct business entirely outside Louisiana." Mem. at 20-21. The escrow statute regulates extraterritorially in that regard *and* by linking escrow payments to national market share, which states a claim under *Grand River*. Under notice-pleading, Plaintiffs can rely on both examples in support of their complaint, since both are factually consistent with the general allegation of extraterritoriality. *See Conley v. Gibson*, 355 U.S. 41, 45 (1957). Reliance on both examples also distinguishes this case from *Star Scientific*, in which the appellant did not rely on the fact that escrow payments are linked to national market share. 278 F.3d at

---

[21] Defendant also claims that *Grand River* criticized an extraterritoriality claim based on "upstream pricing impact." In fact, *Grand River* noted that this was all that was alleged in *another* case, *Freedom Holdings*, which rejected a Commerce-Clause challenge to the Contraband Statute, *not* the escrow statute. *Grand River*, 425 F.3d at 171, *quoting Freedom Holdings*, 357 F.3d at 221-22. *Freedom Holdings* held that the Contraband Statute did not violate the dormant commerce clause merely because its regulations had the effect of increasing the prices *in-state* dealers had to pay for cigarettes from out-of-state manufacturers. Unlike our complaint, the *Freedom Holdings* complaint did not even mention extraterritoriality, but rather alleged obstruction of the channels of interstate commerce and favoritism towards in-state tobacco retailers. *Freedom Holdings v. Spitzer*, Complaint (S.D.N.Y. Apr. 16, 2002) (No. 02-2939) at ¶¶ 42-49 (Exhibit 4).

354-57 (no mention of market share linkage); *see also Waters v. Churchill*, 511 U.S. 663, 678 (1994) ("cases cannot be read as foreclosing an argument they never dealt with").

The Qualifying Statute's extraterritoriality is exacerbated by the fact that it assesses escrow payments from NPMs, regardless of whether they are located in, or sell cigarettes in, the Settling States, if their cigarettes ultimately end up being resold by someone else in a Settling State. Defendant argues, at 21, that the statute cannot be invalid because it "applies only to cigarettes sold 'within the State.'" But Louisiana's escrow statute applies to a manufacturer's cigarettes sold anywhere "in the United States" merely because those cigarettes end up being *resold* in Louisiana. *See* La. R. S. §§ 13:5062(9),(10) ("a cigarette maker is obligated to make payments on cigarettes it produces anywhere "in the United States," that end up being "sold in the [forum] forum state . . . through a distributor, retailer, or similar intermediary"). This violates the Dormant Commerce Clause. *See Grand River*, 425 F.3d at 171 (unconstitutional to "force out-of-state merchants to seek [a State's] regulatory approval before undertaking an out-of-state transaction"); *Louisiana Dairy Stabilization Board v. Dairy Fresh Corp.*, 631 F.2d 67 (5th Cir. 1980), *aff'd*, 454 U.S. 884 (1981) (State may not impose fee of 3 cents on milk processed out-of-state for sale in-state even to defray regulatory costs); *see Quill v. North Dakota*, 504 U.S. 298, 308 (1992) (State could not tax out-of-state mail-order merchant). The "Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Healy v. Beer Institute,* 491 U.S. 324, 336 (1989). And it forbids not only laws that formally dictate the terms of out-of-state

transactions, but also those that have that "practical effect." *Brown-Forman Distillers v. N.Y. Liquor Auth.*, 476 U.S. 573, 586 (1986).

Defendant seeks to avoid the ban on extraterritorial regulations by claiming that the escrow statute imposes a regulatory burden rather than a "tax." Mem. at 24. But it is invalid in either case. Under Fifth Circuit precedent, neither regulatory fees nor taxes may be imposed on goods sold out-of-state. *Louisiana Dairy*, 631 F.2d at 67 (invalidating Louisiana's assessment on out-of-state dairy processors of three cents per hundredweight on dairy products resold in Louisiana). The Fifth Circuit so held even though the assessment was not a tax to raise revenue, but rather merely defrayed the costs of administering the state Dairy Stabilization Law, *see id.*, 631 F.2d at 67; *Louisiana Dairy Stabilization Bd. v. Dairy Fresh Corp.*, 476 F. Supp. 416, 419 (M.D. La. 1979) ("The three cent per hundredweight assessment is in fact" a regulatory fee and "not a tax used by the state to generate revenue"), *aff'd*, 631 F.2d 67 (5th Cir. 1980), and even though it only applied to out-of-state processors to the extent that they "sell dairy products to a retailer or distributor for resale in Louisiana." *Louisiana Dairy*, 631 F.2d at 68; *Dairy Fresh*, 476 F. Supp. at 419 ("dairy products used in Louisiana"). *Louisiana Dairy* thus flatly contradicts *Star Scientific*, on which Defendant relies, at 21-22.

