UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

| | |
|---|---|
| A. B. COKER CO., INC., ET AL | NO. CV05-1372 S |
| VERSUS | JUDGE HICKS |
| CHARLES C. FOTI, JR., ET AL | MAGISTRATE JUDGE HORNSBY |

## DEFENDANT'S REPLY TO PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE MOTION TO DISMISS

# TABLE OF CONTENTS

Introduction

I.   Count I of Plaintiffs' Complaint Fails to State Claim
     under the Compact Clause ........................................................................................2

     A. Nothing in the MSA Actually or Potentially Conflicts
        with the Sherman Act ........................................................................................4

     B. Nothing in the MSA Actually or Potentially Conflicts
        with the FCLAA ........................................................................................7

     C. Nothing in the MSA Actually or Potentially Conflicts
        with the Federal Bankruptcy Code ........................................................................................8

     D. Nothing in the MSA Actually or Potentially Conflicts
        with the First Amendment ........................................................................................9

II.  Count III of Plaintiffs' Complaint Fails to State a Claim
     Under the Commerce and Due Process Clauses........................................................................................11

     A.. Commerce Clause ........................................................................................11

     B.. Due Process Clause ........................................................................................13

III. Count IV of Plaintiffs' Complaint Fails to State a Claim
     Under the Tenth Amendment ........................................................................................14

Conclusion ........................................................................................17

Certificate ........................................................................................18

# TABLE OF AUTHORITIES

**Cases**

*A.D. Bedell Wholesale Co. v. Philip Morris*, 263 F.3d 239 (3d Cir. 2001)......................................5

*Blackburn v. Sweeney*, 53 F.3d 825 (7th Cir. 1995)........................................................................6

*Freedom Holdings, Inc. v. Spitzer*, 2004 WL 2035334 (S.D.N.Y. Sept. 14, 2004), (NO. 02
   CIV.2939 AKH), *reconsideration denied*, 2004 WL 2251668 (S.D.N.Y. Oct 06, 2004), *aff'd
   on other grounds*, 408 F.3d 112 (2d Cir. 2005)....................................................................5

*Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205 (2d Cir. 2004) ......................................................5

*Grand River Enterprises Six Nations Ltd. v. Pryor*, 425 F.3d 158, 173 (2d Cir. 2005)..........11, 12

*Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992) ......................................................5

*Ieyoub v. Bulgartabac Holding Group, PLC*, No. 2005 CW1170 (Louisiana First Circuit Court of
   Appeal, Jul. 26, 2005)...........................................................................................................13

*In re 1820 1838 Amsterdam Equities, Inc.*, 191 B.R. 18 (S.D.N.Y. 1996) .....................................8

*In re First Alliance Mortg. Co.*, 264 B.R. 634 (C.D.Cal. 2001).......................................................8

*Louisiana Dairy Stabilization Board v. Dairy Fresh Corp.*, 631 F.2d 67 (5th Cir. 1980)...........12

*McConnell v. Federal Election Comm'n*, 540 U.S. 93, 186 (2003) ................................................14

*Multistate Tax Commission* and *Northeast Bancorp, Inc. v. Board of Governors of the Fed. Res.
   Sys.*, 472 U.S. 159 (1985) .......................................................................................................2

*New York v. United States*, 505 U.S. 144, 182 (1992)...................................................................14

*PTI, Inc. v. Philip Morris, Inc.*, 100 F. Supp. 2d 1179 (C.D. Cal. 2000) ......................................10

*Quill v. North Dakota*, 504 U.S. 298 (1992) .................................................................................13

*Rice v. Norman Williams Co.*, 458 U.S. 654, 661 (1982).............................................................5, 6

*Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.*, 9 F.3d 415, 419 (5th Cir. 1993). ...................14

*S & M Brands, Inc. v. Summers*, 393 F.Supp.2d 604, 629-30 (M.D. Tenn. 2005)................2, 5, 10

*Sanders v. Lockyer*, 365 F.Supp.2d 1093, 1099 (N.D. Cal. 2005), *appeal pending* (9th Cir. No.
   05-15676)............................................................................................................................2, 5

*South-Central Timber Dev. Co. v. Wunnicke*, 467 U.S. 87 (1984)................................................11

*Star Scientific, Inc. v. Beales*, 278 F.3d 339, 357 (2002) .......................................................3, 8, 12

*Taylor v. Books a Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002) ................................................5

*Trident Int'l Corp. v. Kentucky*, No. 3-04-67 (E.D. Ky. Sept. 8, 2005)...........................................5

*United States Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 473 (1978) ...........................1

*United States v. Gasoline Retailers Ass'n*, 285 F.2d 688 (7th Cir. 1961) ..........................6

*Wisconsin Dept. of Industry v. Gould*, 475 U.S. 282 (1986) .........................................11

*Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 607-608 (1991) ......................15

*Xcaliber Int'l Ltd. v. Edmondson*, (C.A. 04-CV-922-EA(C)) (N.D. Okla. Apr. 5, 2005, May 20, 2005), *reconsideration denied* (Aug. 31, 2005), *appeal docketed*, No. 05-5178 (10th Cir. 2005)...............................................................................................5, 10

*Xcaliber v. Ieyoub*, 377 F.Supp.2d 567, 573, 578 (E.D. La. 2004), *appeal docketed* (5th Cir. No. 05-30323)..................................................................................................10, 13

