RECEIVED

SEP - 5 2006

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT, LOUISIANA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| A. B. COKER, INC., ET AL. | CIVIL ACTION NO. 05-1372 |
| versus | JUDGE HICKS |
| CHARLES C. FOTI, JR., ET AL. | MAGISTRATE JUDGE HORNSBY |

## REPORT AND RECOMMENDATION

### Introduction

Plaintiffs in this action are involved in the manufacture, distribution, sale or smoking

of cigarettes. They allege that they have been harmed by the effects of a Master Settlement

Agreement ("MSA") that was reached in 1998 between the four major tobacco manufacturers

and the attorneys general of forty-six states, including Louisiana. Plaintiffs filed this action

against Louisiana Attorney General Charles Foti seeking a (1) declaration that the MSA and

related Louisiana legislation are unconstitutional and (2) an injunction against enforcement

of the MSA and the statutes. Plaintiffs' complaint sets forth four counts (violation of the

Compact Clause; violation of the Federal Cigarette Labeling and Advertising Act; violation

of the Commerce Clause and Due Process Clause; and violation of the Tenth Amendment).

Before the court is a Motion to Dismiss (Doc. 13) filed by Attorney General Foti. It is

recommended, for the reasons that follow, that the motion be granted.

## Rule 12(b)(6) Standards

A district court may not dismiss a complaint under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 78 S.Ct. 99, 101-02 (1957). The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true. Lowrey v. Texas A&M Univ. System, 117 F.3d 242, 247 (5th Cir. 1997). However, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." Fernandez-Montes v. Allied Pilots Ass'n., 987 F.2d 278, 284 (5th Cir. 1993).

## Relevant Allegations

Plaintiffs attached to their complaint as Exhibit A a copy of the MSA, and they have referred to the MSA throughout the complaint. Exhibits to a complaint are a part thereof for all purposes, including Rule 12(b)(6) analysis. Fed. R. Civ. P. 10(c); Riley v. St. Luke's Episcopal Hospital, 355 F.3d 370, 375 (5th Cir. 2004). The court will not attempt to set forth in this Report and Recommendation every fact alleged in the thirty-page complaint and lengthy MSA, and it will not repeat the legal conclusions and argumentative characterizations of events found in portions of the complaint, but it will set forth a fair summary of the relevant alleged facts. A more detailed discussion of certain alleged facts may await the analysis of the particular count or counts to which those facts are especially relevant.

In the mid-1990's, the attorneys general of several states (including Louisiana) brought law suits against the four major tobacco companies (the "Majors") alleging that their product and related marketing had cost the states billions of dollars in increased Medicaid and other medical service expenses incurred to treat health problems caused by the use of tobacco. Complaint, ¶¶ 2, 6 & 23. In 1997, a group of attorneys general and the Majors drafted a precursor to the MSA, described by Plaintiffs as the "Resolution." The Resolution contained many features in common with the MSA, but its drafters made it contingent upon congressional approval. Plaintiffs alleged that the Resolution "encountered heated resistance on the Senate floor," and died in 1998 "without ever reaching the floor of the House." ¶ 25.

Additional negotiations between several attorneys general and the Majors resulted in the MSA, which was then released to the attorneys general (including Louisiana's) who had not participated in the negotiations. The non-participating attorneys general were given seven days to review the MSA and decide whether to join it. ¶ 26. The attorneys general of forty-six states (including Louisiana) and the Majors (Philip Morris, R J. Reynolds, Lorillard, and Brown & Williamson) agreed to enter into the MSA to resolve the cases brought by the states. Four states (Florida, Mississippi, Texas and Minnesota) made separate individual settlements before the MSA. ¶ 27.

The four Majors are referred to in the MSA as the Original Participating Manufacturers ("OPMs"). The MSA released the OPMs from all tobacco-related legal claims initiated by the states. In return, each OPM agreed to make annual payments into a

fund with each OPM's contribution based principally on its national market share. The payments are then allocated among the states based on a formula, with Louisiana receiving approximately 2.26 percent as its "allocable share." ¶ 29. The OPMs also agreed, per the terms of the MSA, to various restrictions or bans on advertising and political lobbying, trade association activities, and the assertion of legal challenges to state laws and rules regulating tobacco. ¶ 30.

