United States Court of Appeals
Fifth Circuit

**F I L E D**
August 10, 2010

Lyle W. Cayce
Clerk

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

RECEIVED
SEP 03 2010
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT, LOUISIANA

No. 09-30985

D.C. Docket No. 5:05-CV-1372

S&M BRANDS INC.; TOBACCO DISCOUNT HOUSE #1 INC.; MARK HEACOCK,

    Plaintiffs - Appellants

v.

JAMES D. "BUDDY" CALDWELL, in his official capacity as Attorney General State of Louisiana,

    Defendant - Appellee

Appeal from the United States District Court for the
Western District of Louisiana, Shreveport

Before DAVIS, SMITH, and HAYNES, Circuit Judges.

## J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

It is ordered and adjudged that the judgment of the District Court is affirmed.

IT IS FURTHER ORDERED that plaintiffs-appellants pay to defendant-appellee the costs on appeal to be taxed by the Clerk of this Court.

ISSUED AS MANDATE: SEP 1 2010

A True Copy
Attest

Clerk, U.S. Court of Appeals, Fifth Circuit
By: _____
Deputy
SEP 1 2010

New Orleans, Louisiana

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

RECEIVED
SEP 03 2010
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT, LOUISIANA

United States Court of Appeals
Fifth Circuit

**FILED**
August 10, 2010

No. 09-30985

Lyle W. Cayce
Clerk

S&M BRANDS INC.; TOBACCO DISCOUNT HOUSE #1 INC.; MARK HEACOCK,

    Plaintiffs - Appellants

v.

JAMES D. "BUDDY" CALDWELL, in his official capacity as Attorney General State of Louisiana,

    Defendant - Appellee

---

Appeal from the United States District Court
for the Western District of Louisiana

---

Before DAVIS, SMITH, and HAYNES, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

    Plaintiffs appeal the district court's grant of summary judgment in favor of the Attorney General of Louisiana. This case arises out of the Master Settlement Agreement ("MSA") reached in the 1990s between the four largest tobacco manufacturers and the several states. The plaintiffs—who are not signatories to the MSA—sued the Louisiana Attorney General, alleging that the MSA and the Louisiana Escrow Statute, LA. REV. STAT. § 13:5061, *et seq.*, violate the Compact Clause, First Amendment, Federal Cigarette Labeling and

Advertising Act ("FCLAA"), Commerce and Due Process Clauses, and federal antitrust laws. For the following reasons, we AFFIRM.

I.

In 1994, several states, including Louisiana, brought lawsuits against the four largest tobacco manufacturers: Philip Morris, R.J. Reynolds, Lorillard, and Brown & Williamson (collectively referred to as the Original Participating Manufacturers "OPMs"). The states alleged that the OPMs' tobacco products, as well as the marketing related to their tobacco products, cost the states billions of dollars in increased health care costs.

In 1998, the OPMs reached a settlement agreement, the MSA, with fifty-two governmental entities (collectively referred to as the "Settling States"), including Louisiana. The MSA released the OPMs from past, present, and future tobacco-related legal claims. In return, the OPMs were prohibited from participating in certain types of tobacco-related state and federal lobbying, engaging in litigation adverse to the MSA or its enacting state statutes, and various types of advertising. The OPMs also were required to make annual payments into a fund (hereinafter "the MSA fund") based on their present market share. Money paid into the MSA fund is paid out in fixed shares to the individual Settling States.

Smaller tobacco manufacturers that were not part of the OPMs were permitted to join the MSA as Subsequent Participating Manufacturers ("SPMs"). The MSA created two groups of SPMs. The first group (hereinafter the "grandfathered SPMs") included those SPMs that signed on to the MSA within the first 90 days of its execution. As a means of encouraging smaller tobacco manufacturers to become grandfathered SPMs, the MSA provides that grandfathered SPMs do not have to pay into the MSA fund, so long as their market share does not exceed the greater of their 1998 sales or 125% of their

2

1997 sales. The second group (hereinafter the "non-grandfathered SPMs") are those SPMs that joined the MSA after 90 days of its execution. Non-grandfathered SPMs must pay into the MSA fund based on their annual market share, but unlike grandfathered SPMs, they need not remain at the same market size as when the MSA was executed. Both grandfathered SPMs and non-grandfathered SPMs must abide by the aforementioned prohibitions in lobbying, litigation, and advertising that OPMs are subject to under the MSA.