### B. The MSA and Escrow Statute Violate Due Process

The Due Process Clause also forbids the MSA from regulating transactions in non-MSA States. Under due process, "no principle is better settled than that the power of a State ... in respect to property, is limited to such as is within its jurisdiction." *Miller Bros. v. Maryland*, 347 U.S. 340, 342 (1954). This rule against extraterritorial regulation is so strong that a State cannot impose punitive damages to deter conduct in other States,

31

*BMW v. Gore*, 517 U.S. 559, 572-73 (1996), even when that conduct is illegal in the other State, *White v. Ford Motor Co.*, 312 F.3d 998 (9th Cir. 2002); *see also State Farm Auto. Ins. Co. v. Campbell*, 123 S.Ct. 1513 (2003). Yet the MSA imposes assessments on cigarette sales that occur outside any MSA State and that are lawful in the State where they occur. *See* Ayres, 34 Val. U. L. Rev. at 603 (MSA is "extraterritorial due process" violation). Louisiana's escrow statute applies to a tobacco maker even if it sells no cigarettes in Louisiana, merely because its cigarettes are later resold in the State. *Virginia v. Patriot Tobacco Co.*, Case No. CH03-44-1 (Va. Cir. Ct., City of Richmond, Oct. 17, 2003) (Hughes, J.) (attached as Exhibit 1) (Due Process Clause forbids liability for escrow deposits where out-of-state cigarette maker did not intend or expect its cigarettes sold outside the state to be resold in the state); *see Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985) (no jurisdiction based on "'the unilateral activity of another party or a third person'").

## VII.   THE MSA VIOLATES THE TENTH AMENDMENT

The MSA violates the Tenth Amendment in two ways.  First, it delegates state powers in perpetuity to bodies, such as the Firm and NAAG, that are outside the control of the state and federal governments.  Second, it commandeers state legislatures and executives.[22]

A fundamental precept of federalism is that States may not delegate their sovereign powers to the national government.  State "consent" to such a delegation is no

---

[22] Contrary to Defendant's claims, at 29, plaintiffs have standing to raise the Tenth Amendment, because it exists not just to protect States' rights, but also, indirectly, individual rights. *Gillespie v. Indianapolis,* 185 F.3d 693, 703-04 (7th Cir. 1999) (citizen had 10th Amendment standing to sue state entity); *Dillard v. Baldwin County Commissioners,* 225 F.3d 1271, 1276 (11th Cir. 2000); *see Steward Machine Co. v. Davis,* 301 U.S. 548, 573, 585 (1937); *Helvering v. Davis,* 301 U.S. 619, 637, 640 (1937). Moreover, "'standing barriers have been substantially lowered in the decades since the Supreme Court decided *Tennessee Elec. Power Co. [v. TVA,* 306 U.S. 118 (1939)],'" the case on which defendant relies. *Gillespie,* 185 F.3d at 700, quoting United States v. Richardson, 418 U.S. 166, 193 (1974) (Powell, J., concurring).

defense. *New York v. United States*, 505 U.S. 144, 182 (1992) (Tenth Amendment

violation "cannot be ratified by the 'consent' of state officials"). *A fortiori*, the States

may not delegate their inherent powers to some body *outside* the Constitution, including

bodies of their own creation. The Tenth Amendment dovetails with the Compact Clause.

Where the latter forbids interstate agreements without the consent of the Congress, the

Tenth Amendment makes clear that governmental power must be exercised either by the

federal government or by the States (and their subdivisions) or the people: "The powers

not delegated to the United States by the Constitution, nor prohibited by it to the States,

are reserved to the States respectively, or to the people." They are not reserved to, and

cannot be delegated to, the NAAG, let alone "The Firm."[23]

    As the Defendant Attorney General himself has conceded, however,

"Enforcement of the Master Settlement Agreement (MSA) has been delegated to the

National Association of Attorneys General."[24] Fundamental state powers *are* delegated

to the Firm and other NAAG-related entities, which administer tax, appropriations, and

law enforcement functions that are properly reserved for state governments. Cplt. ¶¶ 69,

87. The MSA gives NAAG millions of dollars to enforce and implement the MSA on its

own, and to bankroll others' lawsuits and investigations enforcing the MSA and

Qualifying Statutes. *See, e.g.,* MSA, § VIII(c), Exhibit J; *see also* Cplt. ¶ 69. Moreover,

the MSA establishes and endows, under the umbrella of the NAAG, standing entities

---

[23] Defendant errs in claiming, at 29-30, that *McConnell v. FEC*, 540 U.S. 93, 186 (2003), limited the Tenth Amendment to operating only "as a check on federal authority," not non-federal authorities like NAAG. *McConnell* did not draw any such distinction between federal and non-federal interference, since it itself involved a federal authority, the FEC. Instead, it distinguished between States (who are shielded from regulation by the Tenth Amendment) and private parties (who are not). 540 U.S. at 186 (No Tenth Amendment violation because statute "only regulates the conduct of private parties").