**Louisiana Statutes**

LA REV. STAT. ANN. 13:5063(C)(1)(b) ...........................................................6

LA REV. STAT. ANN. 13:5063(C)(1)(d) ...........................................................9

LA REV. STAT. ANN. 13:5063(C)(2)(b) ......................................................10, 12

LA REV. STAT. ANN. 13:5071 et seq...............................................................12

**Other Authorities**

MSA § IV, VI, VII, and VIII ..................................................................15

MSA § IX(c)(1) .........................................................................9, 12

MSA § IX(d)(1)(C), IX(d)(2)(G)................................................................16

MSA § IX(i).....................................................................................11

MSA § XI(c) ....................................................................................16

MSA § XV ........................................................................................9

MSA § XVIII(p) ...............................................................................15

MSA § XVIII(w)(i)(C) .........................................................................8

MSA § XVIII(w)(i)(D).........................................................................8

Report of the Federal Trade Commission, R.J. Reynolds Tobacco Holdings, Inc./British American Tobacco, P.L.C., File No. 041-0017, p. 4.....................................5

**Federal Authorities**

15 U.S.C.A. § 1334(b)..............................................................................................................7, 8

Tenth Amendment of the United States Constitution...................................................................15

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

A. B. COKER CO., INC., ET AL                    NO. CV05-1372 S

VERSUS                                           JUDGE HICKS

CHARLES C. FOTI, JR., ET AL                      MAG. JUDGE HORNSBY

## DEFENDANT'S REPLY TO PLAINTIFFS' MEMORANDUM
## IN OPPOSITION TO THE MOTION TO DISMISS

### INTRODUCTION

Plaintiffs' Memorandum in Opposition to the Motion to Dismiss ("Pl. Mem.") is long on

rhetoric but short on substance.  Plaintiffs repeatedly mischaracterize the Master Settlement

Agreement ("MSA"), the law, Defendant's arguments, or all three.  More fundamentally, in

attempting to support their Compact Clause claim, Plaintiffs have failed to identify *any* respect in

which the Master Settlement Agreement ("MSA") either potentially or actually "enhances state

power *quoad* the National Government."  *United States Steel Corp. v. Multistate Tax Comm'n*,

434 U.S. 452, 473 (1978) .

Moreover, while complaining that Defendant's arguments imply that "the universe of

state actions prohibited by the Compact Clause is a null set" (Pl. Mem. at 6 n.5),[1] Plaintiffs seek

to use the Compact Clause as a means of preempting the MSA even though they cannot satisfy

the standards for preemption that the United States Supreme Court has developed under the

---

[1]      To the extent the Compact Clause may seem more "arcane" today than in 1789 (Pl. Mem. at 5), that is due
in large measure to the fact that other clauses – and especially the Supremacy and Commerce Clauses – have been
given substantial content during the past 217 years by congressional enactments and judicial decisions that have
given the pressing concerns the Framers faced in 1789, in light of their then-recent experience under the Articles of
Confederation, less urgency in more contemporary circumstances.  In any event, Plaintiffs' claim that Defendant's
arguments imply that "the universe of state actions prohibited by the Compact Clause is a null set" (Pl. Mem. at 6
n.5) is wrong.  Even under the assumptions identified in footnote 5 of Plaintiffs' Memorandum, the Compact Clause
could apply to state compacts on such matters as boundaries, immigration, elections, diplomatic affairs, and military
activities.

Supremacy and Commerce Clauses. *See, e.g.*, Pl. Mem. at 9, 16, 20-21, 26. For that reason, although Plaintiffs purport to accept the Supreme Court's controlling decisions construing the Compact Clause (Pl. Mem. at 6 & n.4), including *Multistate Tax Commission* and *Northeast Bancorp, Inc. v. Board of Governors of the Fed. Res. Sys.*, 472 U.S. 159 (1985), their arguments actually repudiate the holdings of those decisions, requiring the dismissal of their Compact Clause claim. Plaintiffs' other claims are equally without merit.

Accordingly, Defendant's Motion should be granted, and Plaintiff's complaint should be dismissed in its entirety for failure to state a claim on which relief can be granted.

## I.   COUNT I OF PLAINTIFFS' COMPLAINT FAILS TO STATE A CLAIM UNDER THE COMPACT CLAUSE

Plaintiffs begin by claiming that Defendant's "primary defense" is that the MSA does not constitute "state action" and thus "is not subject to constitutional scrutiny." (Pl. Mem. at 3.) Of course, Defendant has made no such argument. Because the MSA was entered into by the Attorneys General of 46 States and approved and ratified by the courts and legislatures of those States, it is obviously "state action."[2] When the States act to settle litigation and release present and future claims for damages and injunctive relief, however, they act in a different way than when they adopt statutes and regulations, and the analysis that applies to any challenge to their actions is necessarily affected by the form of their action. Because the Settling States acted through the MSA, that Agreement is subject to being tested under the standards that determine whether an agreement between States requires congressional consent under the Compact Clause. As the Fourth Circuit has correctly held, the MSA does not require such consent because nothing

---

[2]     *See Sanders v. Lockyer*, 365 F.Supp.2d 1093, 1099 (N.D. Cal. 2005), *appeal pending* (9th Cir. No. 05-15676) ("the settlement itself is a sovereign act of the state of California"); *S&M Brands, Inc. v. Summers*, 393 F.Supp.2d 604, 630 (M.D. Tenn. 2005) ("The settlement is a sovereign act of the state of Tennessee").

in it purports to infringe – either actually or potentially – on the sovereignty of the Federal Government. *Star Scientific v. Beales*, 278 F.3d 339, 360 (4th Cir. 2002).