Other tobacco manufacturers were permitted an opportunity to join the MSA as Subsequent Participating Manufacturers ("SPMs"). OPMs and SPMs are collectively referred to as PMs. Those SPMs who joined the MSA within a ninety-day window were granted an exemption on payments as long as their market share does not exceed the larger of their 1998 market share or 125 percent of their 1997 market share. ¶ 34. If an SPM increases its market share, it is required to make a higher MSA payment on additional packs of cigarettes than what the OPMs pay on each additional pack they sell. Thus, Plaintiffs allege, if an SPM increases its market share by underpricing the OPMs, its payments under the MSA will increase by more than its gain. ¶ 35. Plaintiffs allege that these and other provisions of the MSA were designed to freeze the market share of SPMs at no more than their 1997 or 1998 levels, thereby preserving the Majors' dominant position. ¶ 36.

The MSA also includes provisions that if one of the OPM's loses market share in a particular year, a nationally recognized firm of economic consultants, designated as "The Firm" is to determine whether the restraints imposed by the MSA were a significant factor

contributing to the market share loss. If so, the OPM's payments under the MSA may be reduced by as much as three times its market share loss. This provides an incentive to a settling state to protect the market share of the OPM's. ¶ 38. The potential reduction is known as the Non-Participating Manufacturer Adjustment (or "NPM Adjustment"). The ability of non-participating manufacturers (who are not required to make payments under the MSA) to sell their brands at lower prices poses a threat to the market share held by the OPM's. The NPM Adjustment is imposed only on those states that fail to enforce a Qualifying Statute prescribed by the MSA. This provides a strong incentive for all states to enact a Qualifying Statute. If all but one state were to enact a Qualifying Statute, then the entire NPM Adjustment would be applied to reduce that one state's MSA payments. ¶ 39.

The MSA, standing alone, would appear to put PM's at a cost disadvantage in comparison to NPMs, because the PMs would have to raise prices to cover their MSA payments. That would allow NPM's, including some of the Plaintiffs in this action, to sell at lower prices and increase their market share. The Qualifying Statute that the states were required to enact to avoid feeling the disproportionate effect of the NPM Adjustment is designed to prevent NPMs from gaining such an advantage. Louisiana enacted the model statute, provided for in the MSA, as La.R.S. 13:5061-63. The statute requires every NPM selling cigarettes in Louisiana to either (1) become a PM under the MSA's terms or (2) make an annual deposit into an escrow fund. The amount of the deposit is calculated pursuant to a formula that considers the numbers of cigarettes sold in Louisiana during the prior year.

Accrued interest is paid out to the NPM, and the principal is either paid to the state to satisfy a judgment against the NPM, or, if 25 years pass without such a judgment, returned to the NPM. ¶ 41.

The National Association of Attorneys General ("NAAG") is directed by the MSA to provide coordination and facilitation for the implementation and enforcement of the MSA on behalf of the attorneys general of the settling states. States must notify NAAG in advance of any planned enforcement proceedings, and NAAG coordinates discovery in such proceedings. The NAAG also provides guidance to state assistant attorneys general and legislators about what action by states is sufficient to comply with a state's duty to diligently enforce the MSA. ¶ 31. Payments made by PM's pursuant to the MSA are not paid directly to the individual states. Rather, payments are made to an escrow agent selected by the NAAG and the OPMs, and payments are later made to the settling states.

**Tenth Amendment**

The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." Plaintiffs allege that the MSA violates the Tenth Amendment "by commandeering state legislatures to adopt the Qualifying Statute and delegating their powers to bodies outside the control of either the state or federal governments." Complaint, ¶ 85. Plaintiffs contend that the states' delegation of authority to the NAAG and the Firm wrongfully give power to those bodies in perpetuity.

The Tenth Amendment decisions reviewed by the court involve challenges to federal legislation that infringes upon the powers reserved to the states or the people. The Supreme Court recently stated that when examining congressional enactments for infirmity under the Tenth Amendment, the Court "has focused its attention on laws that commandeer the States and state officials in carrying out federal regulatory schemes." McConnell v. Federal Election Commission, 124 S.Ct. 619, 685 (2003). The Tenth Amendment confirms that the power of the federal government is subject to limits that may preclude it from compelling the states to implement federal regulatory programs or otherwise intruding upon the state's reserved powers. City of Abilene v. U. S. E. P. A, 325 F.3d 657, 661-62 (5th Cir. 2003).