In return for the above concessions, the MSA encourages, but does not demand, that the Settling States pass a Model Statute (hereinafter the "Escrow Statute"). The Escrow Statute requires that tobacco manufacturers not participating in the MSA (referred to as Non-Participating Manufacturers ("NPMs")) and selling tobacco products in the state either (1) join the MSA or (2) make an annual deposit into a qualified escrow account based on the quantity of cigarettes the NPM sold in the state during the previous calendar year. To encourage the Settling States to pass the Escrow Statute, the NPM Adjustment was created. The MSA provides that if any of the OPMs, grandfathered SPMs, or non-grandfathered SPMs (collectively the "PMs") lose its market share, a nationally-recognized firm of economists will be hired to determine whether the loss in market share is due to the aforementioned restraints in lobbying, litigation, and advertising required by the MSA. If those restraints are determined by the economists to be a significant factor contributing to the loss of market share, then the PM may reduce the amount it pays into the MSA fund. This reduction is the NPM Adjustment, which is borne only by the Settling States that have not enacted the Escrow Statute. Louisiana enacted an Escrow Statute, LA. REV. STAT. § 13:5061, *et seq.* Under the Louisiana Escrow Statute, if an NPM fails to join the MSA or fails to make the appropriate annual deposit into a qualified escrow account, the NPM is subject to civil and criminal penalties. LA. REV. STAT. §§ 13:5073, 5076. However, if an NPM pays more to

the qualified escrow account than it would have to pay if it were a non-grandfathered SPM, the NPM is entitled to a refund of the excess amount it paid. LA. REV. STAT. § 13:5063(C)(2)(b).

## II.

Since its implementation, several NPMs and smokers have challenged the validity of the MSA and state Escrow Statutes before a number of courts, including, most recently, this court.[1] This case is yet another challenge to the MSA and Louisiana Escrow Statute.

The plaintiffs[2] filed suit against the defendant, Louisiana Attorney General Buddy Caldwell, seeking to invalidate the MSA and Louisiana Escrow Statute on the grounds that they were unconstitutional because they violated the Compact Clause, the First Amendment, the Commerce Clause, and the Due Process Clause. The plaintiffs further alleged the MSA and Escrow Statute violated federal antitrust laws, the FCLAA, and the Bankruptcy Code.

Following proceedings before the district court, both parties filed motions for summary judgment. Finding there were no genuine issues of material fact, and that the plaintiffs' claims failed as a matter of law, the district court granted the Attorney General's motion for summary judgment and dismissed the plaintiffs' claims with prejudice. The plaintiffs timely filed this appeal. On appeal, the plaintiffs press all of the aforementioned challenges except for their allegation that the MSA and Escrow Statute violate the Bankruptcy Code.

---

[1] *See, e.g., Xcaliber Int'l Ltd. LLC v. Caldwell*, No. 09-30492, 2010 U.S. App. LEXIS 14513 (5th Cir. Jul. 15, 2010); *Grand River Enters. Six Nations v. Beebe*, 574 F.3d 929 (8th Cir. 2009); *KT&G Corp. v. Six*, 535 F.3d 1114 (10th Cir. 2008); *Grand River Enters. Six Nations v. Pryor*, 425 F.3d 158 (2d Cir. 2005); *Star Sci., Inc. v. Beales*, 278 F.3d 339 (4th Cir. 2002).

[2] The specific parties in this case include a cigarette manufacturer who has not joined the MSA, i.e. an NPM (S&M Brands, Inc.), a cigarette dealer (Tobacco Discount House #1), and a smoker (Mark Heacock) (collectively, "the plaintiffs").

No. 09-30985

We review the district court's grant of summary judgment *de novo*. *Breaux v. Halliburton Energy Services*, 562 F.3d 358, 364 (5th Cir. 2009) (citing *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 386 (5th Cir. 2007)).

### III.

We first address the plaintiffs' assertion that the MSA violates the Compact Clause, U.S. CONST., Art. I, § 10, cl. 3, because it is an agreement among the Settling States that has the potential to interfere with the plaintiffs' constitutional rights and has not been approved by Congress. The district court found that the proper analysis to determine whether congressional approval is required under the Compact Clause is the test provided in *United States Steel Corp. v. Multistate Tax Commission*, 434 U.S. 452, 473 (1978): "whether the Compact enhances state power *quoad* the National Government." Because the MSA only increases states' power *vis-a-vis* the PMs and not in relation to the federal government, the district court concluded there was no violation of the Compact Clause.