[24] State of Louisiana, Office of the Attorney General, Charles C. Foti, Jr., *Programs and Services: Health Care: Tobacco* (available at http://www.ag.state.la.us/tobacco.aspx) (visited Dec. 13, 2005).

with the authority to make discretionary decisions that are conclusive and binding upon the Settling States. Cplt. ¶ 70. For example, "The Firm" has the authority to determine whether any state has complied with the provisions of the MSA and fix penalties to be imposed on non-complying States; its decisions as to whether States' Qualifying Statutes satisfy the MSA and its legal and financial determinations concerning payment allocations are "conclusive and binding" and "final and non-appealable." MSA, §IX(d) & IX(d)(2)(G) . In short, the MSA affects an uncontrollable delegation of inherent state powers to an extra-constitutional supra-state agency. Cplt. ¶¶ 85-87.

"Commandeering" is the flip side of delegation. The MSA accomplishes the feat of commandeering both the Louisiana legislature and, on an ongoing basis, the State executive. As noted, the MSA coerced state legislatures to enact the Qualifying Statute, *Star Scientific*, 278 F.3d at 359, and states cannot "directly or indirectly" challenge it and must defend it in the courts and other fora. *See, e.g.,* MSA, § XVIII(l). The Tenth Amendment forbids coercing a state legislature into adopting legislation, or ordering state officials to administer it. *See New York v. United States*, 505 U.S. 144, 161 (1992) (striking down requirement that New York take title to nuclear waste); *ACORN v. Edwards*, 81 F.3d 1387 (5th Cir. 1996) (Tenth Amendment forbade Congress from requiring Louisiana to adopt clean drinking water regulations); *Printz v. United States*, 521 U.S. 898 (1997) (Tenth Amendment forbade Congress to impose on local sheriffs the duty to administer the Brady handgun law). The legislature was compelled to adopt the Qualifying Statute in precisely the form dictated by the MSA without any change. Cplt. ¶¶ 40, 44. And even attorneys general who objected to the MSA effectively had no choice but to sign it. Cplt. ¶ 42 (quoting Alabama Attorney General Bill Pryor).

The "diligent enforcement" provision of the MSA, MSA § IX(d), effectively subjects each of the Settling States' sovereign law enforcement powers to the ongoing supervision and "coordination" of NAAG and its tobacco enforcement bodies. For example, States must work to harmonize their interpretation of the MSA with NAAG, *see, e.g.*, MSA § VII(f), and whether they receive MSA funding to enforce the Agreement and related provisions (such as the Consent Decree and Qualifying Statute) is subject to the total discretion of NAAG. *See, e.g.*, MSA, § VIII(c) & Exhibit J.

## CONCLUSION

The Master Settlement Agreement conflicts with numerous federal laws and constitutional provisions, including the Compact Clause. Accordingly, the motion to dismiss should be denied.

DATED:  December 15, 2005

By:

Billy J. Guin
Rountree, Cox & Guin
1200 Beck Building
400 Travis St., P.O. Box 1807
Shreveport, LA 71166-1807
(318) 226-0993
ID # 06587

Hans Bader, T.A., ID # 911528
Sam Kazman, I.D. # 911529
Competitive Enterprise Institute
1001 Conn. Ave., NW, #1250
Washington, DC 20036
(202) 331-1010

Erik S. Jaffe
Erik S. Jaffe, P.C.
5101 34th Street, NW
Washington, D.C. 20008
(202) 237-8165

## CERTIFICATE OF SERVICE

I hereby certify that a copy of Plaintiffs' Memorandum in Opposition to Motion

to Dismiss has been served upon defendant through his counsel by placing the same in

the U.S. Mail, postage prepaid and properly addressed, including in envelopes addressed

as follows:

Thomas Enright                          Jerald Perlman
Assistant Attorney General              Asst. Attorney General
Louisiana Department of Justice         La. Dept. of Justice
Tobacco Settlement Enforcement Division 330 Marshall St., Ste. 777
1885 North Third Street                 Shreveport, LA 71101
P.O. Box 94005
Baton Rouge, LA 70804-9005


Shreveport, Louisiana, this 16th day of December 2005.