Plaintiffs disagree with the Fourth Circuit's decision and suggest alternative interpretations of the Compact Clause under which they claim the MSA is invalid.  First, Plaintiffs propose that the Compact Clause should be interpreted according to its "plain language" to require congressional approval of any agreement to which two or more States are parties. (Pl. Mem. at 6 & n.4.)  Recognizing, however, that any such argument is foreclosed by controlling Supreme Court precedent, Plaintiffs contend that the Compact Clause imposes a requirement of congressional consent on any agreement between States that "potentially" encroaches on federal authority "whether or not it is independently preempted by existing federal law." (*Id.* at 16.)  Insofar as Plaintiffs' argument relies on federal statutes, however, it is directly contrary to the Supreme Court's *Northeast Bancorp* decision, which held that "[t]o the extent that the state statutes might conflict in a particular situation with other federal statutes, . . . they would be pre-empted by those statutes, and therefore any Compact Clause argument would be academic." 472 U.S. at 176.

Furthermore, the Court has nowhere suggested that if no such conflict existed, the Compact Clause might be pressed into duty as a source of super-preemption.  The MSA may well have enhanced the power of States at the expense of the tobacco manufacturers.  Critically, however, Plaintiffs have not alleged any respect in which the MSA has enhanced the States' power vis-à-vis the Federal Government.  Indeed, as shown below, it is apparent that nothing in the MSA either actually or potentially infringes on federal supremacy in any of the areas Plaintiffs address.

Plaintiffs also misstate the law when they claim that "the Compact Clause places a higher burden on state action taken in concert with other States than the Constitution creates for action taken by a single State alone." (Pl. Mem. at 7.) The Supreme Court rejected the Compact Clause challenge in *Multistate Tax Commission* because the compact "d[id] not purport to authorize the member States to exercise any powers they could not exercise in its absence." 434 U.S. at 475. Thus, if a single State can exercise a power, the fact that it does so in concert with other States in no way implicates the Compact Clause. *Id.* at 472 ("The number of parties to an agreement is irrelevant if it does not impermissibly enhance state power at the expense of federal supremacy."). This is so even if the States are acting in matters affecting interstate commerce: The Supreme Court held in *Multistate Tax Commission* and *Northeast Bancorp* that multistate arrangements did not require congressional consent even though they dealt with taxation of the interstate operations of foreign corporations and with interstate bank acquisitions, respectively.[3]

### A.    Nothing in the MSA Actually or Potentially Conflicts with the Sherman Act.

The Sherman Act prohibits private parties from engaging in concerted action that unreasonably restrains trade. It does not apply to unilateral actions taken by private parties. If

---

[3]    Regarding congressional consent, Plaintiffs confuse the issue with their discussion of the proposed 1997 "Tobacco Resolution." (Pl. Mem. at 13-14.) That Resolution included numerous provisions that required changes in existing statutes in order to be carried out. The MSA represents a far more limited set of provisions, none of which involves cooperative action among the tobacco companies or requires federal statutory implementation. Moreover, whatever may have been the FTC's concerns about the Resolution, the FTC has never suggested that the MSA is contrary to federal antitrust policy. Indeed, when it closely reviewed the structure and performance of the industry in the context of the 2004 merger between two Participating Manufacturers (Brown & Williamson and R.J. Reynolds), the FTC found no evidence that the MSA operated as a "cartel." Instead, the FTC concluded that there had been "substantially increased competition" in the post-MSA period. Report of the Federal Trade Commission, R.J. Reynolds Tobacco Holdings, Inc./British American Tobacco, P.L.C., File No. 041-0017, p. 4.

Plaintiffs also argue that because congressional action regarding the primary payment provisions of the MSA was in an "obscure" provision, it could not constitute consent. In fact, the release of any federal claim to potentially more than $100 billion could not possibly have been "obscure" to the responsible federal officials and congressmen, and, contrary to Plaintiffs' claim that consent must be "unmistakably clear," the Supreme Court has repeatedly found consent to be implied in congressional actions that would not make sense unless the challenged agreement were in place. (*See* Op. Mem. at 14-15.)

the MSA purported to authorize or require cigarette companies to fix prices or agree on output, it would be subject to preemption as inconsistent with federal policy. *Rice v. Norman Williams Co.*, 458 U.S. 654 (1982). As numerous other courts have now held, however, neither the MSA nor the related statutes do so.[4] Rather, under the MSA and related statutes, all cigarette companies are left to make their own unilateral decisions on matters of competitive behavior taking into account the anticipated revenues and costs, including their MSA or escrow costs. Although the MSA, like virtually all state litigation and regulation, may affect competition, it in no respect authorizes or requires any party to violate the antitrust laws.