Plaintiffs argue that if the Tenth Amendment and concepts of federalism that it represents preclude the states from delegating their sovereign powers to the national government, then, *a fortiori,* the states may not delegate their inherent powers to somebody outside the Constitution, including bodies of their own creation. Plaintiffs have not, however, cited any case in which the Tenth Amendment has been held to render unconstitutional an action taken by a state that is similar to Louisiana's participation in the MSA. There is no allegation that the federal government had any involvement in the implementation of the MSA, so there is no basis to conclude that the MSA runs afoul of the federalism principles represented by the Tenth Amendment.

There is also doubt as to whether Plaintiffs have standing to assert a Tenth Amendment claim. See Gaubert v. Denton, 1999 WL 350103 (E. D. La. 1999) (Clement, J.) (noting that some cases indicate that private parties have Tenth Amendment standing but

rejecting those cases in favor of Supreme Court precedent). See also Pierce County v. Guillen, 123 S.Ct. 720, 732, n. 10 (2003) (finding no need to decide Tenth Amendment standing issue in light of resolution of case on other grounds). The standing issue need not be addressed in this case given the recommendation that the Tenth Amendment claim be dismissed pursuant to Rule 12(b)(6).

**Federal Cigarette Labeling and Advertising Act**

The Federal Cigarette Labeling and Advertising Act ("FCLAA"), 15 U.S.C. §1331 et seq., sets forth a comprehensive federal program to deal with cigarette labeling and advertising. Section 1333 makes it unlawful to manufacture or sell cigarettes if the package does not bear one of four prescribed warnings. Similar warnings are required to be included in advertising and on billboards. Section 1334(a) provides that no statement relating to smoking and health, other than the statement required by Section 1333, shall be required on any cigarette package. Subsection (b) sets forth a preemption provision as follows: "No requirement or prohibition based on smoking and health shall be imposed under state law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter."

The MSA places restrictions on each OPM and any PM who later agrees to join the MSA. Those restrictions include a ban on cartoons in advertising, prohibitions on the sponsorship of national sports teams or leagues, and a ban on sponsoring displays or references to tobacco products on television or in motion pictures or video games. There are other restrictions, but these are representative.

Plaintiffs allege that the MSA and Qualifying Statute result in Louisiana imposing a national regulatory scheme on the advertising of cigarettes that violates and is preempted by the FCLAA. Plaintiffs allege that the Qualifying Statute "compels cigarette makers to either join the MSA and thus restrict their advertising, or make substantial annual payments into escrow." Complaint, ¶¶ 73-5. Plaintiff S&M Brands alleges that it advertises in ways that would be prohibited or curtailed if it joined the MSA. ¶ 77.

Plaintiffs apparently realized that the MSA, standing alone, is a mere agreement between Louisiana and parties who consent to its terms so is not a requirement or prohibition on advertising that is "imposed under State law" so as to be preempted by Section 1334(b). The Qualifying Statute, which is state law, does not itself contain any restrictions on advertising. Rather, it requires that any NPM selling cigarettes in Louisiana either (1) become a PM by joining the MSA or (2) deposit money annually into the refundable escrow account to secure possible judgments. Thus, nothing in the statute is preempted by the FCLAA.

Plaintiffs argue that the statute is nonetheless preempted because it coerces them to join the MSA and subject themselves to regulation that a state would not be permitted to enact. Two courts have rejected this argument. In PTI, Inc. v. Philip Morris, Inc., 100 F.Supp.2d 1179, 1205 (C. D. Cal. 2000), the court held that plaintiffs who had not joined the MSA lack standing to challenge the voluntary advertising restrictions agreed to by parties to the MSA. That rationale was followed in Grand River Enterprises Six Nations, Ltd. v. Pryor, 2003 WL 22232974, *17 (S.D. N.Y. 2003). The Grand River court later granted

reconsideration in part, but it did not change its decision with respect to this preemption issue. Grand River, 2004 WL 1594869 (S.D. N.Y. 2004). The district court also made a Rule 54(b) certification that permitted an immediate appeal of several issues, including the preemption issue. The Second Circuit Court of Appeals mentioned the preemption claim as among the issues presented and, although it devoted substantial attention to other claims, it appears to have affirmed dismissal of the preemption claim in one sentence: "We have carefully considered appellant's other arguments and find them to be without merit." Grand River Enterprises Six Nations Ltd. v. Pryor, 425 F.3d 158, 175 (2d Cir. 2005), petition for cert. filed, 74 U.S.L.W. 3618 (April 18, 2006).