The Fourth Circuit in *Star Sci.* reached this same end. *See* 278 F.3d at 359–60. The *Star Sci.* court stated:

> Although the Master Settlement Agreement implicates the Compact Clause, we see no reason to conclude that it encroaches on federal power. In *Multi-State Tax Commission*, the Supreme Court upheld a compact resulting in reciprocal State legislation and establishing an administrative body to coordinate State taxation of certain entities. The Court noted that the compact might result in an increase in bargaining power of the member States with respect to the corporations subject to their taxing jurisdictions, but it found such an increase in power to be acceptable because "the test is whether the Compact enhances state power quoad the National Government." Similarly, the Master Settlement Agreement may result in an increase in bargaining power of the States *vis-a-vis* the tobacco manufacturers, but this increase in power does not interfere with federal supremacy because the Master Settlement Agreement

5

"does not purport to authorize the member States to exercise any powers they could not exercise in its absence."

278 F.3d at 360. *See also VIBO Corp. v. Conway*, 594 F. Supp. 2d 758, 785–86 (W.D. Ky. 2009) (finding that the MSA does not violate the Compact Clause because "[a]n increase in the states' collective bargaining power does not result in an accompanying decrease of federal power").

We agree with the reasoning expressed by the Fourth Circuit and the district court in the instant case, and accordingly find no merit in the plaintiffs' Compact Clause challenge.

## IV.

The plaintiffs also argue that the MSA and Escrow Statute are *per se* violations of the Sherman Act, 15 U.S.C. § 1, because the structure of the MSA creates a national cigarette cartel designed to increase the prices paid out to the OPMs and protect the OPMs market share. The plaintiffs further assert that the only defense potentially available to the Attorney General is the implied state-action immunity found under *Parker v. Brown*, 317 U.S. 341 (1943), but that such immunity does not apply in this case where Louisiana acted as a private player when it entered an agreement with other states and the OPMs to restrain trade.

The plaintiffs' argument that the Escrow Statute is a *per se* violation of the Sherman Act is foreclosed by this court's recent decision in *Xcaliber*. The *Xcaliber* court concluded that the Escrow Statute did not "mandate or authorize conduct that necessarily constitutes a violation of the antitrust laws in all cases." 2010 U.S. App. LEXIS 14513, at *14 (quoting *Rice v. Norman Williams Co.*, 458 U.S. 654, 661 (1982)). Moreover, the *Xcaliber* court found that the Escrow Statute did not "pressure [NPMs] to conspire together to set a specific price, to carve up markets, or otherwise to violate antitrust law." *Id.* (citation omitted).

Thus, this court's precedent in *Xcaliber* precludes the plaintiffs' argument that the Escrow Statute violates the Sherman Act.

This court's decision in *Xcaliber*, however, does not complete our antitrust analysis. In *Xcaliber*, the court was faced with a challenge to only the Escrow Statute. *See id.* at *12 n.5. In the present case, the plaintiffs challenge both the Escrow Statute *and* the MSA. Thus, we must also consider whether the MSA and Escrow Statute working together create an antitrust violation.

Whether the MSA and Escrow Statute violate federal antitrust laws has been addressed by the Sixth, Eighth, and Ninth Circuits, and all of those courts have rejected the plaintiffs' arguments. *See Grand River Enters. Six Nations*, 574 F.3d at 936–38; *Sanders v. Brown*, 504 F.3d 903, 908–11 (9th Cir. 2007); *Tritent Int'l Corp. v. Kentucky*, 467 F.3d 547, 557 (6th Cir. 2006). *See also S&M Brands, Inc. v. Summers*, 393 F. Supp. 2d 604, 622 (M.D. Tenn. 2005), *aff'd by*, *S&M Brands, Inc. v. Summers*, 228 F. App'x 560 (6th Cir. 2007) (finding that the MSA and Escrow Statute were immune from challenge on antitrust grounds under the state-action doctrine). The Sixth Circuit in *Tritent* aptly described the argument the present plaintiffs raise and why it must be rejected:

> The PMs' practice of increasing cigarette prices, thus keeping sales volume down, has allowed them to maintain a stable market share. This has resulted in lower payments to the settling states. If Tritent and the other NPMs had chosen not to raise their prices in response to the PMs' price increase, the NPMs' market share would have presumably increased, but this would have subjected them to higher payments under the Escrow Statute. Kentucky's current statutory scheme . . . thus provides a disincentive for the NPMs to engage in price competition with the PMs. The genesis of this anticompetitive behavior, however, stemmed neither from the MSA nor the complementary legislation that Kentucky enacted to give effect to the MSA's provisions. Instead, the behavior with which Tritent *really* takes issue is the behavior of the PMs following the MSA's enactment. Because such behavior was neither mandated nor explicitly authorized by the state of Kentucky, *McNeilus* [*Truck*

*& Mfg., Inc. v. State ex rel. Montgomery*, 226 F.3d 429 (6th Cir. 2000)] forecloses Tritent's argument on this issue.

467 F.3d at 557.

We agree with the Sixth Circuit and the other circuits that have already considered the issue of whether the MSA and Escrow Statute violate the Sherman Act, and we adopt their rationale. Accordingly, we find no merit to the plaintiffs arguments that the MSA and Escrow Statute violate federal antitrust laws.

V.

The plaintiffs also briefly argue that the MSA and Escrow Statute violate the Commerce Clause and Due Process Clause because they create extraterritorial price increases.

The plaintiffs' claims have been soundly rejected by the Fourth, Eighth, and Tenth Circuits. *See Grand River Enters. Six Nations*, 574 F.3d at 943–44; *KT&G Corp.*, 535 F.3d at 1145–46; *Star Sci., Inc.*, 278 F.3d at 356–57. In examining whether the Arkansas Escrow Statute created extraterritorial price increases, the Eighth Circuit stated,

> NPM escrow payments are entirely a function of an NPM's sales in Arkansas. The payments are not based on nationwide sales. Nor has there been a showing by appellants that escrow payments by NPMs in Arkansas have any effect, either directly or indirectly, on cigarette prices in other states. NPMs must make escrow payments *to* Arkansas based on that NPM's cigarette sales *in* Arkansas. Arkansas has no control over cigarette prices in other states. The MSA calculates an NPM's hypothetical MSA payment in order to refund the excess back to that NPM, but it does not allow Arkansas to control commerce in other states.

*Grand River Enters. Six Nations*, 574 F.3d at 944. We agree with the Eighth Circuit's analysis. The Louisiana Escrow Statute and the MSA only allow

8

Louisiana to regulate and collect escrow payments based on the sale of cigarettes within Louisiana's jurisdiction. Therefore, there is no violation of the Due Process or Commerce Clause.

## VI.

The remaining challenges brought by the plaintiffs rest on the underlying argument that NPMs are compelled to join the MSA to avoid the economic burdens imposed on them by the Escrow Statute. This argument, however, is also foreclosed by this court's recent decision in *Xcaliber*. In *Xcaliber*, the plaintiff asserted that the Escrow Statute "makes doing business as an NPM so unattractive that it compels NPMs to join the MSA . . . ." 2010 U.S. App. LEXIS 14513, at *28.[3] The court disagreed, finding that there was no evidence that the Louisiana Escrow Statute created a price or non-price disadvantage for NPMs. *Id.* at *29–31. Because no disadvantage is created for NPMs by remaining as NPMs, NPMs are not compelled to join the MSA. *Id.* at *31.

Based on the *Xcaliber* court's conclusion that the Escrow Statute does not compel NPMs to become signatories to the MSA, any argument by the plaintiffs based on this premise is foreclosed. With this in mind, we turn to the plaintiffs' claims that the MSA and the Louisiana Escrow Statute violate the First Amendment, the FCLAA, the Commerce Clause and the Due Process Clause, and antitrust laws.

### A.

The plaintiffs argue that the MSA and Louisiana Escrow Statute violate the First Amendment because the MSA directly restrains the speech of PMs by

---

[3] In *Xcaliber*, the plaintiff challenged the Allocable Share Revocation ("ASR"). The ASR was an amendment that Louisiana, and all Settling States, passed to the original escrow statutes in order to close a loophole in the original escrow statutes that was advantageous to NPMs. *See* 2010 U.S. App. LEXIS 14513, at *6–7 (discussing the reason for the ASR). The Louisiana Escrow Statute considered in the plaintiffs' instant challenge incorporates the alteration of the ASR.

forbidding various forms of lobbying and petitioning activity concerning tobacco products and the MSA itself, as well as prohibiting numerous forms of cigarette advertising.