Plaintiffs' Memorandum attempts to avoid this obvious conclusion by claiming that the MSA established a "cartel" and represents a "market division scheme among the participants" and a "price stabilization scheme." (Pl. Mem. at 17.)[5] But "conclusory allegations . . . will not suffice to prevent a motion to dismiss," *Taylor v. Books a Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002), nor will "unwarranted deductions of fact," *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992), and the Complaint's allegations fail this test.

---

[4]     *See S&M Brands, Inc. v. Summers*, 393 F.Supp.2d 604 (M.D. Tenn. 2005) (rejecting Sherman Act preemption challenge on motion to dismiss); *Sanders v. Lockyer*, 365 F.Supp.2d 1093 (N.D. Cal. 2005) (rejecting Sherman Act preemption challenge on motion to dismiss), *appeal docketed*, No. 05-15676 (9th Cir. 2005); *Tritent Int'l Corp. v. Kentucky*, No. 3-04-67 (E.D. Ky. Sept. 8, 2005) (rejecting Sherman Act preemption challenge on motion to dismiss); *Xcaliber Int'l Ltd. v. Edmondson*, (C.A. 04-CV-922-EA(C)) (N.D. Okla. Apr. 5, 2005, May 20, 2005) (rejecting Sherman Act preemption challenge on motion for summary judgment), *reconsideration denied* (Aug. 31, 2005), *appeal docketed*, No. 05-5178 (10th Cir. 2005); *cf. Freedom Holdings, Inc. v. Spitzer*, 2004 WL 2035334 (S.D.N.Y. Sept. 14, 2004), (NO. 02 CIV.2939 AKH) (refusing to grant preliminary injunction against operation of MSA on Sherman Act preemption grounds), *reconsideration denied*, 2004 WL 2251668 (S.D.N.Y. Oct 06, 2004), *aff'd on other grounds*, 408 F.3d 112 (2d Cir. 2005).

[5]     Plaintiffs assert that "appeals courts . . . have generally agreed that [the MSA] constitutes a cartel." (Op. Mem. at 11-12.) In fact, the courts in *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205 (2d Cir. 2004), and *A.D. Bedell Wholesale Co. v. Philip Morris*, 263 F.3d 239 (3d Cir. 2001), held only that the complaints in those cases had alleged that the MSA was a cartel, and did not consider the actual operation of the provisions of the Agreement that were claimed to penalize increased output or allocate markets. The courts that have done so have all rejected any "cartel" label. *See* note 4, *supra*.

Plaintiffs' arguments rely on mischaracterizations of the MSA's payment provisions. Although those provisions may seem complicated, in they end they simply require Participating Manufacturers to make per-cigarette settlement payments.  Similarly, the Escrow Statutes simply require Non-Participating Manufacturers to make deposits into an escrow account for each cigarette sold as security for potential future liability.  Such deposits are virtually the same as – and by the express terms of the Escrow Statute cannot exceed – the marginal per-cigarette payments of an SPM. LSA-R.S. 13:5063(C)(1)(b).

Plaintiffs claim that cigarette companies will increase their prices to attempt to recover their MSA or escrow costs.  (Pl. Mem. at 17.)  Cigarette companies may individually decide to do so, but the MSA no more divides markets or stabilizes prices than would a statute imposing an excise tax in the same amount.  By Plaintiffs' logic, a settlement of litigation by Louisiana and Mississippi against polluters whose actions affected both jurisdictions by which the polluters agreed to employ expensive antipollution technology would create a "cartel" because it raised the price of the polluters' products.  The law, however, says no such thing.  Like the MSA and the Escrow Statutes, such a settlement or statute would leave each former polluter free to compete using whatever efficiencies or other advantages it could achieve.  Neither would be preempted by the Sherman Act or require congressional consent under the Compact Clause, and the same is true of the MSA and related legislation.[6]

---

[6]       Plaintiffs also suggest that the restrictions in the MSA on advertising that misrepresents the health effects of cigarettes or targets youth who cannot lawfully purchase cigarettes or promotes smoking through movie placements, billboards, or brand sponsorships could somehow be preempted by the Sherman Act.  Of course, none of these provisions apply to NPMs like Plaintiffs S&M and CLP, Inc.  In any event, Plaintiffs' cited cases (Pl. Mem. at 17) regarding advertising restrictions are inapposite.  *Blackburn v. Sweeney*, 53 F.3d 825 (7th Cir. 1995), concerned an agreement to limit advertising to certain areas and whose purpose was to divide markets.  *United States v. Gasoline Retailers Ass'n*, 285 F.2d 688 (7th Cir. 1961), involved an agreement not to advertise prices and whose purpose was to stabilize prices.  The MSA advertising restrictions in no way restrict price advertising or otherwise authorize or require *per se* unlawful activity that could result in preemption under the applicable test set forth in *Rice v. Norman Williams Co.*, 458 U.S. 654, 661 (1982).

**B.      Nothing in the MSA Actually or Potentially Conflicts with the FCLAA.**

Plaintiffs allege, both as Count II of their Complaint and as one element of their Compact Clause claim, that the MSA conflicts with the Federal Cigarette Labeling and Advertising Act. ("FCLAA").  On its face, the FCLAA preemption provision applies only to a "requirement or prohibition . . . *imposed under State law*."  15 U.S.C.A. § 1334(b) (emphasis added).  As explained in Defendant's Opening Memorandum (at 15-17) and the cases cited therein, the advertising provisions of the MSA were voluntarily agreed to by the Participating Manufacturers in exchange for a release of the States' past and future claims and hence are not preempted by FCLAA.  That the States monitor the manufacturers' compliance with the Agreement's terms and can bring actions to remedy any breaches does not convert a voluntary contract into a state-law requirement.