None of the Plaintiffs in this case allege that they have joined the MSA through the alleged coercion or otherwise. The two manufacturer plaintiffs are S&M Brands, Inc. that alleges "it is not a signatory to the MSA" and CLP, Inc., which alleges that it is a NPM and "is compelled to make escrow payments" required by the statute. Complaint, ¶¶ 12-13. It is recommended that the FCLAA preemption claim presented by these plaintiffs be rejected for the same reasons stated in PTI and Grand River.

**Commerce Clause**

Plaintiffs allege that the MSA, by basing the amount of payments under the MSA on national market share, regulates interstate commerce in an extraterritorial fashion and, thus, violates the Commerce Clause and Due Process Clause. Plaintiff Heacock, an individual smoker, alleges that he is injured by the increase in the price of cigarettes that has occurred

even outside the settling states. Complaint, ¶ 79. Plaintiffs allege that the Qualifying Statute is similarly unconstitutional because of its alleged extraterritorial reach.

Plaintiffs assert that any NPM, wherever located and irrespective of whether it conducts business in Louisiana, is subject to Louisiana's escrow payment requirements if any of the NPM's cigarettes are sold to consumers in Louisiana, provided that the NPM "intended" that its cigarettes be sold anywhere in the United States. Plaintiffs assert that a manufacturer such as CLT, Inc. must make Louisiana escrow payments with respect to cigarettes it sells in non-MSA states such as Mississippi, Texas or Florida if those cigarettes are then resold in Louisiana, without CLP's knowledge or permission, by persons over whom CLP has no control. ¶¶ 81-82. CLP alleges that these requirements force it to raise its prices in all states to cover the costs of compliance and to take costly precautions, such as sending officers to distant states to monitor distributors and ensure that they attach to CLP's products the tax stamp of the state in which CLP intends that the products be sold. The Qualifying Statute is, therefore, alleged to be invalid because (1) it directly regulates and controls interstate commerce occurring outside Louisiana, (2) it imposes a burden on interstate commerce that is clearly excessive in relation to any local benefits, and (3) it is not substantially related to any valid state interests. ¶ 83.

The Commerce Clause gives Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U. S. Constitution, Article 1, Section 8, Clause 3. Although the Commerce Clause speaks only of Congress's power, there is also a dormant or negative aspect of the Clause that limits the

power of the states to regulate commerce. Piazza's Seafood World, L.L.C. v. Odom, 448 F.3d 744, 749 (5th Cir. 2006). To determine whether a state statute violates the dormant Commerce Clause, the court conducts a two-tiered analysis. It first looks to whether the statute facially discriminates against out-of-state economic interests. Laws that fall in that category and discriminate against interstate commerce on their face are almost per se invalid. National Solid Waste Management Association v. Pine Belt Regional Solid Waste Management Authority, 389 F.3d 491, 497 (5th Cir. 2004).

A review of some additional portions of the relevant statutes will assist in the analysis of this issue. Louisiana law requires that any "tobacco product manufacturer selling cigarettes to consumers within the state" whether directly or through a distributor or other intermediary must (1) become a PM by joining the MSA or (2) place into a qualified escrow fund an annual amount prescribed by statute "per unit sold." La.R.S. 13:5063. A "tobacco product manufacturer" is defined broadly to include any entity that manufactures cigarettes anywhere that the manufacturer "intends to be sold in the United States." La.R.S. 13:5062(9). That definition is broad, but it does not mean that the Louisiana statutes govern all such manufacturers. Rather, only a tobacco product manufacturer "whose cigarettes are sold in this state" must annually certify compliance with the law and provide a list of its brand families that have recently been sold in the state. La.R.S. 13:5073(A). And it is unlawful for any person to affix a stamp to or sell cigarettes in Louisiana that come from a tobacco product manufacturer or brand family that has not been properly certified and included in a directory prepared by the state. § 5073(C). The relevant statutes also limit the escrow

payments, through the definition of "units sold," to an amount based on the number of cigarettes "sold in the state" by the applicable tobacco product manufacturer. § 5062(10).