This same argument was raised in *S&M Brands, Inc. v. Summers*, 393 F. Supp. 2d 604 (M.D. Tenn. 2005), *aff'd*, *S&M Brands, Inc. v. Summers*, 228 F. App'x 560, 563 (6th Cir. 2007). In that case, the court stated,

> The Escrow Act . . . leaves [NPMs] no worse off financially than they would be under the MSA, because it expressly provides that [NPMs] are entitled to a refund on any amounts paid into escrow that they can demonstrate is in excess of the amount they would have paid under the MSA. Further, [NPMs] retain all of the First Amendment and other rights that the PMs gave up when they signed the MSA.

*Id.* at 638. *See also KT&G Corp.*, 535 F.3d at 1134–36 (holding that an escrow statute did not violate NPMs First Amendment rights).

We agree with this reasoning. While the MSA does restrict the speech activities of PMs, the plaintiffs are not PMs and, as previously noted, are not coerced to become PMs. The only statute applicable to the plaintiffs is the Louisiana Escrow Statute, which in no way compels or abridges speech. Therefore, we find no merit to the plaintiffs' First Amendment claims.

### B.

The FCLAA states that "[n]o requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter." 15 U.S.C. § 1334(b). The plaintiffs argue that the MSA and Escrow Statute violate the FCLAA because the FCLAA preempts state regulations targeting cigarette advertising, and the MSA and Escrow Statute prohibit certain forms of cigarette advertising.

This same argument has been raised and rejected in *Grand River Enters. Six Nations, Ltd. v. Pryor*, 2003 U.S. Dist. LEXIS 16995, at *48–50 (S.D.N.Y.

2003), *aff'd by*, *Grand River Enters Six Nations, Ltd.*, 425 F.3d at 175, and *PTI, Inc. v. Philip Morris Inc.*, 100 F. Supp. 2d 1179, 1205 (C.D. Cal. 2000). Like the district court below, we agree with the rationale expressed in those decisions. The plaintiffs are not compelled to join the MSA and the Louisiana Escrow Statute "does not have any connection whatsoever with cigarette packaging, advertising, or promotion." *PTI, Inc.*, 100 F. Supp. 2d at 1205. Therefore, the plaintiffs' FCLAA argument must fail.

## CONCLUSION

For the above reasons, we AFFIRM the district court's grant of summary judgment in favor of the Attorney General.

AFFIRMED.

# United States Court of Appeals
## FIFTH CIRCUIT
### OFFICE OF THE CLERK

LYLE W. CAYCE
CLERK

TEL. 504-310-7700
600 S. MAESTRI PLACE
NEW ORLEANS, LA 70130

*RECEIVED SEP 03 2010 TONY R. MOORE, CLERK WESTERN DISTRICT OF LOUISIANA SHREVEPORT, LOUISIANA*

September 01, 2010

Mr. Tony R. Moore
Western District of Louisiana, Shreveport
United States District Court
300 Fannin Street
Suite 1167
Shreveport, LA 71101-0000

No. 09-30985, A B Coker Co., Inc., et al v. James Caldwell
USDC No. 5:05-CV-1372

Enclosed, for the Western District of Louisiana, Shreveport only, is a copy of the judgment issued as the mandate.

Enclosed, for the Western District of Louisiana, Shreveport only, is a copy of the court's opinion.

Record/original papers/exhibits are returned:
✓ ( 1 ) Volume trans ( 1 ) Envelope ✓ ( 2 ) ~~Box~~ cont. exh.
✓ The electronic copy of the record has been recycled.

Sincerely,

LYLE W. CAYCE, Clerk

By: _____
Nancy F. Dolly, Deputy Clerk
504-310-7683

cc: (letter only)
Mr. Hans Frank Bader
Mr. Richard A. Curry
Mr. W. Wayne Gaudin Jr.
Mr. Billy James Guin Jr.
Mr. Michael Brent Hicks
Honorable S. Maurice Hicks Jr.
Mr. Erik Scott Jaffe
Mr. Sam Kazman
Mr. Gary Dean Wilson
Ms. Stacie L deBlieux

P.S. To Judge Hicks: A copy of the opinion was sent to your office via email the day it was filed.