Plaintiffs' further suggestion that the advertising restrictions are "imposed by State law" because the Louisiana Escrow Statute somehow compels tobacco companies to join the MSA is equally wrong.  As explained in greater detail below, the Escrow Statutes do nothing of the sort. They require NPMs to make escrow deposits that cannot exceed what they would have had to pay under the MSA.  At present, Louisiana's website[7] lists some 16 NPMs qualified to sell cigarettes in Louisiana, including plaintiff CLP.  Since 2004, only one NPM that was listed on that website has joined the MSA.  Not only does the Louisiana Escrow Statute contain no advertising or promotion restrictions, but it is quite evident that it does not impose such restrictions by compelling any tobacco company to join the MSA.

---

[7]      The Louisiana Attorney General's website is – www.ag.state.la.us.

**C.**    **Nothing in the MSA Actually or Potentially Conflicts with the Federal Bankruptcy Code.**

Plaintiffs also allege that the MSA conflicts with federal policy by violating the Bankruptcy Code.    They point to MSA Section XVIII(w)(i)(D), which bars bankrupt Participating Manufacturers from seeking relief from the terms of the agreement or a "discretionary stay" of Settling States' "police and regulatory actions," as allegedly favoring the Settling States over other creditors.    The Code's police and regulatory exception to the stay provision, however, does not allow a state government to collect on a claim, and therefore gives the State no greater right to payment of its claims than any other party possesses.    Moreover, stays of police and regulatory actions are generally disfavored under the Code.    *See, e.g., In re First Alliance Mortg. Co.*, 264 B.R. 634 (C.D.Cal. 2001) (stay of police and regulatory action abuse of discretion); *In re 1820 1838 Amsterdam Equities, Inc.*, 191 B.R. 18 (S.D.N.Y. 1996) (same).

Nor is there any "federal policy" that prevents parties to settlements or other agreements from seeking contractual protection for their claims in the event of another party's bankruptcy. In any case, the MSA expressly states that its provisions can apply only if consistent with the Bankruptcy Code.    If, as Plaintiffs claim (Pl. Mem. at 22-23), the Code bars enforcement of the MSA provisions, the bankruptcy court will not enforce them.    *See Star Scientific v. Beales*, 278 F.3d 339, 360 (4th Cir. 2002).    Finally, MSA Section XVIII(w)(i)(C) does nothing to make the Settling States a "favored class of creditor." (Pl. Mem. at 23.)    It merely states the truism that the States may exercise all of their rights under the Code, the same as any other creditor.

**D.    Nothing in the MSA Actually or Potentially Conflicts with the First Amendment.**

Plaintiffs argue that the MSA "encroaches on federal interests, as well as on federally protected rights, by restricting protected speech and petitioning." (Pl. Mem. at 24.)  Nothing in those restrictions, however, enhances the power of the States *quoad* the Federal Government, and hence no such restriction raises an issue under the Compact Clause.   Moreover, all such restrictions are voluntary on the part of the cigarette manufacturers that choose to participate in the MSA.  *See* MSA § XV.  The voluntary nature of such restrictions would dispose of any First Amendment claim, had Plaintiffs pleaded one.

Plaintiffs argue that the restrictions are not actually voluntary.  According to Plaintiffs, the Escrow Statutes impose a greater payment obligation on NPMs than they would have were they to join the MSA, thereby penalizing NPMs for refusing to waive their constitutionally protected rights of speech, association and petition.  Even if this false assertion were true, it would do nothing to save Plaintiffs' Compact Clause claim.  In any case, the argument fails because the escrow requirement statutorily imposed on NPMs in no way penalizes them for not participating in the MSA.  The deposits that NPMs make under the Escrow Statute for cigarettes they sell in Louisiana are calculated using substantially the same per-cigarette figure – currently about two cents per cigarette – that would be used for the same cigarette sales in calculating their payments under the MSA if they were SPMs.[8]  The payment amounts set forth in the Escrow

---

[8]    Under the MSA, payment amounts are determined by formulas in which base amounts are adjusted based on changes in volume.  With the exception of a small adjustment that causes the MSA payments to increase slightly as the volume decreases, the per-cigarette amount can be determined by dividing the base payment amount by the base volume amount.  For 2005 and 2006, the base annual payment amount is set at $8 billion (MSA § IX(c)(1)) while the base volume amount is 475.656 billion cigarettes.  (MSA Ex. E.)  Dividing the payment amount by the volume results in an MSA per-cigarette payment obligation (before an inflation adjustment is applied) of $.0168189.  By comparison, the escrow deposit obligation in the Escrow Statute (before application of the same inflation adjustment) is $.0167539 per cigarette.  LSA-R.S. 13:5063(C)(1)(d).  With inflation, both amounts are slightly more than $.02 per cigarette for sales in 2005 and 2006, or slightly more than $4.00 per carton.  It should be noted, however, that PMs are subject to other, albeit smaller, payment obligations in addition to the annual payment

9

Statute are always slightly lower than MSA payments that would normally be due on the same cigarettes if the NPM were an SPM instead.  This is true even if an SPM were entitled to an adjustment that reduced its payments, because the Escrow Statute expressly provides for a release from escrow in such circumstances, thus ensuring that escrow payments can never be higher than MSA payments. LSA-R.S. 13:5063(C)(2)(b).