The statutes are not facially discriminatory against interstate commerce. They do not afford different treatment to in-state and out-of-state economic interests to the benefit of in-state interests. All NPMs, whether from Louisiana or another state, are treated the same and subject to the same requirements. To the extent the statutes may affect prices charged by out-of-state distributors, the situation is no different from when any business incurs higher expenses as a result of regulations imposed by one or more states. The business is free to pass those expenses on to its customers in the states that caused the expenses or pass the expenses on to all of its customers, including customers in other states. The business's decision to choose the latter course does not render the state's regulation unconstitutional. Nothing in Louisiana's statutes controls the sale or cost of cigarettes in transactions occurring outside the state. Thus, the rule of per se invalidity does not apply. See Star Scientific, Inc. v. Beales, 278 F.3d 339, 355-56 (4th Cir. 2002) (reaching same conclusion in review of Virginia's similar legislation) and Grand River Enterprises, 425 F.3d at 168 (same result in review of New York legislation).

Plaintiffs urge that the Qualifying Statute does directly regulate interstate commerce by "linking escrow payments to MSA payments" and effectively regulating the price for goods in interstate commerce. Actually, the escrow payments are based on a rate "per unit sold" which is defined as those cigarettes sold in Louisiana. The escrow payment amount is not linked to the MSA. The only link to the MSA is if the tobacco product manufacturer

requests a return of escrow payments before the 25 years expires. Section 5063(C)(2) provides that the principal in an escrow fund shall be released under only two circumstances. The first is to pay a judgment or settlement on a claim brought by the state against the manufacturer. The second is when the manufacturer establishes that the amount it has paid into escrow on account of units sold in the state in a particular year was greater than it would have paid under the MSA had it been a PM. The PM's payment would have been based on its national market share. If the manufacturer establishes such an excess payment, the funds may be returned to it from escrow. By permitting a manufacturer to reduce the amount it must keep in escrow in Louisiana based on a formula that considers the manufacturer's national market share, Louisiana does not control the price charged by that manufacturer or others for a pack of cigarettes sold outside Louisiana.

The second category of statutes that can run afoul of the Commerce Clause are even-handed statutes that effectuate a legitimate local interest and that only incidentally affect interstate commerce. Courts apply the Pike balancing test to such statutes. A statute will be upheld unless the burden it imposes on interstate commerce is clearly excessive in relation to the putative local benefits. National Solid Waste, 389 F.3d at 497, citing Pike v. Bruce Church, Inc., 90 S.Ct. 844 (1970). If a legitimate local purpose is found, the question becomes one of degree. The extent of the burden that will be tolerated will depend on the nature of the local interest involved and whether the interest could be promoted as well with a lesser impact on interstate activities. Pike, 90 S.Ct. at 847.

Louisiana's statutes serve a legitimate state interest. The legislation includes findings that cigarette smoking costs Louisiana millions of dollars each year to provide medical assistance for persons with health conditions associated with smoking. The findings acknowledge the MSA and the obligations of PM's to make payments to the state to compensate it for those losses. The legislature also found that it would be contrary to state policy if tobacco manufacturers (such as two of the plaintiffs) who do not enter into such a settlement could use the resulting cost advantage to derive large, short-term profits in the years before their liability might arise but without insuring that the state would have an eventual source of recovery. Thus, the escrow funds were established to guarantee a source of compensation and prevent manufacturers who were not members of the MSA from earning quick, large profits and then becoming judgment-proof before being sued by the state. La.R.S. 13:5061. That is an important local interest.

Plaintiffs argue that the competing burdens include the obligation of a tobacco product manufacturer to take precautions in distant states to monitor distributors to ensure that they attach to the manufacturer's cigarettes the tax stamp of the state in which the manufacturer intends those cigarettes to be sold. That is because an escrow payment is due on cigarettes sold in Louisiana, whether directly or through a distributor. But a manufacturer should be able to contractually obligate those who purchase cigarettes from it to distribute the cigarettes only for sale in particular states. Furthermore, if the manufacturer has not filed the proper certificates to have a particular brand approved for sale in Louisiana, it is illegal for a distributor to sell that brand in the state. Louisiana law, La.R.S. 13:5073(C), makes it

unlawful for "any person" to sell a brand or affix a stamp to a package of a brand that has not been properly certified by the manufacturer and approved by the state. These rules reduce the alleged burden that manufacturers have to monitor the stream of their products.