Plaintiffs fail to advise the court that their "unconstitutional conditions" argument has been soundly rejected in other cases.  Most recently, the court in *S & M Brands, Inc. v. Summers,* 393 F.Supp.2d 604, 629-30 (M.D. Tenn. 2005), when faced with such a claim, stated:

> The Escrow Act, as amended by the ASR Amendment, leaves Plaintiffs no worse off financially than they would be under the MSA, because it expressly provides that Plaintiffs are entitled to a refund on any amounts paid into escrow that they can demonstrate is in excess of the amount they would have paid under the MSA. Further, Plaintiffs retain all of the First Amendment and other rights that the PMs gave up when they signed the MSA

The U.S. District Court for the Eastern District of Louisiana made the same determination with regard to the identical Louisiana Statute:

> The court finds the amended escrow statute leaves plaintiffs no worse off financially than they would be under the Agreement, and plaintiffs retain all of the First Amendment and other rights that the participating manufacturers relinquished by signing the Agreement. . . . [T]the unconstitutional conditions doctrine does not apply.

*Xcaliber v. Ieyoub,* 377 F.Supp.2d 567, 573 (E.D. La. 2005), *appeal pending* (5th Cir. No. 05-30323) (dismissing NPM plaintiffs' First Amendment, and other constitutional, claims).[9]

---

obligation.

[9]    *See also PTI, Inc. v. Philip Morris, Inc.*, 100 F. Supp. 2d 1179 (C.D. Cal. 2000) (dismissing NPM plaintiffs' First Amendment claim because "the speech restrictions at issue in the MSA are wholly separate from the tax consequences stemming from a tobacco distributor's choice to participate in the MSA or subject itself to the terms of [California's version of the Escrow Act]"); *Xcaliber Int'l Ltd. v. Edmondson*, C.A. 04-CV-922-EA(C), slip op. at 17-19 (N.D. Okla. Apr. 5, 2005) (dismissing First Amendment claims).

10

## II.    COUNT III OF PLAINTIFFS' COMPLAINT FAILS TO STATE A CLAIM UNDER THE COMMERCE AND DUE PROCESS CLAUSES

### A.    Commerce Clause.

Plaintiffs assert that the MSA and Louisiana Escrow Statute regulate "interstate commerce in an extraterritorial fashion." (Pl. Mem. at 27.)[10]  In fact, there is no "extraterritorial" regulation.  Plaintiffs' tortured reasoning to the contrary runs as follows:  Although an NPM's escrow deposits are in the first instance based on the simple calculation of cigarette sales made in the State times the per-cigarette amount specified in the Escrow Statute, the NPM may be entitled to a release that could reduce its escrow obligation.  That release would be calculated on the basis of the MSA payment the NPM would have made as a result of those sales had it been an SPM.  The calculation of payments by an SPM, in turn, is based in part on its national "market share."  This, Plaintiffs say, is sufficient to justify their claim that the Escrow Statute "effectively regulates the pricing mechanism for goods in interstate commerce."  (Pl. Mem. at 28, quoting *Grand River Enterprises Six Nations Ltd. v. Pryor*, 425 F.3d 158, 173 (2d Cir. 2005).)

Plaintiffs' argument is patently incorrect.  While the MSA uses national "market share" as one term in the formula that determines the MSA payment amount SPMs will make, it does so only to ensure that the per-cigarette amount paid by SPMs will equal the per-cigarette amount paid by Original Participating Manufacturers ("OPMs") before any adjustment is applied.  MSA § IX(i).[11]  If an adjustment reduces that amount, the per-cigarette escrow obligation of an NPM

---

[10]    With respect to the question whether the MSA "regulates" commerce, Plaintiffs rely on cases involving contracts in which provisions were required to be included by force of state law. (Pl. Mem. at 4, 27.) *See Wisconsin Dept. of Industry v. Gould*, 475 U.S. 282 (1986) (state statute debarred federal law violators from doing business with state); *South-Central Timber Dev. Co. v. Wunnicke*, 467 U.S. 87 (1984) (state statute required timber taken from state land to be processed within state). That of course is not the situation here.

[11]    The way § IX(i) operates is somewhat complicated but nevertheless apparent on the face of the MSA:

in Louisiana may go down. LSA-R.S. 13:5063(C)(2)(b). But that has absolutely nothing to do with how many cigarettes the NPM sells in Louisiana or elsewhere – or how many cigarettes it would have sold here or elsewhere had it been an SPM. It will simply lower the amount the NPM is required to keep in escrow for the benefit of Louisiana. As a result, the Louisiana Escrow Statute neither applies to, nor affects the prices of, cigarettes sold elsewhere, and nothing in the escrow statute can remotely be described as "control[ling] prices outside of the enacting states." (Pl. Mem. at 29 (quoting *Grand River*, 425 F.3d at 173).)