Considering the important state interests advanced by the challenged statutes and the minimal burden placed on interstate commerce by its operations, the undersigned concludes that the burden on interstate commerce is not clearly excessive when compared to the strong local benefits. Accordingly, the Commerce Clause claim fails on this theory. See Star Scientific, 278 F.3d at 356-57 (reaching same conclusion with respect to Virginia law) and Grand River, 425 F.3d at 169-70 (same conclusion under New York law). A Commerce Clause challenge to Pennsylvania laws was similarly rejected in Mariana v. Fisher, 226 F.Supp. 2d 575, 583-86 (M.D. Penn. 2002). The Third Circuit affirmed Mariana, but the Court of Appeals based its decision on a lack of standing by the user-plaintiffs (unlike the manufacturers and distributors who are plaintiffs in this case) rather than the merits. Mariana v. Fisher, 338 F.3d 189, 204-06 (3d Cir. 2003). A Commerce Clause claim brought in another Louisiana federal court was dismissed under Rule 12(b)(6) in Xcaliber International Ltd., LLC v. Ieyoub, 377 F.Supp.2d 567, 577-78 (E.D. La. 2005)(Lemmon, J.). The plaintiff tobacco company in Xcaliber succeeded in obtaining a ruling from the Fifth Circuit that the district court had erred in dismissing the company's free speech, equal protection and procedural due process claims that were based on the effect of a 2003 amendment to the Louisiana statutes, but the plaintiff "d[id] not challenge the dismissal of its Commerce Clause claim" in its appeal. Xcaliber International Ltd., LLC v. Foti, 442 F.3d 233 (5th Cir. 2006).

Most courts end the Commerce Clause analysis here, but the Second Circuit recently looked to a third theory and declined to grant 12(b)(6) relief when the tobacco company plaintiffs alleged that the aggregate effect of the state's statutes enacted in connection with the MSA is to create a sort of "interstate regulatory gridlock" that results in higher prices nationwide. Grand River, 425 F.3d at 171. When Grand River later moved for a preliminary injunction, the district court noted the Second Circuit's holding that the claim cleared the Rule 12(b)(6) hurdle, but it found there was not a sufficient likelihood of success on the merits to warrant injunctive relief. The court found that Grand River had not shown that the challenged scheme resulted in interstate price control. The challenged statute did not make cigarette prices or escrow payments in a particular state dependent on prices or escrow payments in other states, and it did not have any effect on price or escrow payments by NPM's in other states. Grand River Enterprises Six Nations, Ltd. v. Pryor, 2006 WL 1517603 (S.D. N.Y. 2006). The undersigned has considered those authorities as well as the "interstate regulatory gridlock" arguments made by Plaintiffs and respectfully takes a different path from the Second Circuit by recommending that the claims in this case be dismissed pursuant to Rule 12(b)(6). If each state ties a fee or escrow payment to a company's national market share, that may have a nationwide effect that increases prices, but Louisiana's participation in the MSA and its related legislation do not control or regulate prices or escrow payments paid in other states.

Plaintiffs include with their Commerce Clause claim a similar Due Process Clause claim based on the alleged extraterritorial effect of the statute. Plaintiffs complain that

Louisiana's statutes impose escrow requirements on a tobacco product manufacturer, even if the manufacturer does not directly sell cigarettes in Louisiana, merely because its cigarettes are later resold in Louisiana. There is no allegation, however, that any of the Plaintiffs is at risk of such extraterritorial application. Plaintiff CLP, Inc. alleges that it sells tobacco in Louisiana. Complaint, ¶ 13. S&M Brands, Inc. alleges that it is a Virginia company that would seek to sell cigarettes in Louisiana but for the obstacles to competition posed by Louisiana's Qualifying Statute. ¶ 12. S&M does not allege facts to show that it lacks sufficient contacts with Louisiana to warrant application of the statute to it based on sales that might originate in other states. Considering the Fifth Circuit's broad view of the stream of commerce theory of personal jurisdiction, the facts alleged in the complaint do not present a basis to further explore this claim. See Luv n' Care, Ltd. v. Insta-Mix, Inc., 438 F.3d 465 (5th Cir. 2006), cert. denied, 126 S.Ct. 2968 (2006)(applying stream of commerce theory).

**Compact Clause**

The Compact Clause of Article 1, Section 10, Clause 3 of the Constitution provides: "No State shall, without the Consent of Congress, . . . enter into any Agreement or Compact with another State, or with a foreign Power ... ." Read literally, the Clause would require the states to obtain congressional approval before entering into any agreement among themselves. Academics and litigants often advocate a literal application of the Clause, but the Supreme Court has held that the application of the Clause is limited to agreements that are directed to the formation of any combination tending to the increase of political power in the states, which may encroach upon or interfere with the just supremacy of the United

States. United States Steel Corp. v. Multistate Tax Commission, 98 S.Ct. 799, 812 (1978). Group action by states may increase their bargaining power when dealing with corporations. "But the test is whether the Compact enhances state power *quoad* the National Government." 98 S.Ct. at 812-13. The compact does not have to actually take power from the federal government. "[T]he pertinent inquiry is one of potential, rather than actual, impact upon federal supremacy." Id. at 812.