Plaintiffs also argue that Louisiana's Escrow Statute may violate the dormant Commerce Clause because it "applies to a manufacturer's cigarettes sold anywhere 'in the United States' merely because those cigarettes end up being *resold* in Louisiana." (Pl. Mem. at 30 (emphasis in original).) The Fourth Circuit rejected the same argument in *Star Scientific, Inc. v. Beales*, 278 F.3d 339, 357 (4th Cir. 2002), noting that any burden the escrow payment poses for manufacturers whose cigarettes are sold through distributors is minimal. Moreover, *Star Scientific* was decided before Virginia, Louisiana, and other States enacted Complementary Enforcement Legislation that prohibits the sale of cigarettes of manufacturers that have not affirmatively certified to the State that they will make the escrow payments required on all of their cigarettes that are sold in the State. LSA-R.S. 13:5071 et seq. This legislation ensures that no escrow obligation can arise unless the NPM affirmatively takes steps to have its cigarettes sold in the State, and that the obligation applies only to cigarettes that are in fact sold here.[12]

---

OPM payments are determined by multiplying each OPM's "Relative Market Shares" – i.e., the OPM's percentage share of the aggregate OPM sales – by the unadjusted base amount set in § IX(c). When the product is divided by the OPM's volume it produces a uniform per-cigarette payment amount. An SPM's payment is determined by dividing its "market share" by the Aggregate OPM market share to produce an "equivalent" Relative Market Share for the SPM. When that equivalent Relative Market Share is multiplied times the Base Payment amount and then divided by the SPM's cigarette volume, the result is the same per-cigarette payment amount as for the OPMs.

[12]     In these circumstances, the authority on which Plaintiffs rely is wholly inapposite. In particular, *Louisiana Dairy Stabilization Board v. Dairy Fresh Corp.*, 631 F.2d 67 (5th Cir. 1980), involved the application of Louisiana

**B.      Due Process Clause.**

Plaintiffs' due process claim largely relies on the same allegations of extraterritorial regulation as their Commerce Clause claim.  However, neither the MSA nor the Escrow Statute has any such extraterritorial effect, as previously explained.  Although Plaintiffs assert that "the MSA imposes assessments on cigarette sales that occur outside any MSA State" (Pl. Mem. at 32), in fact the MSA is a litigation settlement that calculates compensation paid to the States, and then allocates the compensation among the States according to a method agreed upon by the parties.  Nothing in due process jurisprudence – and certainly not the cases Plaintiffs cite (Pl. Mem. at 31-32) – prevents parties to a settlement from agreeing to use national data to calculate compensation.  (See Op. Mem. at 20.)

As for the Escrow Statute, Plaintiffs cite a Virginia Circuit Court decision holding the Virginia statute inapplicable to a manufacturer, located in another State, that alleged it had no contacts with Virginia and had no control over where its customers resold its cigarettes (Pl. Mem. at 5).  Numerous other jurisdictional challenges to Escrow Statutes based on similar allegations have failed, including a challenge brought in Louisiana.[13]  In any event, as discussed above, because an NPM's cigarettes may not be sold in Louisiana unless the NPM has taken

---

regulations to, and the imposition of a fee on, the activities and transactions of dairy processors occurring in other States.  The court struck the regulations because they "restrict[ed] access of out-of-state suppliers to local markets in order to protect local economic interests."  *Id.* at 69.  The Escrow Statute, in contrast, applies only to transactions in Louisiana, and Plaintiffs do not allege that the Escrow Statute in any way protects local Louisiana interests against out-of-state competition.  Equally irrelevant is *Quill v. North Dakota*, 504 U.S. 298 (1992) which has no application outside the realm of state sales taxes.  *See* 504 U.S. at 305; *see also Xcaliber v. Ieyoub*, 377 F.Supp.2d 567, 578 (E.D. La. 2004), *appeal docketed* (5th Cir. No. 05-30323).

[13]       *See Ieyoub v. Bulgartabac Holding Group, PLC*, No. 2005 CW1170 (Louisiana First Circuit Court of Appeal, Jul. 26, 2005) (rejecting challenge to Louisiana's exercise of jurisdiction over out-of-state NPM because "Relator has sufficient contacts with the forum and the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice").

affirmative steps to have its cigarettes certified for sale here, any such challenge would be frivolous.[14]

## III.   COUNT IV OF PLAINTIFFS' COMPLAINT FAILS TO STATE A CLAIM UNDER THE TENTH AMENDMENT

The Supreme Court has described the Tenth Amendment's focus as "laws that commandeer the States and state officials in carrying out federal regulatory schemes." *McConnell v. Federal Election Comm'n*, 540 U.S. 93, 186 (2003). Plaintiffs' Tenth Amendment claim therefore contradicts their own Compact Clause claim, which is premised on the supposed enhancement of state power at the expense of the federal government.

Plaintiffs attempt to overcome the clear absence of any federal commandeering of state authority by citing *New York v. United States*, 505 U.S. 144, 182 (1992), which held that a federal law violated the Tenth Amendment even though state officials supported its enactment. According to Plaintiffs, if States may not delegate their sovereign powers to the federal government, then they "may not delegate their inherent powers to some body *outside* the Constitution, including bodies of their own creation" such as the National Association of Attorneys General ("NAAG") and the economic accounting firm ("the Firm") that makes certain determinations related to a potential NPM Adjustment to the MSA settlement payments.   (Pl. Mem. at 33 (emphasis in original).)   This is a *non sequitur*.   The *New York v. United States* decision was concerned with the division of authority between federal and state governments, and held that state officials "cannot consent to the enlargement of the powers of Congress beyond those enumerated in the Constitution." 505 U.S. at 182. Nothing in that decision or in

---

[14]       Fifth Circuit law is clear that a manufacturer subjects itself to a State's jurisdiction when it places its products in the stream of commerce and knows or should know that those products are sold in the State and takes no steps to prevent their sale. *See Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.*, 9 F.3d 415, 419 (5th Cir. 1993).

the Constitution prohibits the States from delegating their powers to bodies of their own creation. *Cf. Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 607-608 (1991) ("The principle is well settled that local governmental units are created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them . . . in [its] absolute discretion.") (internal quotation marks and citations omitted).[15]

Plaintiffs' claim also fails factually. It is apparent from the face of the MSA that no sovereign powers have been delegated to NAAG or the Firm. NAAG is the membership organization of the State Attorneys General, and thus is subject to the control of those state officials. It is assigned certain functions under the MSA relating principally to coordinating and facilitating the implementation and enforcement of the Agreement and administering the enforcement fund established by the Attorneys General. *See* MSA §§ IV, VI, VII, and VIII. NAAG is not a party to the MSA, however, and it has no independent authority to enforce it on behalf of the Settling States or to require States to adopt particular interpretations of the Agreement. In fact, Section XVIII(p) of the MSA expressly provides that the States have exclusive authority to enforce the MSA and that such authority cannot be delegated.[16]

The Firm has two assigned functions under the MSA: (1) if any State had not enacted an Escrow Statute (and all did), it would have determined whether an alternative enactment met the definition of a "Qualifying Statute" as set forth in the MSA, and (2) for purposes of the Non-

---

[15]     Plaintiffs also assert that the "Tenth Amendment forbids coercing a state legislature into adopting legislation, or ordering state officials to administer it." (Pl. Mem. at 34.)  Not surprisingly, all of the cases they cite in support of that assertion involve federal statutes imposing some duty on States.  Moreover, the Supreme Court has rejected the notion that the types of financial incentives the MSA provides Settling States to pass Escrow Statutes represent coercion under the Tenth Amendment.  (*See* Op. Mem. at 30.)

[16]     Plaintiffs cite a statement on Defendant's website that "[e]nforcement of the [MSA] has been delegated to the National Association of Attorneys General."  Of course, statements on websites cannot alter the terms of the MSA.  In any case, Plaintiffs omit the immediately following language:  "and the Attorneys General of the individual states."

Participating Manufacturer Adjustment, it decides whether disadvantages experienced by Participating Manufacturers as a result of the provisions of the MSA were a "significant factor" in any market share loss experienced by Participating Manufacturers.  MSA §§ IX(d)(1)(C), IX(d)(2)(G).  This latter determination, which is a condition precedent to the application of the NPM Adjustment, is made in the course of a highly specialized arbitration-type proceeding to which both the States and the Participating Manufactures are parties.  The Firm was chosen by the MSA parties to use its highly specialized economic expertise to resolve issues that may arise in the course of administering the litigation settlement embodied in the MSA.  Plaintiffs are plainly wrong in asserting that the MSA empowers the Firm to "determine whether any state has complied with the provisions of the MSA and fix penalties to be imposed on non-complying States."[17]  (Pl. Mem. at 34.)

Neither NAAG's nor the Firm's role under the MSA comes close to the exercise of "[f]undamental state powers" such as "tax, appropriations, and law enforcement functions."  (Pl. Mem. at 33.)  Plaintiffs' allegations (Complaint ¶¶ 69, 87) to the contrary are rebutted by the clear terms of the Agreement itself.

---

[17]      The MSA includes a dispute resolution provision, Section XI(c), which subjects to binding arbitration certain disputes relating to calculations and determinations made by the Independent Auditor that is responsible for calculations of payments and disbursements.  All other disputes are subject to the jurisdiction of courts pursuant to Section VII.  Plaintiffs evidently do not contend that dispute resolution procedures agreed to by States violate the Tenth Amendment.

## CONCLUSION

For the reasons stated above and in Defendant's Opening Memorandum, the Court should

dismiss the Complaint.

Respectfully submitted,

CHARLES C. FOTI, JR.
Attorney General

BY:

Thomas L. Enright, Jr.
Trial Attorney
Assistant Attorney General
(La. Bar #25040)

LOUISIANA DEPARTMENT OF JUSTICE
Tobacco Settlement Enforcement Section
1885 North Third Street
P. O. Box 94005
Baton Rouge, Louisiana  70804-9005
Telephone: (225) 326-6423
Facsimile:  (225) 326-6072

and

Jerald Ñ. Perlman
Assistant Attorney General
(La. Bar #8602)

LOUISIANA DEPARTMENT OF JUSTICE
Litigation Division
330 Marshall Street, Suite 777
Shreveport, LA 71101
Telephone (318) 676-5711
Facsimile (318) 676-5703

ATTORNEYS FOR DEFENDANT

17

## **C E R T I F I C A T E**

I HEREBY CERTIFY that a copy of the above and foregoing has this day been served

upon plaintiffs through their counsel of record by placing the same in the U. S. Mail, postage

prepaid and properly addressed.

Shreveport, Louisiana, this _____ day of January, 2006.

_____

OF COUNSEL

18