The compact at issue in United States Steel Corp. was the Multistate Tax Compact, which established the Multistate Tax Commission in an effort to better address the problem of member states in properly determining and collecting state and local taxes from businesses with interstate operations. The Commission was made up of the tax administrators from all member states, and the Commission was authorized to adopt uniform advisory regulations. Parties who faced threats of audits by the Commission asserted a Compact Clause challenge on the grounds that the compact encroached upon federal supremacy with respect to interstate commerce. The Court rejected the challenge, finding that the compact was not an effort by the member states to "aggrandize their power or threaten federal control of commerce." 98 S.Ct. at 814.

Plaintiffs allege that the MSA has not been approved by Congress and violates the Compact Clause. They contend that the MSA encroaches upon federal authority because it potentially violates federal antitrust laws, the First Amendment, the Commerce Clause, federal cigarette labeling and tobacco control laws, and the Bankruptcy Code. Similar challenges have been rejected. Star Scientific, 278 F.3d at 359-60; PTI, Inc. v. Philip Morris,

Inc., 100 F.Supp.2d 1179, 1197-98 (C.D. Cal. 2000); and Hise v. Philip Morris, Inc., 46 F.Supp.2d 1201, 1210 (N.D. Okla. 1999). The district court in Mariana v. Fisher also rejected such a claim on the merits, 226 F.Supp.2d at 586-87, but the Third Circuit found that the consumer plaintiffs did not have standing to assert a claim. Mariana, 338 F.3d at 204-06.

None of the reported decisions has devoted extensive attention to the claim before rejecting it. The Fourth Circuit, in Star Scientific, compared the MSA to the compact at issue in United States Steel v. Multistate Tax Commission and concluded that the MSA, like the agreement at issue before the Supreme Court, may have increased the bargaining power of the states but that increase in power does not interfere with federal supremacy because the MSA does not purport to authorize the member states to exercise any powers they could not exercise in the absence of the MSA. The Fourth Circuit also observed that the MSA does not derogate from the power of the federal government to regulate tobacco; some of MSA's provisions anticipate that Congress may, in the future, pass laws regulating tobacco. The Fourth Circuit also concluded that the MSA did not derogate from federal bankruptcy authority because the provision of the MSA addressing bankruptcy issues states that it is only enforceable if consistent with the Bankruptcy Code.

Plaintiffs take issue with Star Scientific, and they add that they raise arguments not discussed in that appellate decision. Plaintiffs do raise some different arguments, but their concerns about the MSA's potential violations of antitrust laws, the First Amendment and other federal laws do not equate to the states enhancing their political power in a way that encroaches upon the supremacy of the federal government. If the MSA actually violates

antitrust laws, the First Amendment or other federal laws, a party with proper standing may bring a suit under those laws to enforce them. But the potential for such claims does not require the court to annul the MSA as a violation of the Compact Clause. The legal standard described in <u>Multistate Tax Commission</u> is quite friendly to such multistate agreements. The dissenters in that case and Plaintiffs in this action take issue with the standard, but it must be applied, and it does not provide a basis for a claim in this case.[1]

Accordingly,

**IT IS RECOMMENDED** that the **Motion to Dismiss (Doc. 13)** be **granted** by (1) dismissing Plaintiffs' Tenth Amendment claim without prejudice for lack of standing and (2) dismissing all of Plaintiffs' remaining claims with prejudice for failure to state a claim upon which relief can be granted.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are

---

[1] The Fifth Circuit recently issued a decision in a case that put at issue the interpretation of provisions in a tobacco settlement agreement between Texas and five large tobacco companies. Texas is not a party to the MSA, and the MSA was excluded as evidence in that case. <u>State of Texas v. American Tobacco Co.</u>, ___ F.3d ___, 2006 WL 2522411, n.1 (5th Cir. 2006). The decision does not address any of the issues that are the subject of this Report and Recommendation.

directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED at Shreveport, Louisiana, this the 5th day of September, 2006.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE